770

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| In the Matter of:<br><br>SPRAIN BROOK MANOR, LLC;<br>PINNACLE DIETARY, INC.;<br>CONFIDENCE MANAGEMENT SYSTEMS;<br>SC & BP SERVICE, INC.; AND<br>COMMERCIAL MAINTENANCE CORP.,<br><br>   Respondents,<br>And<br><br>1199 SEIU, UNITED HEALTHCARE<br>WORKERS EAST,<br><br>   Charging Party,<br>And<br><br>LOCAL 713, INTERNATIONAL<br>BROTHERHOOD OF TRADE UNIONS,<br><br>   Party to the Contract,<br>And<br><br>BUDGET SERVICES, INC.,<br><br>   Party to the Contract. | Case No.  02-CB-095670, et al |

The above-entitled matter came on for hearing pursuant to

Notice, before THE HONORABLE KENNETH W. CHU, Administrative Law

Judge, at the National Labor Relations Board, Region 2, 120 W.

45th Street, New York, New York, in Hearing Room 1, on Monday,

December 15, 2014, at 9:30 a.m.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

771

A P P E A R A N C E S

On Behalf of the General Counsel:
     JULIE ULMET, Esq.
     JULIE POLAKOSKI-RENNIE, Esq.
     NICOLE OLIVER, Esq.
     National Labor Relations Board, Region 2
     26 Federal Plaza, Suite 3614
     New York, NY  10278

On Behalf of the Respondent (Pinnacle):
     REBECCA WINKELSTEIN, Esq.
     Jasinski, PC
     60 Park Place, 8th Floor
     Newark, NJ  07102-4412

On Behalf of Respondent (Sprain Brook):
     JEFFREY A. MEYER, Esq.
     Kaufman, Dolowich & Voluck, LLP
     135 Crossways Park Drive, Suite 201
     Woodbury, NY  11797-2005

On Behalf of the Charging Party:
     WILLIAM S. MASSEY, Esq.
     Gladstein, Reif, & Meginnis, LLP
     817 Broadway, 6th Floor
     New York, NY  10003-4709

On Behalf of Party to the Contract (Budget Services):
     AVROM R. VANN, Esq.
     Avrom R. Vann, P.C.
     1211 Avenue of the Americas, 40th Floor
     New York, NY  10036-8718

On Behalf of the Party to the Contract (713):
     BRIAN McCARTHY, Esq.
     Brian C. McCarthy & Associates
     1454 Route 22, Suite B-101
     Brewster, NY  10509

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

772

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Jose Perez | 777 | 793 | 811 | -- | -- |
|  |  | 807 |  |  |  |
|  |  | 810 |  |  |  |
| Shelly Ann Williams | 817 | 844 | 860 | -- | -- |
|  |  | 851 |  |  |  |
| Paula Robinson | 862 | 894 | 902 | -- | -- |
|  |  | 899 |  |  |  |

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

773

E X H I B I T S

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-22(c) | 826 | 828 |
| GC-23(c) | 827 | 828 |
| GC-57 | 818 | (withdrawn) |
| GC-57 (remarked) | 836 | 838 |
| GC-58 | 839 | 840 |
| GC-59 | 883 | 884 |
| GC-60 | 885 | 887 |
| GC-61 | 887 | 889 |
| GC-62 | 890 | 892 |
| RESPONDENT'S (Sprain Brook) | | |
| SB-3 | 805 | 806 |

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

774

P R O C E E D I N G S

(Time Noted: 1:54 p.m.)

ADMINISTRATIVE LAW JUDGE CHU:  On the record.

December 15, 2014, reconvene on the matter of Sprain Brook Manor Rehab, LLC, et al, and 1199 SEIU, and Local 713, Party for the Contract.  There are two case numbers.  I don't think I need to repeat it.  It is all part of the record.

A couple of things I want to just kind of summarize that we discussed off the record.  First, I want to reflect that this proceeding started at 1:45 p.m. due to a snafu in getting the court reporter here on time.

While we were waiting for the court reporter, we had several conversations off the record and I just want to note it for the record, at this time.

With regard to Respondent, Sprain Brook Manor Rehab, LLC, General Counsel has not received any of the subpoenaed documents with respect to Sprain Brook.  As I understand, Mr. Meyer has been trying to contact Mr. Robert Kline, custodian of record for Sprain Brook, and has not been able to do so.  The representation is that Mr. Kline is very sick at the moment and he will continue to make his attempts to reach Mr. Kline.

General Counsel has indicated they may move for an order for sanctions.  And I suggested to Mr. Meyer to try to reach Mr. Kline as soon as possible so I don't have to deal with a motion for sanctions.

With regard to Sprain Brook Manor, LLC, again, the parties may be able to stipulate as to the composition of the employee unit, which may help to alleviate the need for additional documentation.

With regard to Respondent Local 713, I believe the parties have indicated that they may have worked out some stipulation as to what is available depending on the time frame.  And that was pursuant to a subpoena document problem from the General Counsel.  Local 713 also indicated that they will provide an answer to the last consolidated amended complaint when we are on the record, either today or tomorrow, depending on when he speaks to his client.

With regard to Budget, Mr. Vann, welcome.  If you would like, you can state your appearance for the record, at this time.

MR. VANN:  Sure.  It's Avrom R. Vann, Avrom R. Vann, P.C., 1211 Avenue of the Americas, 40th Floor, New York, New York, 10036, for Respondent, Budget Services.

JUDGE CHU:  I just want the record to reflect that there was an order that I had issued on November 17th that Budget Services is added as Respondent pursuant to the General Counsel's motion.  It is my understanding that Budget had provided the subpoenaed documents and that they will provide an answer pursuant to my November 17th order before the end of the week.

And, finally, with regard to Pinnacle, it is my understanding that the answer to the last consolidated amended complaint is in the mail.

Any other points that I failed to mention for the record?

(No response.)

JUDGE CHU:  All right, let's proceed with the next witness.  Who will that be, Ms. Ulmet?

MS. ULMET:  We're calling Mr. Jose Perez.

JUDGE CHU:  Have a seat up here, please, by the court reporter.  Raise your right hand and I'll swear you in as a witness.

(Whereupon,

JOSE PEREZ,

was called as a witness by and on behalf of the General Counsel and, after having been duly sworn, was examined and testified as follows:)

JUDGE CHU:  Thank you.  State for the record your full name and spell your last name, please.

THE WITNESS:  Sure.  My full name is Jose Luis Perez.  The last name is spelled P-E-R-E-Z.

JUDGE CHU:  And I ask that you speak up and speak into the microphone so that we take all your testimony in.  If there are any objections to any of the questions, do not answer that question until I can discuss with the party why there is an objection.  Do you union?

THE WITNESS:  Yes, sir.

JUDGE CHU:  Okay, great.  Thank you.  All right, General Counsels.

DIRECT EXAMINATION

BY MS. ULMET:

Q    Good afternoon, Mr. Perez.

A    Good afternoon.

Q    Mr. Perez, are you currently employed?

A    Yes, I am, ma'am.

Q    Where are you employed?

A    I'm employed at Brookhaven Nursing Home, Far Rockaway, New York.

Q    How long have you been working at Brookhaven Nursing Home?

A    About three months right now, a little bit over three, going on four.

Q    And prior to that time were you employed?

A    Prior to that, I was working for CMS, Confidence Management Systems.

Q    During what time period did you work for CMS?

A    It was about four and a half years during the period of 2010 till 2014.

Q    What was your position at CMS?

A    I was a regional manager for them.

Q    What were your responsibilities as regional manager for CMS generally?

778

A    Basically, oversee multiple accounts within the New York area.

Q    Are you familiar with a nursing home called Sprain Brook?

A    Yes, I am.

Q    How are you familiar with that nursing home?

A    It was one of my accounts.

Q    At CMS?

A    With CMS, yes.

Q    Can you describe for us your responsibilities at CMS, specifically with respect to Sprain Brook?

A    My specific role there was basically to oversee the housekeeping and laundry department, make weekly visits.  There was a transition period.  We just got into the facility -- we just acquired the facility, so it was a new account for me.  But the same thing, just basically check and oversee housekeeping, laundry services, make sure the staff are meeting the standards that CMS looks for, as well as what Sprain Brook wanted.

Q    Do you recall the time period when you had responsibility for the Sprain Brook account?

A    It was about two years ago in the summer, late summer.  I'm guessing right now around August, I acquired that building.

Q    In 2012?

A    In 2012, correct, yes.

Q    So starting in August of 2012.  And do you recall when

779

that -- when your responsibility for Sprain Brook ended?

A    A few months after that, just prior to the winter season.

Q    So during that time period that you were working -- the time period of the late summer of 2012, and the next few months after that, who did you report to at CMS?

A    I reported to Mr. Pat Egan, who was the vice president of the New York area.

Q    Was there anybody that worked -- anyone else from CMS that worked with Sprain Brook who reported to you?

A    Yes, Brian.  I can't remember his last name, but he was the director of housekeeping there.

Q    He was the director of housekeeping at Sprain Brook?

A    Yes.

Q    Was he employed by CM -- who was he employed by?

A    By CMS.  CMS took him on.

Q    When you say they took him on, what does that mean?

A    At one point, he worked for Sprain Brook.  And then when we took over, he joined CMS.

Q    When you took on that account, did you personally have any responsibility, any role in hiring employees to work at Sprain Brook?

A    Yes.  Yes.

Q    Can you describe the hiring process?

A    A typical hiring process will be that there's an opening. We interview a couple of candidates.  And we just hire the best

one we thought possible.  But in Sprain Brook, that's not what happened, though.

Q    Oh, so what happened in Sprain Brook?

A    In Sprain Brook, we, the existing employees that were there, who worked for Sprain Brook, was given the opportunity to get employment through CMS, because there was a company switch or somebody bought somebody out, I don't know the details of that.  But we gave them the opportunity to be employed through CMS.

Q    How often did you visit the Sprain Brook facility during that time, during the time that you had responsibility for Sprain Brook at CMS?

A    A couple of times a week.

Q    During those visits, did you have any interactions with Sprain Brook management?

A    Yes.  It was my responsibility to meet management on every visit.

Q    Can you identify the members of management that you dealt with a Sprain Brook?

A    The key individual I met with was the administrator.  I don't know his full name, but I think his first name was Shalom (sic), something like that.

Q    Okay.  And were there any other members of management that you spoke with at Sprain Brook?

A    Every now and then, I used to speak to one of the owners.

781

I believe that was Ari, something like that.

Q    Anyone else?

A    And then typical nursing on the units, I'll speak to a nursing supervisor, but mostly just the administrator.

Q    Do you know how many -- do you happen to know how many employees CMS had working at Sprain Brook?

A    That would be -- I think it was like four or five floors, about a dozen employees give or take.

Q    Are you familiar with an individual named Clarisse Nogueira?

A    Yes.

Q    How are you familiar with her?

A    She was one of the employees there.  She did housekeeping and laundry services.

Q    Who was she employed by?

A    She was employed by --

MS. WINKELSTEIN:  Objection, Your Honor.  We're here to talk about the employer/employee relationship.  It's a legal conclusion.

MS. ULMET:  I think she was employed by his company and he was a supervisor of her supervisor.  He certainly has personal knowledge to tell us that.

UNIDENTIFIED SPEAKER:  Now counsel is testifying.

JUDGE CHU:  I think that's an issue here is who these people were employed by.  I'm not sure whether this witness can

legally state on the record who this person was employed by.

MS. ULMET:  I can rephrase the question, Your Honor.

JUDGE CHU:  All right.

BY MS. ULMET:

Q    So you said that Ms. Nogueira was a housekeeping employee?

A    Yes.

Q    Do you know whose payroll she was on?

A    I believe she was on the payroll of CMS.

Q    How do you know that?

A    Because we hired her.  We gave her the opportunity to get employed by CMS.

Q    Do you know who supervised Ms. Nogueira?

A    The director of housekeeping, Mr. John or Brian or something like that.

Q    Brian John?

A    Brian John, yes.

UNIDENTIFIED SPEAKER:  Can we get a spelling of that employee's name, the housekeeping employee?

MS. ULMET:  It's in the complaint, but I'll tell you it is C-L-A-R-I-S-S-E, last name Nogueira, N-O-G-U-E-I-R-A.

UNIDENTIFIED SPEAKER:  Thank you.

JUDGE CHU:  Let me go back to what you testified earlier before the General Counsel continues.  You said the hiring process was different when you came to Sprain Brook.  How was it different?

THE WITNESS:  Different in a sense it was -- not that the process was different, but the situation was different where multiple people at one time were given the opportunity to get employed.

JUDGE CHU:  You said this earlier and you said it now again, they were given an opportunity for employment.  Who gave them that opportunity?

THE WITNESS:  CMS.

JUDGE CHU:  Were you directed to give them that opportunity or is that something CMS decided?  How did you go about hiring the majority of the existing employees?

THE WITNESS:  On that specific day, which I don't recall the date --

JUDGE CHU:  That's all right.

THE WITNESS:  I was called in by my vice president to meet him at the location, Sprain Brook, that we are going to give the opportunity for the employees to work for CMS because they were somehow terminated from Sprain Brook.

JUDGE CHU:  Were you given a reason why by your supervisor?

THE WITNESS:  I don't remember the exact detail.  It has to do with something, the building was sold or new management came on board, something to that nature.

JUDGE CHU:  How did you go about hiring the people, the employees?

THE WITNESS:  We, myself and the vice president of CMS, we met early in the morning at Sprain Brook, and we call a meeting.  We gather all the housekeeping and laundry staff, and we told them that you are no longer employed with Sprain Brook, but you are being given the opportunity to work for CMS and we are an outside cleaning service company.  We'll give you applications.  Those who want to continue with us, you can do so.  Fill the application out and we'll take it from there.  Most of the speaking was done by my boss, at that time, which was the vice president.

JUDGE CHU:  Did you do individual interviews of the existing employees who want jobs?

THE WITNESS:  I don't recall doing single interviews, no.  It was more of a mass group.  We told them that if you want to be employed through CMS, these are the rules.  This is the pay scale.  And if you want to, fill out the application and get in.

JUDGE CHU:  Did you do background checks of these employees?

THE WITNESS:  The office did, yes.

JUDGE CHU:  All right, sorry.  Please continue.

BY MS. ULMET:

Q    So we were taking about an individual named Clarisse Nogueira.  And you said you were familiar with her, but what do you remember about that individual?

A    She was one of the staff members of the department.

Q    Do you know for how long she was a staff member of that department?

A    Prior to CMS, I don't know.

Q    And how about after CMS came in?

A    About a month or so.

Q    What happened after that month, why was she not a staff member of the department anymore?

A    She was terminated.

Q    How did she come to be terminated?

A    She was terminated because I terminated her.

Q    Why did you terminate her?

A    I was informed to do so.

Q    By who?

A    By Sprain Brook management.

Q    And when you say Sprain Brook management, which individuals are you referring to?

A    Ari and the administrator, Shalom.

Q    Did you have conversations with either -- let's do them one by one.  Did you have any conversations with Ari about Ms. Nogueira?

A    Brief conversation.  Basically, he just pulled me to the side.  He knew who I was.  And he basically said that they want this individual, who was Ms. Nogueira, due to the fact that she was causing issues in the department, harassing people, and she

786

was not meeting the standards of the department.

Q    Did he say anything else?

A    No.

Q    Did you respond?

A    I responded by telling him that I need to get a hold of my supervisors to get his issues addressed.

Q    Did you have any conversations with the Sprain Brook administrator about Ms. Nogueira?

A    Yes, I have.

Q    Can you describe those -- how many conversations?

A    A couple.  Besides your everyday duties and functions and other issues, but Ms. Nogueira was another issue, same subject, about releasing her.

Q    What reasons did the administrator give you for --

A    Same reason, harassing other employees and not meeting the standards.

Q    Did you take any steps to investigate whether she was, in fact, harassing anyone?

A    Yes, on my weekly rounds.

Q    What did you do?

A    I go up to the units.  I observe to see if she's in the areas that she's supposed to be at, that's number one.  Number two, I'll ask other employees, other members if things are taken care of as far as cleaning-wise, no issues.  I didn't see no issues.  So just those are the things that I did.

787

Q    So you were investigating also whether she was meeting the standards?

A    Pretty much, yes.

Q    Okay.  And were you able to get any additional information about the claim that she was either harassing people or not meeting the standards of the department?

A    From other staff members complaining about she's giving us a hard time, she's harassing us, but not in detail.

Q    Do you know what --

A    Mostly nursing staff.

Q    Do you know what she was supposedly harassing them about?

A    No, just pretty much they were saying to the fact that they were being delayed in their assignments because she was talking too much.

Q    Did you speak to -- do you know who, which people in the nursing department you spoke to?

A    No, I don't recall names, though.

Q    Do you recall what position they had?

A    They could have been supervisors, because it was behind the nursing desk.

Q    Were you able to verify whether she was meeting the standards of the department or not?

A    Yeah, she was meeting the standards.  Every time I walked the floor, she was where she was supposed to be at and she was performing.  She was doing her duties.

Q    Do you know what her duties were?

A    Yes.  If I recall, she worked three days in housekeeping and two days in the laundry room.  So three days she did cleaning, you know, sweep, mop, dust, three days a week.  And the other two days she was giving out linen and accepting the linen.

Q    And she was meeting those responsibilities?

A    Yes.

JUDGE CHU:  Were you instructed to terminate her or were you told to look into it and make an independent decision to terminate her?

THE WITNESS:  No.  I was instructed to do so.

JUDGE CHU:  Then what was the purpose of the investigation?

THE WITNESS:  Not that it was an investigation.  That's just my job.  My job is to follow and make sure that the assignments are getting done.

JUDGE CHU:  So you --

THE WITNESS:  It was I had to do it anyway.

JUDGE CHU:  So you testified that she was doing her job.

THE WITNESS:  Correct.

JUDGE CHU:  So didn't you raise with the administrator or Mr. Stein that --

THE WITNESS:  Yes.  I told him I have to report it to my superior, which was the vice president.

MS. ULMET:  Maybe we should get to that.

JUDGE CHU:  All right, could you?

BY MS. ULMET:

Q    So did you then discuss the matter with the vice president, Mr. Egan?

A    Yes.  After the conversation with Ari, I immediately called my supervisor and I informed him of what I was told to do.

Q    And what did Mr. Egan tell you?

A    Mr. Egan told me, no, you can't do that.  And I told Mr. Egan, well, the guy is very strong about it.  He wants me to do it.  No, don't do nothing yet; I'll get back to you.

Q    Did CMS have any policies or protocols for discharging employees?

A    Yes, we have protocols.

Q    And what are they?

A    Those are the steps that you take, the disciplinary steps, the counsel, the write-ups, the suspensions that leads to termination.

Q    Did you take those steps in this case?

A    No.

Q    Why not?

A    I was told not to.

Q    By whom?

A    By my superior, Pat Egan.

Q    Okay.  So you testified about a conversation where Mr. Egan told you to wait.

A    Correct.

Q    And so was there another conversation with Mr. Egan?

A    A few days later, Mr. Egan called me back and said, okay, you can terminate her.

Q    Then what did you do?

A    I did exactly as I was told.  I went back to the facility and called Ms. Nogueira to a private area, and I told her I have to let you go, you're being terminated.

Q    Did you explain why she was being terminated?

A    I informed her of the reasons why.  Number one was that she was harassing people and that her assignments and her duties were not being fulfilled.

Q    Was it a true statement that her duties were not being fulfilled?

A    It was not true.  I was the regional manager.  I was overseeing the staff and the director of housekeeping.  And from my observation and the weekly rounds, she was doing okay.

Q    So why did you tell her that, if it wasn't true?

A    Again, because I was told to.

Q    By who?

A    By my vice president.

Q    Okay.  So I just want to make sure the record is clear, some of the questions that the Judge was asking.  So you had --

how many conversations did you have with Ari about Ms. Nogueira?

A    A couple.

Q    Can you, as best as you can recall, tell us the exact words that Mr. Stein used in those conversations?

A    The exact words was that he said, Jose, you have to terminate her.  You have to fire her.  That's what he said was fire, not terminate.  He goes you have to fire her; we don't want her here.

Q    Anything else?

A    Not that I can recall right now, no.

JUDGE CHU:  Did he didn't give you a reason why, if you can recall specifically?

THE WITNESS:  The reason again was she doesn't fit in. She was creating problems with the staff.  She was harassing staff.  And she was not meeting the standards to what the department was looking for, which is cleaning.

JUDGE CHU:  Is that what you summarize he said or is that exactly what he said?

THE WITNESS:  Well, those are -- that is -- those are the phrase that I remember him telling me.

JUDGE CHU:  Good, thank you.

BY MS. ULMET:

Q    How about your conversations with the administrator about Ms. Nogueira, how many conversations did you have with him?

792

A   A couple.

Q   And the same question, if you can?

A   Same question.  More of a follow-up.  His role was more of a follow-up, I believe, what's the status and like when are you going to let her go, and stuff like that.

Q   Did he give you any other reasons for firing her?

A   No.

Q   This job that you had at CMS, is it fair to characterize that as the contract cleaning industry?

A   Yes.

Q   How long, Mr. Perez, have you worked as a manager in the contract cleaning industry?

A   About a good 10 years.

Q   In those 10 years, have you ever before had a client direct you to fire an employee?

A   No.

MR. MEYER:  Objection, relevance.

JUDGE CHU:  Not relevant.

MR. MEYER:  Can we strike the answer, Your Honor?

JUDGE CHU:  The answer is stricken from the record, yes.

MR. MEYER:  Thank you.

BY MS. ULMET:

Q   At Sprain Brook, did Sprain Brook management ever -- did anyone from Sprain Brook management ever speak to you about the job performance of any other employees?

A    No.

Q    So they never spoke to you about disciplining of any other employees?  No?

A    No.

MS. ULMET:  No further questions.

JUDGE CHU:  Thank you.  Mr. Massey, I'm going to do things slightly different this time around.  If you are ready to do any direct examination of this witness, I ask that you proceed now.

MR. MASSEY:  I don't have any questions, Your Honor.

JUDGE CHU:  Thank you.  Mr. Meyer?

MR. MEYER:  Do we have an affidavit for this witness?

MS. ULMET:  Yes.

MR. MEYER:  Thank you.  Can we have 15 minutes, Your Honor, to review?

JUDGE CHU:  Ten minutes.  We'll take a recess, come back in 10.

(Whereupon, a brief recess was taken.)

JUDGE CHU:  Back on the record.  Ready for cross-examination.

MR. MEYER:  Thank you, Your Honor.

                        CROSS-EXAMINATION

BY MR. MEYER:

Q    Mr. Perez, the in-house manager that you referred to in your -- well, let me back up.  You provided an affidavit to the

National Labor Relations Board as part of this case, isn't that correct?

A    Yes.

Q    A sworn statement, correct?

A    Correct.

Q    You swore to the veracity of the truth of that statement?

A    Correct.

Q    In there, in the statement, you reference an in-house manager.  That in-house manager was an employee of CMS, correct?

A    Correct.

Q    Is that Brian?

A    Yes, sir.

Q    Brian John?

A    Yes, sir.

Q    You also had testified about the date or approximate date when CMS started working, providing services at Sprain Brook.  Do you recall the specific date when that happened?

A    I don't recall the specific date.  I know it was towards the end of the summer.  It could have been August.  I don't know the specific date.

Q    If I told you that CMS had a contact with Sprain Brook Manor Nursing Home Rehab dated September 16, 2012, would that trigger or refresh your recollection?

A    Could have been, yes.

Q    Now let's put Ms. Nogueira aside for a moment.

A    Sure.

Q    Were there any other employees of CMS that you supervise at Sprain Brook that you ever disciplined?

A    There were other employees that, yes, we supervise, but, and there were other employees that I spoke to regarding their work.

Q    Do you recall who you spoke to, what employees?

A    What employees?  One of the employees is Brian.  I spoke to him about his work performance.

Q    Brian is a CMS employee, correct?

A    He is CMS --

Q    A manager, I mean, at CMS.

A    He is a manager.  I also recall speaking to other employees regarding their performance.

Q    Do you recall those employees by name?

A    I guess on of the names was Maria, but just minor issues, forgot to do this, forgot to do that.

Q    And lead me up to that conversation, what caused you to have a conversation with those employees?

A    Again, they all due to my weekly follow-ups, visit the building, walk the building.  My job is look for issues.  I find an issue, I'm going to approach you.

Q    What type of issues did you see that spurred those conversations?

A    I don't recall, but a common one is dust, dusty rooms, not moping the floor right, not sweeping right, issues like that.

Q    Did you ever issue any warnings or any disciplinary action to any of those employees for not doing their jobs?

A    Not that I can recall, not from Sprain Brook.  I don't remember.

Q    You don't recall?

A    No, I don't recall.

Q    Do you recall if you terminated any other employees?

A    No.

Q    For performance reasons?

A    No.

Q    Do you recall when you provided your affidavit to the NLRB?

A    Earlier during the year.

Q    Which year?

A    This year.

Q    This year, 2014?

A    Yes, sir.

Q    Now in the 10 minutes or so that I just reviewed this, I see no reference to a Mr. Stein or to an Ari.  Would that be accurate?  Do you recall in your statement whether you ever mentioned the name Ari or Mr. Stein to the NLRB?

A    I don't recall what exactly is in the statement, but I don't know.

MR. MEYER:  Your Honor, I don't have -- we have extra copies here, but I'd like to -- can I show the witness a copy of his statement?

JUDGE CHU:  Sure.

MS. ULMET:  I have a little extra if you want to see one.

JUDGE CHU:  You can provide one.

MR. MEYER:  May I approach, Your Honor?

JUDGE CHU:  Go ahead.

BY MR. MEYER:

Q    Take a moment to read that, Mr. Perez.

A    Sure.

Q    That statement looks familiar to you?

A    Yes, sir.

Q    And that's your signature on the last page?

A    Yes.

Q    And your initials on the bottom right of each page?

A    Correct.

Q    I know you looked over it a few moments, but anywhere in here do you recall or see the name Ari Stein, Mr. Stein referenced in any paragraph?

A    I'm looking at it quickly.  I do not see his name here.

Q    You don't see his name anywhere?

A    No.

Q    Okay.  If you could take a moment and look at -- oh, what paragraph is it?  Well, before we get to that, you testified --

798

let's go back to the affidavit.  In Paragraph 13 --

A    Yes.

Q    About one, two, three, four, five six -- six lines down,
the last word of that line and then going to the seventh line,
it says the staff just complained.

A    Yes.

Q    How did you hear about those complaints?

A    Those complaints, again, when I walk the floors, staff
approached me.

Q    They just came up to you and said, Mr. Perez, we have an
issue with Clarisse?

A    Yes.

Q    And do you recall when that first happened?

A    As soon as I got into the building, as soon as they gave
me the account.

Q    So assuming for the moment that September 16th date when
the contract was signed was when CMS first stepped onto the
Sprain Brook facility, within the same day you were there
employees were complaining about Ms. Nogueira?

A    I don't know if it was the same first day I was -- I
entered the building, but it was short after we took over, yes.

Q    And that was before you had any conversations with the
administrator, as you testified to in this affidavit, correct?

A    I guess.  I mean, yes, there was complaints regarding her
by other employees.

Q    Were they other CMS employees?

A    No.

Q    Who were the other employees then?

A    They were Sprain Brook.

Q    Who were they?

A    Mostly nursing.

Q    Nursing employees?

A    Nursing employees.

Q    They were the actual nurses?

A    They were the actual nurses.

Q    And do you recall by name who they are?

A    No, I don't.

Q    So other employees of the company complained?

A    Correct.

Q    To you?

A    Yes, sir.

Q    They told you that -- well, explain to me exactly what they said.

A    Basically, they were saying she was interfering where they were.  So a nurse would say during my, I don't know, changes, meaning they change diapers and stuff like that, Clarisse will go and then talk to them, cause them to lose time, something like that.

Q    And when the nurses were at change times, they were changing diapers, they were changing whatever, sheets, whatever

they're supposed to be doing, what was Clarisse supposed to be doing at that time?

A    At that time should have been her work area, whether it's cleaning or doing laundry.

Q    Those two days when she's in laundry, she's not in residents' rooms, isn't that correct?

A    Unless she was delivering linen or clothing.

Q    And you said before after -- you testified before that after you spoke with the administrator and Ari, even though you don't mention him in your affidavit, that you investigated, correct?  You further investigated the allegations?

A    Sure, yes.

Q    If I could direct you to Paragraph 15, seven lines down?

A    Yes.

Q    Paragraph 15 is about your conversations with the administrator, correct, or what you did shortly thereafter?

A    With the administrator?

Q    It's Paragraph 15 details what you did after you talked to the administrator, correct?

A    Can I take a few seconds?

Q    Sure, sure.

A    Yes.

Q    Okay.  So you previously testified that after you spoke with the administrator about Clarisse, that you did an investigation, correct?

801

A    Right.

Q    And what did you do as part of that investigation?

A    Like I said earlier, I visit the building once a week. And it is my responsibility to check on all employees and make sure they're providing the functions and the responsibilities that CMS is supposed to do.  So that's what I was doing, whether it was investigation or follow-up, that's my job.

Q    So as part of that, you went floor by floor.  You spoke with the employees on each floor?

A    Yes.

Q    About the complaints about Clarisse?

A    Not so much complaints, just, you know, just go and make sure the supplies are good, do they have any concerns, how can I help them, stuff like that.

Q    Now previously I believe you testified that -- you said after you spoke with the administrator, you spoke with management at Sprain Brook about Clarisse; that you went and investigated whether or not she was meeting the standards, and whether or not she was harassing employees.  Isn't that correct?

A    Yes.

Q    So did you speak with employees about whether or not she was harassing them once you had already met with the administration?

A    I don't recall exactly the conversation that took place

between me and other employees, but I do follow-up on people. And I don't recall anybody really giving me negative feedback. As far as departmental staff members from the housekeeping department or the laundry department, I don't recall them giving me any negative feedback on Ms. Nogueira.

Q    Nogueira, correct?

A    Of course I spoke to her.

Q    You did.  So you spoke with all 12 people --

A    Of course.

Q    -- in the group?

A    Sure.

Q    But you received complaints from other employees?

A    Yes, sir.

Q    But you didn't speak with them as part of this investigation?

A    No.  Normally, if I have an issue with you, I'm not going to speak the issues I have with you to other people.

Q    So why do you say then in Line 7, of Paragraph 15, that I did not investigate the administrator's allegations?

A    Maybe the terminology was wrong.  But a complaint was made and I do follow-up on the complaint.

Q    Complaint from whom?

A    From the administrator, and the owner, and from nursing personnel.

Q    When was the first time you heard the name Ari Stein or

Mr. Stein?

A    The first time I heard of it, I guess as soon as I entered -- as soon as I acquired the account.

Q    At that time, you also knew the administrator, correct? You met the administrator right away?

A    Yes, sir.

Q    And you also said that you spoke with your supervisor or the vice president of the company, Mr. Egan?

A    Yes.

Q    About this Clarisse issue?

A    Yes.

Q    Is there any reason why you make no reference to that anywhere in this affidavit?

A    I believe I made references.  Why it is not on this affidavit, I don't know why.

Q    You don't know why.

A    No.

Q    Do you know why Mr. Stein's name is never mentioned once in this affidavit?

A    I have no idea why.

Q    Even though he allegedly made statements to you about wanting to get rid of Clarisse?

A    I don't know why.  I can't answer that.  I don't know.

Q    Did you prepare -- what did you do to prepare for today's testimony?

A    I met with Julie.

Q    When was that?

A    Earlier during the week.

Q    And you were subpoenaed to testify?

A    I was subpoenaed, yes.  First I was subpoenaed was back in October.

Q    And you didn't testify then, obviously --

A    No.

Q    -- correct?

A    No.

Q    And were you sent a second subpoena?

A    Yes.

Q    When did you receive that?

A    I received it -- I don't know the exact date, but I was subpoenaed.  It was a follow-up conversation.  I came to this location on the date I was supposed to come.  And for some reason it was either cancelled, postponed, I don't know what happened, but I called.  "Mr. Perez, sorry, but it's not taking place.  We are going to keep you informed as to when we will meet again."

Q    Okay.  And during that conversation, did you speak about Mr. Kline?

A    No.

Q    When you met with the Board attorney?

A    Oh, when we met.

Q    When you prepared for today.

A    Yes, sir.

Q    And in what context did his name come up?

A    Mr. Ari?

Q    Yes.

A    Pretty much what I've been saying all along.  He is the one that told me to terminate her.

Q    But back on July 2nd, when you signed this affidavit, you didn't once make reference to him.

A    I guess the question wasn't asked.

Q    Were you asked about the administrator?

A    Yes.

Q    But you were never asked about Mr. Kline in July 2014 -- Mr. Stein, I'm sorry.

A    I don't remember.

MR. MEYER:  Your Honor, we'd like to -- I guess, well, first, we'd move to mark this as Sprain Brook 3, SB-3, and move for its admission.

(Respondent's SB-3 identified.)

JUDGE CHU:  That's his affidavit?

MR. MEYER:  Correct.

JUDGE CHU:  Any objections?

MS. ULMET:  I would object, the same objection I've had to the admission of the other affidavits.  So to the extent you're admitting it only for the limited purpose of going along with

the testimony about any inconsistencies that have been discussed on cross-examination, but not for anybody to identify any additional inconsistencies or any other issues that are not addressed on cross, today.

JUDGE CHU:  Consistent with my prior ruling on submission of affidavits, I'll allow it to show any inconsistency and credibility issues between the testimony and the statements made in the affidavit, with the limitation that you have just indicated, Ms. Ulmet.

(Respondent's SB-3 received.)

MR. MEYER:  Your Honor, just to be clear, that would include the lack of reference to Mr. Stein anywhere in the affidavit, correct?

JUDGE CHU:  That's correct.

UNIDENTIFIED SPEAKER:  That's SB-3?

MR. MEYER:  SB-3, I believe.  I have SB-1 and 2.  I don't have anything after that.

JUDGE CHU:  Yeah, we're up to 3.  Continue.

BY MR. MEYER:

Q    When did you first -- well, you spoke of Ms. Nogueira, correct?

A    Yes.

Q    When did you first recall her first name?  When did you first come to know her first name?

A    When I first entered the building, when I acquired the

807

account.

Q    And you knew her first name was what?

A    She had like a nickname.  I forgot what was the nickname, but she had a nickname.  But I know her last name was Nogueira.

MR. MEYER:  I have nothing further, at this point.

JUDGE CHU:  I'll just go down in order.  Mr. Vann?

CROSS-EXAMINATION

BY MR. VANN:

Q    Mr. Perez.

A    Yes.

Q    I gather you've been doing this kind of work for at least 10 years.

A    Yes, sir.

Q    I take it you do a pretty good job of it from the way you talk to us.

A    Well, thank you.  I think I do.

Q    What I'm not clear about in your testimony is from the time you first entered this facility at Sprain Brook until you were told to terminate Ms. Nogueira, how much time elapsed?

A    A few months, three, four months.

Q    Now you've testified that you went to the Sprain Brook facility once a week?

A    Correct.

Q    And you walked the entire facility to check on your employees.

A    Correct.

Q    You've also told us that you were stopped by nursing staff and told that Ms. Nogueira was interfering with their work, harassing them, your term?

A    Correct.

Q    And this happened like at the very beginning you went there, from what I understood of your testimony.

A    Yes.

Q    What I haven't heard from you today is after you were told this by the nursing staff, did you go talk to Ms. Nogueira to ask what was going on?

A    Sure, I did.

Q    And what did she tell you?

A    It's not true.

Q    How many people told you she was harassing them?

A    I don't recall a number.  A couple.

Q    More than five?

A    Could have been half a dozen.

Q    Half a dozen people tell you she's interfering with their work, she's harassing them, and she says to you it's not happening.  Doesn't that raise a red flag to you of some kind?

A    Sort of, yes.

Q    Did you talk to Brian about it and ask him to keep an eye on her for you?

A    Yes, I did.

Q    Did Brian tell you he was seeing her interfering with any of the other employees?

A    No.

Q    Never told you that?

A    Never told me.

Q    Did you ever tell Ms. Nogueira that if you kept getting those reports, she might face disciplinary action or be discharged?

A    I recall speaking to her about the comments that are being made about her.  But I never mentioned about disciplinary action, at that point.

Q    You kept getting those comments almost every time you went there, isn't that true?

A    Not almost every time, at the very beginning.

Q    And then?

A    Then I don't think the comments were made anymore or it was just my conclusion that, you know, she was doing a pretty good job.  Every time I came, she was in the area she was supposed to be at.  She was doing the job that she was supposed to be doing.  So for me, she was doing a good job.

Q    I appreciate that comment.  But I think you would agree with me that an employee can be doing a very good job with what they are assigned to do, but still be interfering with other employees' work.

A    Could happen, yes.

810

Q    And if that were happening, you could understand that the other employees, particularly nurses who carry tremendous responsibility, would be very upset.

A    Could be, yes.

Q    And that they would go to their superiors, the administrator of the home or the owner, and say this woman is interfering with our work.

A    Um-hum.

Q    And you could understand then that if the owner of the home is concerned about the quality and the service performed in that particular facility, he might call your boss and say we've got to get rid of her.

A    Could happen.

Q    And that would be perfectly reasonable, wouldn't it?

A    Reasonable for?

Q    For the owner of the home who wants to make sure that his employees are able to do their work without being disrupted.

A    Yes.

Q    I have no further questions for you.  Thank you.

JUDGE CHU:  Thank you.  Ms. Winkelstein?

MS. WINKELSTEIN:  I just have two quick questions.

CROSS-EXAMINATION

BY MS. WINKELSTEIN:

Q    You testified that you hired Ms. Nogueira, is that correct?

811

A    We gave her the opportunity to be employed with CMS, yes.

Q    So CMS -- her paychecks came from CMS, is that correct?

A    Yes.

MS. WINKELSTEIN:  I have nothing further, Your Honor.

JUDGE CHU:  Mr. McCarthy?

MR. McCARTHY:  I have nothing.

JUDGE CHU:  Thank you.  Any redirect?

MS. ULMET:  Yes, Your Honor.

JUDGE CHU:  Go ahead.

REDIRECT EXAMINATION

BY MS. ULMET:

Q    Mr. Perez, Mr. Meyer asked you if you recalled terminating any other employees during your time working at Sprain Brook and you said no.  I want to ask you was that, no, you don't recall, or, no, you did not terminate any other employees?

A    No, I believe I did not terminate anyone.

Q    We've heard some testimony about your conversations with nursing staff.  Now do you -- how did you know that they were nursing staff, first of all?

A    Uniform was an indicator.  And, two, it was the job they were doing.

Q    Where did these conversations take place?

A    In the resident's room.  I could be checking a room and a nurse could be changing a dressing or feeding a resident, and they'll tell me, oh, by the way, this lady, your staff is

812

bothering us, she's dah, dah, dah.

Q    Do you know the names of any of those nurses?

A    No, I don't.

Q    Do you know for sure what their job position was?

A    Yes.

Q    What was it?

A    The people that were complaining?

Q    Yeah.

A    The nursing staff.

Q    But do you know whether they were --

A    As far as titles?

Q    Right, as far as title.

A    No, not really.

Q    And so they could have been supervisors?

A    Could have been.

Q    Did you ever hear any conversation at Sprain Brook concerning an ongoing union organizing campaign?

A    No.

MR. MEYER:  Objection to relevance.

JUDGE CHU:  He answered already.  I'll allow it.

MS. WINKELSTEIN:  It's outside -- it's beyond the scope of cross.

MS. ULMET:  I don't think it is.  I can give you an argument.  I mean I want to be careful what I say in front of the witness, but I think it's relevant.

813

JUDGE CHU:  I let you have it already.

MS. ULMET:  Okay.  Oh, thank you.  Sorry.

BY MS. ULMET:

Q    Sorry.  So you can answer the question.

A    Can you repeat it again, please?

Q    Yeah, sure.  During the time that you were working at Sprain Brook, do you recall hearing anything about an ongoing union organizing campaign?

A    Not that I can remember, no.

Q    Now you testified on direct about the total amount of time that you worked with Sprain Brook.  I think you said the total amount of time you were there was about -- was a few months, is that correct?

A    It was a few months.  It was less than a year.

Q    Were you ever replaced as the manager responsible for Sprain Brook at CMS?

MR. MEYER:  Objection.  It's outside the scope of direct.

MS. ULMET:  It's not.  We talked about timing on cross.  I want to talk about timing.

JUDGE CHU:  Go ahead.  I'll allow it.

THE WITNESS:  At one point, yes, I was relocated from the Westchester account, which is Sprain Brook, and I was sent over to Brooklyn.

BY MS. ULMET:

Q    Okay.  So there was a time that CMS still had the Sprain

814

Brook account, but you were no longer responsible for it.

A    Correct.

Q    And do you recall when that was that your responsibilities changed to not be responsible for Westchester anymore?

A    I don't remember the exact month.  It was in the winter months.  I don't know.  I think it was the beginning -- the ending of 2012, beginning of 2013.  I don't know, to be honest.

Q    So you started working with Sprain Brook in or around September of 2012?

A    Yes.

Q    And then you stopped being responsible for Sprain Brook at some point in the winter of 2012 to 2013?

A    Right.

Q    Do you recall at what point in your tenure working with Sprain Brook you fired Ms. Nogueira, beginning, middle, end?

A    Of that year, towards the -- well, if I got there in September, I will say by October, well, I terminated her in October.

Q    So I think you testified on cross that it was between the time that you started working with Sprain Brook until you were told to fire her, it was three to four months.  Is that accurate?

A    I was in Sprain Brook for a total -- I always thought it was August, late August, by September, December -- I believe I was at Sprain Brook, I was a regional manager at Sprain Brook

for about maybe three or four months, and then I let her go prior to that, so maybe that's more accurate.  As far as time frame is concerned, I just don't recall the time frame.  I don't keep track of that.

MS. ULMET:  No further questions.

JUDGE CHU:  He needs recross.

MR. MEYER:  I have nothing, Your Honor.  I don't know about anybody else.

JUDGE CHU:  Anybody else on recross?

UNIDENTIFIED SPEAKER:  No.  Thank you.

JUDGE CHU:  Mr. Perez, you are excused as a witness. Please do not discuss your testimony with anybody else in this proceeding, all right?

THE WITNESS:  Okay.  Thank you.

JUDGE CHU:  You're free to go.

THE WITNESS:  Thank you.

(Witness excused.)

JUDGE CHU:  Off the record for a moment.

(Pause off the record.)

JUDGE CHU:  Back on the record, ready to proceed with the next witness.  Please state your full name.

THE WITNESS:  Shelly Ann Williams.

JUDGE CHU:  And Williams, just spell it for the record.

THE WITNESS:  W-I-L-L-I-A-M-S.

JUDGE CHU:  All right.  I'm Judge Chu.  I'm going to swear

816

you in.  Please relax.  We're not here to get you upset.  We just want some testimony from you.  All right?

THE WITNESS:  Okay.

JUDGE CHU:  Raise your right hand, please.

(Whereupon,

SHELLY ANN WILLIAMS,

was called as a witness by and on behalf of the General Counsel and, after having been duly sworn, was examined and testified as follows:)

JUDGE CHU:  Now the government attorney is going to be asking you questions followed by the attorneys from the other parties.  All right?

THE WITNESS:  Okay.

JUDGE CHU:  If anybody objects to a question, don't answer it until I can decide whether you should answer it or not, all right?

THE WITNESS:  Okay.

JUDGE CHU:  Understood?  And just speak up and speak into the microphone.

THE WITNESS:  Okay.

JUDGE CHU:  All right, you've got it.  Thank you.

UNIDENTIFIED SPEAKER:  Your Honor, before we get started, can we just get clarification on Ms. Williams' first name?  We have a couple of different understandings.  I'm sorry.

JUDGE CHU:  Oh, spell your first name?

817

THE WITNESS:  S-H-E-L-L-Y, A-N-N.

UNIDENTIFIED SPEAKER:  Thank you very much, Ms. Williams.

JUDGE CHU:  Thank you.

UNIDENTIFIED SPEAKER:  Is that one word or two?

THE WITNESS:  Two.

JUDGE CHU:  All right, now we've got the right spelling. Thank you.  Let's continue.  General Counsel?

DIRECT EXAMINATION

BY MS. POLAKOSKI-RENNIE:

Q    Good afternoon, Ms. Williams.

A    Good afternoon.

Q    Have you ever been employed at a nursing home located at 77 Jackson Avenue, in Scarsdale, New York?

A    Yes.

Q    So for the rest of my questions to you, today, I'm going to refer to this nursing home as Sprain Brook.

A    Okay.

Q    Do you recall when you first started working at Sprain Brook?

A    Yes, November 2004.

Q    What is your job at Sprain Brook?

A    I'm a CNA.

Q    What does that stand for?

A    Certified nursing assistant.

Q    Has this always been your job at Sprain Brook?

A    Yes.

Q    What are your job duties?

A    I do patient care.

Q    Have these always been your job duties at Sprain Brook?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what has previously been marked as GC-38.

JUDGE CHU:  Do you have an extra copy for the witness?  I don't think the reporter has this.

MS. POLAKOSKI-RENNIE:  Oh, actually, 38 was --

JUDGE CHU:  I could show her mine.

MS. POLAKOSKI-RENNIE:  I'm going to actually mark this as a new exhibit instead of showing her one.  The one that we had admitted was filled out by an employee, I am sure, if I can find it.  So I'd like to have this marked as GC-57.

(General Counsel's GC-57 identified.)

MS. WINKELSTEIN:  Judge, is there some sort of foundation for this, because right now we're leading.  I'm confused as to what we're showing.  Is there some sort of foundation first?

MS. POLAKOSKI-RENNIE:  Okay.  Sorry.

JUDGE CHU:  Well, 38 there would have been a foundation. But now it's not 38, it's something else so we need to establish the foundation for what we're about to show the witness.

MS. POLAKOSKI-RENNIE:  My apologies.

819

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, I'd like to direct your attention to September of 2012.  Do you recall being asked to fill out any paperwork at Sprain Brook?

A    Yes.

Q    Do you recall what kind of paperwork that was?

A    It was an application.

Q    And application for what?

A    For Budget Services.

Q    What was the application for, though?

A    Employment.

Q    Employment.  Who asked you to fill out the job application?

A    The director of nursing.

Q    Do you know her name?

A    Amelia Mendizabal.

Q    Does she have a nickname that she goes by?

A    Ms. Amy.

Q    Ms. Amy asked you to fill out that job application?

A    Yes.

Q    Do you remember why she asked you to fill out the job application?

A    She said that's been --

UNIDENTIFIED SPEAKER:  Objection.  Calls for conjecture.

JUDGE CHU:  Did she actually tell you?

820

THE WITNESS:  Yes.

JUDGE CHU:  All right, we can ask why.

BY MS. POLAKOSKI-RENNIE:

Q    What did Ms. Amy tell you?

A    She said that Sprain Brook has been sold to a new company and they no longer employ.

MS. POLAKOSKI-RENNIE:  I'd like to now mark this as GC-57.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, please take your time and look over this document.  Have you ever seen this document before?

A    Yes.

Q    Where have you seen it before?

A    At Sprain Brook.

Q    Is this the job application that you were just referring to?

A    Yes.

Q    Did Ms. Amy say what would happen if you didn't fill out this job application?

A    She said if we don't fill out the application, we don't have a job.

Q    Did you fill out the job application?

A    Yes.

Q    And what did you do after you filled it out?

A    I returned it to Ms. Amy.

Q    And then did you continue working at Sprain Brook?

821

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to have GC-57 entered into evidence, please.

MR. VANN:  I would object, Your Honor.

JUDGE CHU:  My 57 is blank.

MR. VANN:  So is mine.  That's my reason for the objection.

JUDGE CHU:  Do we have this witness' application, itself?

MS. POLAKOSKI-RENNIE:  No, we don't.

JUDGE CHU:  Why not?

MS. ULMET:  Because the Respondents haven't provided it in response to the subpoena duces tecum outstanding for them.

JUDGE CHU:  Mr. Vann, do you know whether there is an application for Ms. Williams by Budget Services?

MR. VANN:  May I have a moment, please?

JUDGE CHU:  Yes, sir.

UNIDENTIFIED SPEAKER:  Your Honor, I just have to answer a call, so I'm going to step out.

JUDGE CHU:  Can we proceed without you?

UNIDENTIFIED SPEAKER:  Oh, absolutely.

(Pause.)

MS. ULMET:  Your Honor, I'm not really sure that the fact that this is a blank document is a basis for not admitting it. There may be additional relevance to one that's filled out by Ms. Williams, but Ms. Williams has testified that this is a

822

copy of the application that she filled out.  That's her testimony.  So it seems to me like the document is relevant and authenticated.

JUDGE CHU:  I'd rather have her own application as GC-58. If you want her to refer to an application, you can refer to GC-38, which is somebody else, and ask her whether that's a similar application.  I don't know why we need to add on another application that's a blank format.

MS. ULMET:  Oh, so that we don't crowd the record with too many of these things.

JUDGE CHU:  It's becoming crowded already.

MR. VANN:  Your Honor, with respect to the question you directed to me, I don't know whether my client has this document or not.  What I can tell you is the subpoena which was served upon my client, to which I responded several documents that were responsive to the subpoena, did not require applications for employment from employees.  It required correspondence between Sprain Brook and Budget; invoices between Sprain Brook and Budget; emails, letters, text messages, communications with Pinnacle; documents with Union Local 713; communications from Sprain Brook to Budget including record of hours worked; net payroll checks and copies of dues deduction authorization cards.  That was it.  That was the universe.  We responded to that and I delivered all the documents that my client had responsive to those items.  And my

823

objection to the admission of a blank form stands.

MS. ULMET:  Judge, I don't have a copy of the subpoena with me.  I wonder if I could just glance at Mr. Vann's copy.

MR. VANN:  I'll make it available, Your Honor.

JUDGE CHU:  Thank you.

MS. ULMET:  Thank you very much.

MR. VANN:  No problem.  And for the record, Your Honor, I will also note that after I produced the documents there was no request from counsel for the National Labor Relations Board to produce anything else.

JUDGE CHU:  Well, as I said earlier, I don't think there is any dispute that she actually filled out an employment application form.  You can show her GC-38.  That's the form, you can use that form that was in Exhibit 38 of the General Counsel, and ask her about that one.  But a blank one doesn't help anything but to crowd the record.

MS. POLAKOSKI-RENNIE:  I'd like to withdraw my request to have GC-57 admitted as an exhibit.  And I'd like to instead show the witness what's previously marked as GC-38.  If you like, I can give her a copy that I have here.

JUDGE CHU:  No, I'll show her mine.  This is General Counsel's Exhibit 38.  Can you identify it for the record?  You don't have to mention the employee's name, just the caption.

THE WITNESS:  Employment application, Budget Services.

JUDGE CHU:  Was that the same employment application that

824

you filed out as in General Counsel Exhibit 38?

THE WITNESS:  Yes.

JUDGE CHU:  You can flip through it and double check.

(Pause.)

THE WITNESS:  Yes.

JUDGE CHU:  Now you said yes, but did it also include the employment application that is captioned Pinnacle?

THE WITNESS:  No.

JUDGE CHU:  That's where --

THE WITNESS:  I stopped at the Budget part.

JUDGE CHU:  Just the Budget part.

THE WITNESS:  Yes.

MS. ULMET:  Judge, our copy of GC-38 doesn't have anything that says Pinnacle on it.

JUDGE CHU:  Doesn't have what?

MS. ULMET:  I heard you asking the witness about something that says Pinnacle.  But our copy of GC-38 doesn't have anything that says Pinnacle on it.  It's a one, two, three -- it's a seven-page document.  Oh, yeah, and actually that's what the court reporter's stamp says, seven-page document.

MS. POLAKOSKI-RENNIE:  Pinnacle was GC-37, though, the Pinnacle application.  Oh, they're in backwards on the exhibit list.

JUDGE CHU:  All right, GC-38 is just for Budget Services. Please continue.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, the job application that you just looked over which is marked as GC-37 -- or 38, sorry, and was filled out, but you had also seen that job application before.

A    Yes.

Q    Was it blank when it was given to you?

A    Yes.

Q    Who had given you that job application?

A    Ms. Amy.

Q    Do you recall what, if anything, Ms. Amy said to you when she gave you the job application?

A    If you don't fill it out, you don't have a job.

Q    Do you recall anything else from that conversation with Ms. Amy?

A    No.

Q    Did you fill out the job application then?

A    Yes.

Q    And then what did you do with the job application after you filled it out?

A    I gave it back to Ms. Amy.

Q    Did you continue working at Sprain Brook then?

A    Yes.

Q    After you filled out this job application, had your job duties changed in any way at Sprain Brook?

A    No.

Q    After you filled out this job application, had your job title changed in any way at Sprain Brook?

A    No.

Q    Prior to receiving this job application, had there ever been an announcement before at Sprain Brook about a change in ownership?

A    No.

Q    Do you recall receiving any other documentation about the change in ownership, at that time?

A    Yes.

Q    What did you get?

A    I got a termination letter and I got new ownership letter.

Q    Do you remember who had given you a termination letter?

A    We got it with our paycheck.

Q    You got it with your paycheck.  Do you remember who it was from?

A    I got it from the front desk.

Q    Do you remember the name who had signed the letter, if anyone had signed the letter?

A    I can't recall at the moment.

      MS. POLAKOSKI-RENNIE:  I'd like to have this marked as GC-22(c).

      (General Counsel's GC-22(c) identified.)

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, you said you also received something else in

827

that envelope with your paycheck, at that time?

A    I have.

Q    What was that other document that you had received, do you remember?

A    The termination letter and the new ownership letter.

Q    You received a letter about the new ownership?

A    Yes.

Q    Do you remember who that was from?

A    No.

Q    Do you remember who had given you these letters?

A    It was in our paycheck.

MS. POLAKOSKI-RENNIE:  I'd also like to have this marked as GC-23(a) -- (c), sorry.

(General Counsel's GC-23(c) identified.)

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, if you could please take a look at that letter.  Are they both -- do you have a copy of GC-22(c) and GC-23(c) in front of you?

A    Yes.

Q    Do you recognize these two letters?

A    Yes.

Q    Were these the two letters that you were just referencing that you received in your paycheck?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to have these exhibits

entered into evidence as 22(c) and 23(c), please.

JUDGE CHU:   Any objection?

MR. MEYER:   No, Your Honor.

JUDGE CHU:   All right.   Hearing none, it's marked and entered.

(General Counsel's GC-22(c) and GC-23(c) received.)

BY MS. POLAKOSKI-RENNIE:

Q   Ms. Williams, had anyone talked to you about these letters when you got them?

A   No.

Q   After you got these letters, did anyone talk to you about them?

A   Only at Ms. Amy's office.

Q   At Ms. Amy's office?

A   Yes.

Q   Ms. Amy talked to you about them?

A   She would talk about the new ownership.

Q   Do you recall what Ms. Amy said about that?

A   She said that Sprain Brook have new ownership and it's going to be for the better of Sprain Brook.

Q   So still directing your attention to September of 2012, around the time when you received these letters in your paycheck, do you recall any other announcements being made at Sprain Brook?

A   Yes.

829

Q    What do you recall?

A    A few days later, after the application, we have an overhead page that everybody should come to the recreation room.

Q    Do you remember who made that overhead page that you said?

A    Joanie Campbell.

Q    Who is Joanie Campbell?

A    She used to work at the front desk.

Q    Do you recall who was paged on the intercom?

A    Yes.  It was housekeeping, the kitchen, and the nursing staff.

Q    What were you directed to do in that page?

A    We were supposed to come to the recreation room.

Q    Did you go to the recreation room?

A    Yes.

Q    Do you remember around what time that was?

A    One-thirty, two.

Q    How do you remember what time it was?

A    It was the changing of the shift.

Q    Once you got to the recreation room, was anyone else there?

A    Yes, there was somebody from Budget Services and somebody from Local 713.

Q    How do you know that the person was from Budget Services?

A    She introduced herself.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

830

Q    Did she tell you her name?

A    I don't recall her name right now.

Q    And when she introduced herself, what did she say, do you remember?

A    She introduced her.  She said her name.  And she said she is a representative from Budget Services.

Q    You said someone else had said they were from -- sorry, you said there was someone there from 713.  How do you know that this person was from 713?

A    He also introduced himself.

Q    Did he tell you his name?

A    Kevin.  I can't recall his last name.

Q    Do you recall what Kevin said when he introduced himself?

A    That he was a representative from Local 713.

Q    So was there anyone else in the recreation room with you and these other two people?

A    Joan.

Q    Joanie?  Was this Joanie Campbell that you referenced earlier?

A    Yes.

Q    Were there other employees there?

A    Yes.

Q    What other employees?

A    The kitchen staff, nursing staff, and the housekeeping staff.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

Q    Do you recall what, if anything, was said in this meeting?

A    Yeah, we were told again if we don't fill out paperwork, we wouldn't have a job.

Q    Were you given paperwork then?

A    Yes.

Q    Do you remember what this paperwork looked like?

A    Yes.  There was a blue card with some medical.  There was a white card with a yellow background, and then a white sheet of paper.

Q    Who had told you that you had to fill out the paperwork?

A    The lady from the local -- from Budget.

Q    She was the one who told you?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what was previously marked and entered into evidence as GC-26(a), 26(b), and 26(c).

JUDGE CHU:  I'll show her my copy, so we don't have to find it, get it out.

MS. POLAKOSKI-RENNIE:  Okay, thank you.

JUDGE CHU:  Because I don't think the reporter has a set of these exhibits.

UNIDENTIFIED SPEAKER:  That's 26(a), (b), and (c), Your Honor?

MS. POLAKOSKI-RENNIE:  Yes.

JUDGE CHU:  That's correct.

UNIDENTIFIED SPEAKER:  If you just take a look at these.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, have you seen these before?

A    Yes.

Q    Where had you seen them before?

A    In the meeting.

Q    Do you remember -- is this the meeting that you were just talking about in the recreation room?

A    Yes.

Q    Who handed you these cards?

A    Kevin.

Q    Are these the cards that the Budget rep told you, you had to fill out?

A    Yes.

Q    Do you recall what, if anything else, you were told about these cards?

A    No.

Q    Did you fill out the cards?

A    Yes.

Q    Do you remember anything else being said in that meeting?

A    They talk about our benefits.

Q    Who did?

A    The lady from Budget and also Kevin.

Q    Do you recall what they said?

A    They said that we used to get -- the set amount we used to

get has been reduced.

Q    I'm sorry.  Can you repeat that?

A    Like we used to get before when we were working with Sprain Brook, it is now reduced.

Q    When you say what you used to get, do you mean --

A    We used to have 10 holidays; we're getting 7.  We used to have two personal day; we're not getting any more personal days.  I used to have three weeks' vacation, now everybody is down to one week off.

Q    And before this meeting, you said you used to get more sick time, you used to get more vacation time, and those things, and personal days --

MR. MEYER:  Objection.  It's leading, Your Honor.  There is no reference to sick.

MS. POLAKOSKI-RENNIE:  I'm sorry.

BY MS. POLAKOSKI-RENNIE:

Q    Before this meeting, how much sick leave did you get?

A    We used to get 12 days.

Q    Were you told anything about sick leave in this meeting?

A    Yes, we're down to three.

Q    How long had you been getting 12 sick days for?

A    Since I started working at Sprain Brook.

Q    You said that you were getting three weeks' vacation before this meeting?

A    Yes.

Q    How long had you been getting three weeks' vacation for?

A    I had just started my three weeks that year.

Q    Was that based on your seniority?

A    Yes.

Q    After this meeting, how many weeks of vacation were you getting?

A    Five days.

Q    You said you used to receive personal days before this meeting?

A    Two.

Q    And after this meeting, how many days did you get?

A    None.

Q    How long had you been getting two personal days for?

A    Since I started working at Sprain Brook.

Q    Do you remember anything else that was discussed in this meeting?

A    No.

Q    Do you recall if they discussed --

MS. WINKELSTEIN:  Objection, Your Honor, it's leading. She just testified that she didn't remember anything else.

MS. POLAKOSKI-RENNIE:  She said she couldn't recall, so I thought I'd ask a more specific question.

JUDGE CHU:  I think she said no.

MS. POLAKOSKI-RENNIE:  It was a do you recall question.

JUDGE CHU:  Go ahead, ask.  I'll allow it.

BY MS. POLAKOSKI-RENNIE:

Q    Did they discuss health insurance at this meeting?

A    Yes.

Q    Do you recall what, if anything, they said about health insurance?

A    They said that Budget Services have a contract with Local 713 and we will be getting their insurance.

Q    Did they give you any documents about what your insurance would be like or how you any documents about what your new benefits would be like?

A    There was a package there, but we wasn't allowed to take it with us.

Q    So you said that you were given those forms and you filled them out?

A    Yes.

Q    Who did you give the forms to, after you filled them out?

A    I gave mine to Joan the following day.

Q    Why did you fill out those forms?

A    Because we were told if we don't fill them out, we don't have a job.

Q    Who told you that?

A    We were told by Local 713 and Budget representative.

Q    Do you remember -- I'd like to direct your attention now to December of 2012 still.  Do you recall ever receiving any documents around that time about benefits?

A    Yes.

Q    Do you remember what you received?

A    It was a paper talking about our holidays, how many holidays we'll be getting, how many sick times, and etc., and also a paper.  We used to get weekly checks, now biweekly checks.

Q    How were you given these documents?

A    With our paychecks.

Q    You said you received a document about -- the one document you received about your holidays, do you remember who that document was from?

A    No.

MS. POLAKOSKI-RENNIE:  I'd like to have this marked as GC --

MS. ULMET:  I think this is GC-57 now because we withdrew the last GC-57.

MS. POLAKOSKI-RENNIE:  57?

JUDGE CHU:  Yeah, 57 is correct.

(General Counsel's GC-57 identified.)

BY MS. POLAKOSKI-RENNIE:

Q    Please take a look at this document, Ms. Williams.  Have you ever seen this before?

A    Yes.

Q    Is this the document that you were referring to that you received in your paycheck?

A    Yes.

Q    And has it been your experience that your benefits have changed to reflect what this letter says?

A    Yes.

Q    So this letter says that employees are entitled --

MS. WINKELSTEIN:  Objection, Your Honor, leading.

JUDGE CHU:  Why don't you ask -- point to the section of the document and ask the witness about that section.

BY MS. POLAKOSKI-RENNIE:

Q    If you'd like to turn to the second page of the document, where it says vacation, at the top of the page it says vacation and then it goes onto say other things.  Can you tell me what it says about -- can you just read over it and tell me if it has been your experience that that's now what you receive at work?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to have this moved into evidence as GC-57, please.

JUDGE CHU:  Any objections to 57?

MR. VANN:  Yes, Your Honor.  If you look at the paragraph headed health insurance on the second page, it says please see the election form attached to this memo.  This is an incomplete document.  There is no election form here.  So at least on that basis, I certainly would object.

MS. ULMET:  Your Honor, this is another document -- yet

another document that we received from employees and have not received from a single Respondent, even though there seem to be a number of Respondents that are involved in giving this document to employees.  So any deficiencies are -- we've turned over everything that we have in our session.

MR. VANN:  Your Honor, this witness has testified she received this document with her paycheck, so presumably she has a copy of it, a complete copy.  This is an incomplete copy.

MS. POLAKOSKI-RENNIE:  And presumably the Respondent whose names are at the top would have a complete copy as well.  And pursuant to subpoena, that would have been the better document to have produced today.

MS. WINKELSTEIN:  Your Honor, for the record, I've heard no testimony from other employees that they have received this document.

MS. POLAKOSKI-RENNIE:  And this case isn't over yet.

JUDGE CHU:  I'll allow it in for now.  If there is a better version of GC Exhibit 57, either the General Counsel or one of the Respondent entities can submit it.  But for the purpose of indicating for this witness the benefits, and the attachment was not referenced to by this witness, so I'm not sure whether if there are attachments, whether they would be relevant anyway.  We're only talking about the benefits.

(General Counsel's GC-57 received.)

JUDGE CHU:  Continue.  Marked and entered over the

839

objections with the provision that if there is a better version of GC-57, it be produced.  Continue.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, you said earlier that you also received something else in your paycheck at that time?

A    Yes.

Q    Do you remember what that was about?

A    Our paycheck will be biweekly.

MS. POLAKOSKI-RENNIE:  I'd like to have this marked as GC-58.

(General Counsel's GC-58 identified.)

JUDGE CHU:  All right, please continue.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, have you ever seen this document before?

A    Yes.

Q    Is this the document that you were just referring to that you received in your paycheck?

A    Yes.

Q    Before you received this document, how often were you paid by Sprain Brook?

A    Weekly.

Q    And after you received this document, how often were you paid?

A    Biweekly.

MS. POLAKOSKI-RENNIE:  I'd like to move to have GC-58

entered into evidence, please.

JUDGE CHU:  Any objection to 58?  Hearing none --

MR. MEYER:  Well, she said she received it in her paycheck.  It doesn't say who it's from, so I guess that's still a question.  But other than Mr. Massey's name, but I presume it didn't come from him.

JUDGE CHU:  It didn't come from Mr. Massey.  All right, if perhaps as we get along in the trial we'll find out who generated this document.  But it speaks for itself and I note for the record it does not identify who it came from.

(General Counsel's GC-58 received.)

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, when you received this document in your paycheck, did anyone tell you where it was coming from?

A    No.

Q    Who did you get your paychecks from?

A    We got it at the front desk.

Q    Who worked at the front desk?

A    At the time, it was Joan.

Q    Do you know who did the payroll at Sprain Brook?

A    Israel.

Q    Do you know Israel's last name?

MR. McCARTHY:  I object to that question.  She's leading the witness.  Nobody testified the payroll was done by Sprain Brook.

841

MS. POLAKOSKI-RENNIE:  I don't remember saying that, sorry.

JUDGE CHU:  That's correct.  We have to establish that fact.

BY MS. POLAKOSKI-RENNIE:

Q    I'd like you to look towards the bottom of the document, the last paragraph, if you could read that last paragraph?  And at the bottom of this document where it says -- where it references Israel in the business office, do you know who Israel is?

A    Yes.

Q    Who is he?

A    Israel do payroll.

Q    Do you know who Israel -- the business office that this letter references, where is that located?

A    On the first floor.

Q    In the building where you work?

A    Yes.

JUDGE CHU:  When you say Israel is payroll, what does that mean?

THE WITNESS:  He does payroll services.  Like if you have a problem with your check, he is the one you go to.

JUDGE CHU:  Okay, thank you.

MS. POLAKOSKI-RENNIE:  I'd like to motion again to have this -- I'm not sure if it was entered into evidence.

JUDGE CHU:  It was.

MS. POLAKOSKI-RENNIE:  It was, okay.  Thank you.  I'm sorry.

JUDGE CHU:  We just have not identified the source.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Williams, you said that Israel works in payroll?

A    Yes.

Q    Do you know how long he has been there?

A    2006, 2007.

Q    How do you know that he does anything with payroll?

A    Because he is the one we go to, if we have a problem with our checks.

Q    Have you ever had a problem with your paycheck?

A    Yes.

Q    What did you do when you had a problem with your paycheck?

A    Went to Israel.

Q    Do you recall what, if anything, happened when you sent to Israel about that?

A    When we have a problem, we go to Israel and it is fixed by the following payday.

Q    Does Israel still work in payroll?

A    Yes.

Q    And when you've had problems with your paychecks, you said, and you went to Israel, when was that?

A    Quite a few times I had problems with my check.

843

Q    Do you remember if it was this year?

A    Not this year.

Q    Do you remember what year it was?

A    Within the last three years, I've been having problems. Not lately.

Q    How many problems?

A    Quite a few.

Q    Is Israel the one that you talk to about it?

A    Yes.

Q    When you go to him with a problem with your paycheck, what has he said to you?

A    He will take care of it.

MS. POLAKOSKI-RENNIE:  I don't have any further questions for this witness.

JUDGE CHU:  Thank you.  Mr. Massey?

MR. MASSEY:  Nothing, Your Honor.  Thank you.

JUDGE CHU:  Cross-examination?

MR. MEYER:  Do we have an affidavit, Your Honor?

MS. POLAKOSKI-RENNIE:  Yes.

JUDGE CHU:  Mr. Meyer, do you need time to review it?

MR. MEYER:  Yes, Your Honor, please.

JUDGE CHU:  Till four o'clock?

MR. MEYER:  That will be fine.

JUDGE CHU:  Let's take a recess till four.

(Whereupon, a brief recess was taken.)

844

JUDGE CHU:  Cross-examination of this witness, please.

CROSS-EXAMINATION

BY MR. MEYER:

Q    Ms. Williams, you filled out an affidavit for the NLRB as part of this proceeding, correct?

A    Yes.

Q    It was a sworn statement?

A    Yes.

Q    And you understand what that means?

A    Yes.

Q    That you're averring to the truth of what's in that statement?

A    Yes.

Q    And you're under oath right now, too, correct?

A    Yes.

Q    Isn't it true that your pay rate, whether -- I'm going to use September 13th as that was on or about the date of the sale from old Sprain Brook to new Sprain Brook.

MS. POLAKOSKI-RENNIE:  Objection.  I don't recall any -- it's outside the scope.  I don't recall her testifying about pay rates at all in her testimony.

MR. MEYER:  We'll get to the paychecks.  We're going to get there, Your Honor.

BY MR. MEYER:

Q    Prior to, Ms. Williams, the sale of Sprain Brook, what

Q    company's name was on your paychecks?

A    Sprain Brook.

Q    And in 2004, it said Sprain Brook, correct?

A    2004, it was with Ad (ph.), first.

Q    What was the name of the company?

A    I'm not sure that company.  They put you in an agency for a year and then you go to Sprain Brook.

Q    So every employee who works at Sprain Brook initially starts at an agency?

A    For a year.

Q    How long do you understand that policy or that practice to be in place for?

A    When I got there.  I'm not sure before that.

Q    How about after you started working, how long did it continue?

A    I'm not sure, because I went on staff after a year.

Q    Did you ever speak with any other employees about whether or not they were an agency employee or not?

A    Most of them was there before me that I spoke to.

Q    Did you speak with any employees --

MS. POLAKOSKI-RENNIE:  Objection.  It's not relevant.

MR. MEYER:  I haven't asked the question yet.

MS. POLAKOSKI-RENNIE:  His last question about -- that line of testimony about agency workers is not relevant.

MR. MEYER:  She opened the door to it, Your Honor.

JUDGE CHU:  Ms. Williams testified to that.  I think we're getting to the point where we want this witness to identify the name on the payroll check, so I'll allow this background information.

MR. MEYER:  Thank you, Your Honor.

BY MR. MEYER:

Q    Ms. Williams, did you speak with any employees who were hired after you?

A    Not about their check.

Q    About whether or not they were an agency employee for a period of time or not.

A    Not about their checks.

Q    Did you ever speak with them about whether or not they were employed by an agency?

A    No.

Q    How long did -- for what period of time did your paycheck say Sprain Brook, Sprain Brook Manor Nursing Home, LLC, I presume, right?

A    Sprain Brook Manor Nursing Home.

Q    How long a period of time did your paychecks say that?

A    From 2005 until 2012.

Q    Do you recall when that changed?

A    Around 2013.

Q    And what name then appeared on your paychecks?

A    Budget.

Q    So you've had a total of three different names on your paychecks, correct?

A    Yes.

Q    What was the name of the first company?

A    I don't recall.

Q    It was something other than Sprain Brook, though, correct?

A    Yes.

Q    And the rate of pay set forth in those pay stubs --

MS. POLAKOSKI-RENNIE:  Objection.

MR. MEYER:  -- was always the same, correct?

MS. POLAKOSKI-RENNIE:  Objection.

JUDGE CHU:  I'll allow it.  Go ahead, answer.

THE WITNESS:  The first one was 8.25.  Then after it went to Sprain Brook, it was $10.

BY MR. MEYER:

Q    And your Budget paystubs were also $10, correct?

A    Yes.

Q    Did you speak with any other CNAs about their rates of pay?

A    That was the rate we were all getting at the time on night shift.

Q    So at least for the CNAs on your shift, it's your understanding and your testimony that everybody was paid $10 an hour?

A    The ones that started night time.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

848

Q    And by $10, both pre and post-sale, that September or so date when your check went from Sprain Brook to Budget, correct?

A    Yes.

Q    Do you know about the other CNAs at the facility?

A    No.

Q    You stated in your affidavit, I believe it was in Paragraph 5, that you met with a Budget representative and a Local 713 representative that you testified to, that they introduced themselves at the start of the meeting, but you didn't recall their names.  You recall providing that information in your affidavit?

A    Yes.

Q    Okay.  And you also testified earlier today that the Local 713 representative's name was Kevin, correct?

A    Yes.

Q    When did you first recall that his name was Kevin?

A    Because he came by Sprain Brook after and had meetings.

Q    But that was before you submitted this affidavit, correct?

A    After.

Q    After, okay.  When was the last time that you spoke with or met with Kevin?

A    Around April.

Q    Of which year?

A    2014.

Q    '14, okay.  What did you do in order to prepare for your

849

testimony, today?

A    Could you repeat the question?

Q    Were you subpoenaed to appear here, today?

A    Yes.

Q    And as part of prior to you appearing here, today, did you prepare in any way?  Did you review any documents?  Did you speak with anyone?

A    I look over my affidavit and I also was in contact with Julie.

Q    Which Julie?  There are two Julies here.  Do you recall which one?

A    Julie P.

Q    Julie P, okay.  When did you meet with Julie P?

A    The last time was on Friday.

Q    This past Friday?

A    Yes.

Q    Were you ever told that Israel owned Budget Services?

A    Yes.

Q    Who told you that?

A    I heard it from the girl at the front desk, Stephanie.

Q    How did that come up in conversation?

A    Because I was trying to get in touch with somebody from Budget.  And the name they gave me, I couldn't get in touch with them.  They said it was a payroll agency.

Q    So Stephanie gave you a name of somebody at Budget to

call?

A    Israel gave me a name.  But when I called, they said it was a payroll agency.

Q    Did you speak with somebody at Budget?

A    They said it was a payroll agency.

Q    Why did you call somebody at Budget?

A    Because I wanted to find out when are we going to get a raise and other things.

Q    Did you raise any of your payroll issues with that person at Budget?

A    It was a payroll agency.  They couldn't answer my questions.

Q    Did you ever raise the question or concerns you had about your payroll with anyone at Budget?

A    No.

Q    Even though you were told Budget was a payroll company, correct?

A    Yes, they only did payroll.

Q    But you never called them about payroll issues?

A    I called them because they said I'm working for Budget, so I wanted to know who I'm working for.

Q    I understand that.  But with regard to your payroll questions that you said you had, that you hadn't had for a number of years --

        MS. POLAKOSKI-RENNIE:  Objection.  It was asked and

851

answered.  I think he's badgering my witness.

MR. MASSEY:  That's a confusing question.

JUDGE CHU:  We're going to clarify --

MR. MEYER:  She's not answering the question, is the easy answer.

MS. POLAKOSKI-RENNIE:  He's badgering.

MS. ULMET:  She answered no.

JUDGE CHU:  Did you ever speak to somebody from the Budget agency about your payroll?

THE WITNESS:  When I called, they said they was just a payroll agency.  They couldn't answer my questions.

JUDGE CHU:  All right, that's the answer.

MR. MEYER:  I don't have anything else.

JUDGE CHU:  Thank you, counsel.  Mr. Vann?  Anybody else?

                    CROSS-EXAMINATION

BY MR. VANN:

Q    Good afternoon.

A    Good afternoon.

Q    Do you recall the phone number that you called to try to speak to somebody at Budget?

A    No.

Q    How long ago was it that you made that phone call?

A    It was around 2013, early 2013.

Q    What were the questions that you wanted to ask Budget?

A    I wanted to know when am I going to get a raise.  I wanted

852

to know what benefit I have and what they going to do for us as their workers.

Q    After you made that phone call and you were told that Budget is a payroll agency, did you do anything else to try to get answers to your questions?

A    I went to the front desk, to Stephanie, at the time.

Q    And?

A    She told me that Budget was run by Israel.

Q    Israel, a man who is in the payroll office at Sprain Brook?

A    Yes.

Q    So then after she told you that, what, if anything, further did you do?

A    I just stopped right there.

Q    You stopped right there.

A    Yeah.

Q    You didn't go to Israel to ask him the questions that you wanted answers to?

A    Because the first time I went to Israel, he gave me a number for Budget.  And nobody could answer my questions.  So I figured it's -- they're just sending me in circles.

Q    Did you go to Israel and tell him that you called the number and nobody at Budget could answer your questions?

A    No.

Q    Why not?

853

A    Because I spoke to Stephanie already.

Q    Stephanie is a receptionist?

A    Yes.

Q    She's not an owner of the company, is she?

A    No.

Q    She doesn't make decisions about payroll, does she?

A    No.

Q    And you knew that to be the case, is that right?

A    Yes.

Q    When you had issues with your checks, you went to Israel to discuss it, correct?

A    Yes.

Q    And after you spoke to Israel, those issues were resolved on your very next paycheck, isn't that correct?

A    Yes.

Q    So it was clear to you that Israel had something to do with payroll, isn't that correct?

A    Yes.

Q    And yet you didn't go to Israel to ask for the answers to these questions that were so important to you.

A    No.

Q    You said that you went to a meeting in the rec room at Sprain Brook.

A    Yes.

Q    Is there a reason why in your description of the premises

of Sprain Brook in your affidavit there is no reference to a rec room?

A    It's in there.

Q    It's in there?

MR. VANN:  May I hand a copy, please?

BY MR. VANN:

Q    Could you show me where in this document you have a reference to a rec room?  Look at your Paragraph 2, please.

MS. POLAKOSKI-RENNIE:  I think the witness should be directed to look at paragraph --

MR. VANN:  There's no coaching from the side here, please.

JUDGE CHU:  She was asked to look at the entire affidavit.

THE WITNESS:  It's in 4.

BY MR. VANN:

Q    Before we get to 4, could you please read Paragraph 2 in its entirety into the record?

MS. POLAKOSKI-RENNIE:  Objection, Your Honor.

MS. ULMET:  It's a waste of time.

MS. POLAKOSKI-RENNIE:  We have her testimony about what happened.  Unless he has something specific that he wants to question her about, an inconsistent --

JUDGE CHU:  Yeah, I don't want her reading the entire paragraph from the affidavit into the record.  Is there a specific point in that Paragraph 2?

BY MR. VANN:

Q    In Paragraph 2, you describe the premises, correct?

A    Yes.

Q    And you describe the top three floors as being the floors on which patient rooms are located, correct?

A    Yeah.

Q    And then you describe the first floor.  And you said it has a dining room and a rehab area.  Correct?

A    Yes.

Q    Nothing about a rec room there, in that paragraph, isn't that correct?

A    Yes.  You wanted me to put everything on the floor?

MR. VANN:  I move to strike everything except the word --

MR. MASSEY:  I move to strike your question.  This is abusive of the witness.  I mean, come on, are you really disputing there is a rec room in the facility?  Where are we going with this line of questioning.  It's in Paragraph 4. Where are you going, counsel?

MS. POLAKOSKI-RENNIE:  It is irrelevant.

MR. MASSEY:  This is a waste of time.

MR. VANN:  This woman signed an affidavit under oath as to a description of the premises.

MR. MASSEY:  She didn't say it's a description of the premises.  She did not say that.

MS. POLAKOSKI-RENNIE:  Also, if that's --

MR. MASSEY:  That's your characterization, not hers.  This

856

is a waste of time.

MS. POLAKOSKI-RENNIE:  It's outside the scope as well.  I didn't ask her to describe the facility on direct.

MR. MASSEY:  Is there a rec room?  Are you disputing there is a rec room at the facility?  Where are we going with this line of questioning?

MR. VANN:  I haven't been at the facility.  She has.

JUDGE CHU:  It's beyond the direct.  Nobody asked this witness to describe or give a description of the nursing home on direct.  Let's move on, counsel.

MR. VANN:  Thank you, Your Honor.

BY MR. VANN:

Q    You said that you were at a meeting at which there was a representative of the local and a representative of Budget.

A    Yes.

Q    Was there only one such meeting or more than one such meeting?

A    That was the one meeting I've been to.

Q    That's the only meeting you went to, correct?

A    That they have both of them there.

Q    Okay.  Did you ever see that woman again at any time after the meeting?

A    No.

Q    Did you ever see that woman at any time before the meeting?

A    No.

Q    So you saw that woman once and one time only?

A    Yes.

Q    How long did that meeting last?

A    I'm not sure how long it last.  I leave work at two, so I had to leave.

Q    How long were you at the meeting?

A    About 30 minutes to 45.

Q    You got a chance to get a good look at that woman?

A    Well, I think if I see her again, I could recognize her.

Q    Why don't you tell us what she looked like?  How tall was she?

A    About 5'5".

Q    How much did she weigh?

A    I don't know.

Q    What color was her hair?

A    I believe it was brown.

Q    Did she wear glasses?

A    I don't recall.

Q    What was she dressed like, at the time?  What was she wearing?

A    I don't recall.

Q    What language or languages did she speak?

A    English.

Q    And you said in your testimony that she identified herself

as a Budget employee?

A    A representative for Budget.

Q    A representative of Budget.  Did she say whether she was an employee of Budget?

A    No.

Q    Did anybody ask her in what capacity she was a representative of Budget?

A    No.

Q    Did she give her name?

A    I don't recall her name.  Yes.

Q    Did anybody ask her any questions?

A    Not when I was in there, at the time.

Q    How long did she speak to the people who were there, while you were there?

A    After she introduce herself, she tell us that Local 713 comes with Budget.

Q    Anything else that she said?

A    I don't recall.

Q    Do you recall any other identifying features of this woman that would enable you to recognize her, if you saw her again?

A    No.

Q    There are four women sitting in this room.  Are any of those the women who were at that meeting?

A    No.

Q    You've never again seen that woman?

A    No.

Q    You don't know her name?

MS. POLAKOSKI-RENNIE:  Objection; asked and answered.

JUDGE CHU:  Sustained.

BY MR. VANN:

Q    Did this woman give out a business card or anything else to the people who were present?

A    I didn't receive one, if she did.

Q    Did you see her give out a card to anybody?

A    No.

Q    Did you see her arrive at the premises?

A    No.

Q    Do you recall the color of her eyes?

A    No.

Q    What was the color of her skin?

JUDGE CHU:  Would you identify the person as Caucasian?

THE WITNESS:  I'm not sure if she's Caucasian.  She was like light skinned.  I don't know if she was Caucasian, Hispanic, I don't know.

BY MR. VANN:

Q    If I told you that Budget does not have any employee at that time of the type you are describing, would that surprise you?

A    Yes.

Q    Did you complete any forms on that day?

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

A    No.

Q    You testified earlier that the statement was made at that meeting that if you didn't complete the forms, you wouldn't have a job, is that correct?

A    Yes.

Q    Was it important to you to have and keep the job that you then had?

A    Yes.

Q    And yet you didn't fill out any of those forms on that day?

A    Because I had to leave.

Q    I didn't ask you because.  Yes or no?

A    Can you repeat the question?

Q    Is it true that you did not fill out any of those forms on that day?

A    Yes.

    MR. VANN:  I have no further questions of this witness, Your Honor.

    JUDGE CHU:  Thank you.  Ms. Winkelstein?

    MS. WINKELSTEIN:  Nothing, Your Honor.

    JUDGE CHU:  Mr. McCarthy?

    MR. McCARTHY:  Nothing.

    JUDGE CHU:  Thank you.  Redirect?

                    REDIRECT EXAMINATION

BY MS. POLAKOSKI-RENNIE:

861

Q    Ms. Williams, Mr. Vann was just asking you some questions about this meeting that you had in which there was a Budget representative present and you were told to fill out some forms, and you said that you did not fill them out that day. When did you fill out the forms?

A    I filled it out the next day and returned it to the front desk.

Q    Why did you wait till the next day to fill it out?

A    Because I leave work at two and I had to go get the kids.

Q    Were you scheduled to work the day that you turned them in?

A    Yes.

MS. POLAKOSKI-RENNIE:  I don't have any further questions for this witness.

JUDGE CHU:  Mr. Massey?

MR. MASSEY:  Nothing further.

JUDGE CHU:  Thank you.  Ms. Williams, you are free to go. Thank you for your testimony.  Do not discuss your testimony with anybody outside of this proceeding.  All right?  Thank you.

(Witness excused.)

JUDGE CHU:  Off the record.

(Pause off the record.)

JUDGE CHU:  On the record.

Please state for the record your full name, spell your

last name.

THE WITNESS:  Paula Robinson, R-O-B-I-N-S-O-N.

JUDGE CHU:  Ms. Robinson, I'm Judge Chu.  I'm going to swear you in as a witness.  Raise your right hand, please.

(Whereupon,

PAULA ROBINSON,

was called as a witness by and on behalf of the General Counsel and, after having been duly sworn, was examined and testified as follows:)

JUDGE CHU:  Thank you.  The lawyers will be asking you questions for you to answer.  If anybody objects to the question, do not answer that question until I can make a ruling on it.  All right?  Thank you.  General Counsel, please?

DIRECT EXAMINATION

BY MS. POLAKOSKI-RENNIE:

Q    Good afternoon, Ms. Robinson.

A    Good afternoon.

Q    Have you ever been employed at a nursing home located at 77 Jackson Avenue, in Scarsdale, New York?

A    Yes.

Q    For the rest of my questions to you, today, I'm going to refer to this nursing home just as Sprain Brook.

A    Okay.

Q    Do you recall when you first started working at Sprain Brook?

A    Yes.

Q    When was that?

A    In February 2004.

Q    What is your job title at Sprain Brook?

A    A certified nurse's aide.

Q    Has this always been your job title?

A    Yes.

Q    What are your job duties as a certified nurse's aide?

A    My job title (sic) is to provide care for the resident. Also, to collect specimens when required, and to report to the nurses of any changes with the residents.

Q    Have these always been your job duties as a certified nurse's assistant at Sprain Brook?

A    Yes.

Q    What are the hours that you work?

A    11 p.m. to 7 a.m.

Q    How long have you had this schedule for?

A    From 2004, 10 years.

Q    Does anyone keep track of the hours that you work at Sprain Brook?

A    Yes.

Q    How is that done?

A    By punching in and out on a time clock.  What we do is we put our social -- the last four digits of our social, punch that in, and then you put your five fingers of your right hand

864

under a sensor.

Q    Where is that time clock located?

A    It's in the lobby at Sprain Brook.

Q    How long have you been using that time clock?

A    For a while.

Q    Have you used it longer than a year?

A    Yes, longer than a year.

Q    Were you using it before 2012?

A    Yes.

Q    Do you remember how long before 2012 you had been using it for?

A    I'll say around three years.

Q    I'd like to direct your attention now to September of 2012.  Do you remember being called into work to fill out some paperwork?

A    Yes.  I was on vacation, at the time; at that time, on three weeks' vacation.  And I was in Mexico when I checked my voicemail and there were like all my friends were calling.  And there was a message from the director of nursing saying that I need to come in and do some paperwork or I might not have a job.

Q    Who is the director of nursing?

A    Amy.

Q    Do you know Amy's full name?

A    No, I can't recall.

Q    Would you know it, if you heard it?

A    Yes.

Q    Is it Amelia Mendizabal?

A    Yes, that's it.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what has previously been marked and entered into evidence as GC-38.

MS. WINKELSTEIN:  Again, Your Honor, I'd just ask for a foundation first.

JUDGE CHU:  Why don't you ask some questions leading up to Exhibit 38?

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, you said Ms. Amy told you to come fill some paperwork out?

A    Yes.

Q    And do you remember what that paperwork was?

A    When I got back from vacation, September 21st, I went there like 9 p.m. that night, when I got back, because she said as soon as I get back, I should come in.  And Paul Quinto was the 3 to 11 supervisor at that time.  He brought me the application and two letters.

Q    And Paul Quinto, you said he's a supervisor?

A    At that time, he was the 3 to 11 supervisor.

Q    How long had he been a supervisor for?

A    For a while.

Q    Was he a supervisor after that time, too?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what was marked as GC-38, please.

JUDGE CHU:  Is this what they asked you to fill out?  This is not your name, so don't pay attention to the name, but just the caption.

THE WITNESS:  Yes.

JUDGE CHU:  What does it say?  State for the record what does this say?

THE WITNESS:  Employment Application, Budget Services, Inc., 129 South 8th Street, Brooklyn, New York, 11211.

JUDGE CHU:  All right, thank you.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, I understand that the document you were just shown, which is GC-38, has someone else's information filled out, but is that the job application that Ms. Amy had asked you to fill out?

A    Yes.

Q    And is that the one that you filled out?

A    Yes.

Q    Do you remember what, if anything, Ms. Amy -- what else she said about filling out the application?

A    No.  She only said to me that better things are coming to Sprain Brook.  I remember that on my voicemail.

Q    After you filled out the application, who did you give it

to?

A    Paul Quinto.  It was like nine in the night.

Q    After you gave the application to Paul Quinto, did you continue working at Sprain Brook?

A    Yes.

Q    Did your job change at all after that?

A    No.

Q    Did you continue working as a certified nurse's aide?

A    Yes.

Q    Did your job duties change as a certified nurse's aide?

A    No.

Q    Did your schedule change after you filled out that job application?

A    No.

Q    Did your supervisors change after you filled out this application?

A    No.

Q    Do you remember being given any other documents at work around that time?

A    Well, I think sometime in December.

Q    I'd like to direct your attention still to September of 2012.  You said that Mr. Quinto had given you other documents at that time?

A    Yeah, the application, along with the two letters, and my three weeks' vacation checks.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

Q    What were these two letters?

A    It was one from Mr. Kline terminating our service effective immediately, dated September 12th.  And our service would terminate immediately, September 13th.  And there was an also from -- signed by Ari Stein that he would be the new owner.  And we'd be working for this -- if we want, we work for the same pay.

Q    You said the letter from Mr. Kline was dated September 12th.  Do you remember what year that was?

A    2012.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what was previously marked as GC-22(c) and GC-23(c).

BY MS. POLAKOSKI-RENNIE:

Q    Are these the two letters that you were just referencing in your testimony?

A    Yes.

Q    Do you know why you got these letters?

A    Well, only because I say, as I stated, that our service was terminated effectively and somebody was taking over.

Q    Before you received these letters, at any point had you heard an announcement at Sprain Brook that there was a change in ownership?

A    No.  This was a shock.

Q    After the change in ownership, did you continue working the night shift?

869

A    Yes.

Q    And after the change in ownership, was there a change in the staff that you worked with in the night shift?

A    No.

Q    Did you continue working with the same co-workers?

A    Yes.

Q    And earlier in 2012, had there been any changes to the staffing in the shift that you were working?

A    No.

Q    Earlier than 2012, so in 2011, had there been any staffing changes in the shift that you worked?

A    Eleven to seven?

Q    Yeah.

A    No, maybe only supervisor.

Q    So there had been a change in supervisors or was it a simple someone quitting or someone being fired and rehired?

UNIDENTIFIED SPEAKER:  Objection, leading.

BY MS. POLAKOSKI-RENNIE:

Q    What was the change that you had observed to the supervisors in 2011 that you just talked about?

A    It was only our supervisor.  We got a new supervisor sometime in November 2011, Mercedes.

Q    Is Mercedes still a supervisor at Sprain Brook?

A    No.

Q    When did she leave?

A    She resigned the end of December 2012.

Q    After the change in ownership, was Ms. Amy still the director of nursing?

A    Yes.

Q    How long had she been there for?

A    I can't recall, been a while.

Q    Do you know who currently does the payroll at Sprain Brook?

UNIDENTIFIED SPEAKER:  Objection, leading.

THE WITNESS:  Israel.

JUDGE CHU:  I'll allow it.  Let's move on.

BY MS. POLAKOSKI-RENNIE:

Q    Do you know Israel's last name?

A    No.

Q    Do you know how long Israel has been doing the payroll at Sprain Brook?

A    I think maybe from around 2006.  I'm not sure.

Q    How do you know that Israel does the payroll at Sprain Brook?

A    Because if there is an issue or anything, you talk to Israel.

Q    Have you ever talked to him about an issue that you have had?

A    Yes, I did.

Q    What kind of issue did you have?

A    I remember once when I went to the bank, because it's direct deposit, on Friday morning, I went to the bank and there was no money, so I text him and he text me back to say Budget messed up.

Q    Do you remember when that was?

A    It was a Friday.  I can't remember.  In 2013, I think it was July.  I'm not sure.  But he said Budget messed up.  And then I called a girlfriend and they said they were issuing, instead of direct deposit, they were issuing checks so I would have to come in and pick up my check.

Q    Did you go pick up your check?

A    Yes, that Friday afternoon.

Q    Had there been any other times that you had issues with your paycheck that you had gone to Israel about?

A    Yeah, you know, recently I saw -- if I see anything on my check.  I saw this weekend rate, so I text to ask him what this is about.  So he text me back and said they were trying out something new with people who work on weekend to get a special rate, but they are going to stop it.

Q    Do you remember when that was?

A    That was recently, a couple of weeks ago.

Q    Okay.  Have you ever heard of a company named Budget Services?

A    Yes, payroll service.

Q    How do you know that they are a payroll service?

A    Because I called them once.

Q    Why did you call them?

A    We keep hearing that we are working for Budget and I wanted to know who Budget really was, so I call to tell them I was looking for a job.  And it was a female who answered and she said we don't employ people, we are a payroll service.

Q    Who is the female that you talked to?

A    I don't know her name.

Q    Who had given you the number to call?

A    It was Israel.

Q    Why had he given you that number?

A    I asked for it.  So, afterwards, I call, I think I spoke to Kevin, and he said that was the wrong number.  He gave me another number.  When I called that number, it says Renaissance Home Care.

Q    Who is Kevin?

A    Kevin Watts work with Local 713.

Q    Why did you ask Kevin for Budget's phone number?

A    Because I heard that Kevin was the one who -- the union person.  And since the letter from Ari had stated that someone from 1113 or 713 would be coming in along someone from Budget to speak to the people, I decided to call him up.

Q    What did you say to Kevin when you talked to him?

A    We spoke about the number.  He gave me the number and I spoke to him, asked him if there is any delegate at Sprain

873

Brook that I could talk to.  He said no, nobody wanted it.  So I said -- I remember I said to him because we didn't vote you people in, so we don't have a delegate.

Q    When you said that Israel told you that you worked for Budget, do you remember when that conversation was with Israel?

A    I can't recall if it was in January or December.

Q    Of what year?

A    It was either December 2012 or January '13.

Q    I'd like to direct your attention now to December of 2012.  Do you remember receiving any documents, at that time?

A    Well, I remember working and our supervisor, Mercedes, came in and said she left some -- two -- a set of documents, because two of us work at nights, for us to sign.  And she left it on the nurses' station.

Q    She came back in the morning asking for that.  I said I'm not signing it.  She says Ari need it on his desk.  I said tell Ari that I said I am not signing it.  And that was it.

Q    Do you know what these two documents that -- I'm sorry, who had given them to you?

A    Mercedes.

Q    Mercedes had given to you, do you know what they were?

A    It was two packages, one for each one of us.

Q    Why did you refuse to sign them?

A    Because I saw the other girl signing hers and it was all from 713.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

Q    So you looked at the document?

A    Yeah.  She told me they are from 713 Union.  And she was filling them out.

Q    Do you recall what, if anything else, Mercedes told you about those documents?

A    Apart from Ari needs on his desk that morning, no, we didn't talk about it.  That was it.

Q    Okay.  Do you know what kind of documents they were?

A    I remember I saw the girl with a blue card and I really didn't know the other documents, what they were.

Q    Who was the girl with the blue card?

A    Grace Woodward.

Q    Do you recall what Grace said about the card to you?

A    She said it was a medical card and some other document, and she said she didn't care because she has another job, so she really didn't care.  She just filled them out and give them back.

Q    Do you know if you were given those same documents in the package that Mercedes handed you at the nurses' station that day?

A    I really didn't open my package.  But from what I saw, it was the same thing; it would be the same things, because she said she have two, the set of documents for us to fill out.

Q    Did you glance at the documents?

A    Yeah, as I remember --

UNIDENTIFIED SPEAKER:  Objection, Your Honor, leading.

THE WITNESS:  -- I saw the blue card.

JUDGE CHU:  I'll allow it.

BY MS. POLAKOSKI-RENNIE:

Q    You can --

A    I remember I saw the blue card, she said that's the medical card, and some other forms.

Q    Would you be able to identify like the blue card and the other one that you just referenced, if you saw them?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what was previously admitted as GC-26(b) and GC-26(c), well, and GC-26(a).

JUDGE CHU:  That's the first two pages of 26.  The first one has a yellow card and the second page has a blue card.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, you said there was a blue card that you had seen.  If you look at GC-26(b), do you recognize it as the same one?

A    Yes, the blue one.  And also the yellow one, I remember the yellow one.

Q    Can you look at GC-26(a), please?

JUDGE CHU:  She just did.

BY MS. POLAKOSKI-RENNIE:

Q    Okay, so that was the yellow card?

A    Yeah, I saw the yellow card and the blue one.

Q    And you recognize those two cards as the cards that your co-worker, Grace, was filling out?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to show the witness what was also previously marked and entered into evidence as GC-57.

MS. WINKELSTEIN:  Objection, Your Honor, foundation.

MS. POLAKOSKI-RENNIE:  It's been previously entered into evidence and I don't know that I have to --

MS. ULMET:  We don't need a foundation.

MS. POLAKOSKI-RENNIE:  We don't need a foundation for it.

MS. ULMET:  She can look at the document, tell us if she recognizes it or not.  If she doesn't recognize it, she can say no.

MS. WINKELSTEIN:  Judge, she needs to lay a foundation before she can recognize a document, otherwise it's leading.

MS. ULMET:  You need a foundation to authenticate a document.  You don't need a foundation to show a witness a document that is already in evidence in the case.

JUDGE CHU:  It's a part of the record.  The witness can identify if she has seen this before.  Go ahead, answer.

THE WITNESS:  Is this the one?

JUDGE CHU:  Yes, that's the one.  Go ahead, ask the question.

BY MS. POLAKOSKI-RENNIE:

Q    You have GC-57 in front of you?

A    Yes.

Q    Have you had a chance to look it over?

A    Yes.

Q    Have you ever seen this before, Ms. Robinson?

A    Yes.

Q    Where have you seen this before?

A    We got it in our paychecks, I think in December.

Q    What year?

A    2012.

Q    Ms. Robinson, can you look at the top of the document? What does it say?

A    Local 713 IBTU, Sprain Brook Manor Rehab, Scarsdale.

Q    Has it been your experience that your benefits have changed to reflect what this document says?

A    Yes.

Q    I'd like you to go to the point of the document where it says holiday pay.

A    Yes.

Q    And it has a list of days there.

A    Yes.

Q    Has it been your experience that after you received this document that those are the days you get holiday pay for?

A    Yes.

Q    Are there any holidays that are not on that list that you

get holiday pay for?

A    Used to.

Q    You used to?

A    Yes.

Q    But after this document, are there any holidays that you get holiday pay for that are not on there?

A    No.

Q    So you said used to.  So before you got this document, what holidays did you get -- well, did you get more holiday pay or less holiday pay?

A    More.

Q    You got more holiday pay.  And did you get more days for holiday pay or less?

A    We got more.  This is showing seven days.  We usually get 10.

Q    So before you received this document, you received 10 holiday days?

A    Yes.

Q    How long had you been receiving 10 holiday days for?

A    From 2004.

Q    It says vacation at the bottom of that first page and then it goes into the second page.  Has it been your experience that your vacation now is what this document says it is?

A    Now.

Q    Now?

A    But it was much more.

Q    When you say it was much more, was it before you received this document?

A    Yes.

Q    How much more did you get before?

A    Well, I was getting three weeks' vacation, at that time, because I've done five years.  Five years and up, it depend, you get three weeks.

Q    So based on your seniority, you had done five years?

A    Yeah.

Q    And how long -- like when did your vacation time change to reflect what this document said?

A    September 2012.

Q    When did your holiday pay change as well?

A    This came in effect, I think, January 1, 2013.

Q    Okay.  So up until that point, your benefits had not been changed?

A    Because I went on vacation before this happened, you know, September, so I didn't do any more vacation until 2013, which I only got five days.

Q    Okay.  I'd like you to still go back to that second page of the document, under sick time?

A    Yes.

Q    Has it been your experience that that's the amount of sick time that you get now?

880

A    That's what we get now.

Q    And before you received this document, how much sick time had you been getting?

A    We used to get 12 days per year.

Q    How long had you been getting 12 days of sick time a year?

A    From start working, 2004.

Q    When did that change to be what it is now?

A    It changed in January 1, 2013, when we got this document.

Q    I'd like you to still look then at the last section.  It says health insurance.  Has it been your experience then that your health insurance reflects what this section says?

A    Yes.

Q    When did your health insurance change?

A    January 1st.  I never usually take their insurance till recently.  So you get a $50 -- used to get $372 per month.

Q    Stipend?

A    Yeah.

Q    And what was that stipend for?

A    If you don't take your insurance, Sprain Brook insurance.

Q    You had received that before you received this document?

A    Yes.  I think they cut it off a couple of months before September.  I can't really remember exactly when.

Q    Do you know then how much it was after you received this document?

A    Fifty dollars.

881

Q    Okay.  This document -- do you receive personal days currently?

A    No.  We usually get two.  Now we don't get any.

Q    When did you receive two personal days?

A    Before we got this document.

Q    And then when did that change?

A    Everything changes on January 1, 2013.

Q    You said two personal days.  Was that per year?

A    Per year.

Q    What's your seniority date currently?

A    Now?

Q    Yes.

A    September 15, 2012.

Q    Had that always been your seniority date at Sprain Brook?

A    No.

Q    What was it before?

A    Well, I started in February 2004.

Q    When had it changed?

A    It changed September 15, 2012.

Q    Okay.  Do you get any other kinds of stipends at work?

A    Used to, but not anymore.  Usually get uniform allowance. I think it's $4.20, I'm not sure about the cents, per week, and a meal allowance of $5.40 per week.  But we don't get that anymore.

Q    When did you stop getting those allowances?

882

A    September.

Q    Of what year?

A    2012.

Q    How long had you been receiving those allowances before September 2012?

A    From 2004.

Q    I'd like to direct your attention now to December of 2012. We're jumping back again.  You testified that you were given a package of documents by Mercedes to sign.  You refused to sign those documents.

A    Yes.

Q    Did you ever sign anything that said that you wanted to become a member of Local 713?

A    No, never.

Q    Did you ever sign anything that said that you were giving permission to Local 713 to take union dues out of your paycheck?

A    No, never.

Q    Did you ever give permission to your employer to take dues for Local 713 out of your paycheck?

A    No.

Q    Were union dues for Local 713 ever taken out of your paycheck?

A    Yes.

Q    Do you remember when that started?

883

A    It started January 2013.

MS. POLAKOSKI-RENNIE:  I'd like to have this marked as GC-59.

(General Counsel's GC-59 identified.)

JUDGE CHU:  Let's go.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, do you recognize what has been set in front of you, it's GC-59?

A    Yes.

Q    What is this?

A    These are my pay stubs.

Q    Can you look at the date on the one that's on top, on the right-hand corner?  What date is that?

A    7/19/2013.

Q    Under that there is a section that says union dues.

A    Yes.

Q    What is the amount there?

A    The weekly one or the one to-date?

Q    Both.

A    The union dues, $11.54.  And then to-date, $138.48.

MS. POLAKOSKI-RENNIE:  I'd like to move to have these pay stubs which were marked as GC-59 entered into evidence.

JUDGE CHU:  Any objections?

MR. MEYER:  No, Your Honor.

JUDGE CHU:  Thank you.  Marked and entered, GC-59.

(General Counsel's GC-59 received.)

BY MS. POLAKOSKI-RENNIE:

Q    Did you discuss the dues coming out of your paycheck with anyone from Local 713?

A    Yes.

Q    Who?

A    Kevin Watts.

Q    Do you know who Kevin Watts is?

A    The union person.

Q    Do you remember when you talked to Kevin Watts?

A    I think it was sometime in January.

Q    Of what year?

A    2013.

JUDGE CHU:  Can you spell his last name?

THE WITNESS:  I think W-A-T-T-S.  I am not sure.

UNIDENTIFIED SPEAKER:  I'm sorry.  I didn't hear that?

MR. MASSEY:  W-A-T-T-S.

JUDGE CHU:  W-A-T-T-S.

BY MS. POLAKOSKI-RENNIE:

Q    Do you remember what, if anything, was said in that conversation with Kevin Watts?

A    When I called him up, I told him that -- I told him I notice my paycheck, I have union dues being deducted and I did not sign any paper for them to deduct anything from my pay.

Q    Do you recall if he had a response?

A    Yeah, he told me that he'll be at Sprain Brook, I can't remember, that Monday, because he comes to Sprain Brook -- there is a document that stated he comes to Sprain Brook every first and third Monday of each month.  And I told him I could not be there because I work nights and he's coming in at two o'clock.

Q    Do you recall anything else from that conversation with Mr. Watts?

A    No, I can't recall.

Q    Did you ever end up meeting with Kevin Watts?

A    No.

Q    Did you ever end up meeting with anyone from Local 713?

A    Never.

Q    Did they ever resolve the issue about why there were dues coming out of your paycheck?

A    No.

Q    Do you know if Kevin Watts visits Sprain Brook?

A    From what I heard, he comes like every first --

UNIDENTIFIED SPEAKER:  Objection.

MS. POLAKOSKI-RENNIE:  I'd like to have marked as GC-60 --

(General Counsel's GC-60 identified.)

MS. WINKELSTEIN:  Again, Judge, she's giving the witness documents when this witness hasn't testified about what this is or her knowledge.

MS. ULMET:  She just testified about a flyer.  This is the

886

flyer.  It's also not a proper objection.

UNIDENTIFIED SPEAKER:  It seems appropriate to ask her if she remembers this stuff before we start refreshing her recollection with documents she hasn't looked at.

MS. ULMET:  She just testified about a flyer showing when Kevin visits the facility.

UNIDENTIFIED SPEAKER:  She didn't say any such thing.

MS. ULMET:  If you guys didn't hear it, I'm sorry, but it was in the record.

UNIDENTIFIED SPEAKER:  She didn't say anything about a flyer.

JUDGE CHU:  Excuse me, I'm speaking.  She did testify that this Kevin fellow, on 7/13, does go to Sprain Brook at least twice a month during the hours that she's not working.

UNIDENTIFIED SPEAKER:  She also referenced a paper or a sign.  She might have used the word leaflet, but she certainly referenced this document.

JUDGE CHU:  So this document referenced her earlier testimony about the appearance of Kevin at Sprain Brook.  Let's continue.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, have you ever seen this document before?

A    Yes.

Q    Where have you seen this before?

A    It's over our time clock where we punch in and out.

Q    At Sprain Brook?

A    Yes.

Q    Do you remember when you saw this posted at the time clock?

A    I think it's in 2013 sometime.

MS. POLAKOSKI-RENNIE:  I'd like to move to have this document, GC-60, entered into evidence.

JUDGE CHU:  Any objections to that document?

(No response.)

JUDGE CHU:  I hear none, so it's marked and entered.

(General Counsel's GC-60 received.)

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, I'd like to direct your attention to July of 2013.  Do you remember seeing anything, any other flyers posted at work?

A    July 2013.  I think there was some papers at the nurses' station about call-out time.  I can't remember if it was July.

Q    You remember something being posted about call-out times?

A    Yeah.  It was just on the nurses' station where we stay.

MS. POLAKOSKI-RENNIE:  I'd like to have this marked as GC-60 -- 61, sorry.

(General Counsel's GC-61 identified.)

UNIDENTIFIED SPEAKER:  Can I just ask a question?  Do they all have that (indiscernible) marked on the back?

UNIDENTIFIED SPEAKER:  Yeah.

888

UNIDENTIFIED SPEAKER:  All right.

JUDGE CHU:  There it is.  Proceed.

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, you said that you saw this posted at work?

A    Yes.

Q    I'd like you to turn to the second page of this document.
At the top, it says call-out and no-call/no-show.  And under
that can you tell me what it says?

A    Call-out must have a valid reason, is that it?

Q    Yes.  Does it say who you have to contact with your valid
reason?

A    It says should be approved by a supervisor, director of
nursing, or staffing coordinator.

Q    Who would be the director of nursing that you would call?

A    Amy.

Q    That was Ms. Amy that you testified about earlier?

A    Yes.

MS. POLAKOSKI-RENNIE:  I'd like to have this GC-61 entered
into evidence, please.  I'd like to move to have it entered
into evidence.

MR. VANN:  Objection, Your Honor.  There's no relevance to
this document, to this case.

JUDGE CHU:  Can you tell me why this document has been
proffered?

MS. POLAKOSKI-RENNIE:  I'd like to show that it lists the

director of nursing as the person to contact, Ms. Amy, for call-out reasons.  And that it was posted at the nursing station as something that --

UNIDENTIFIED SPEAKER:  She didn't say it was posted at the nursing station.

MS. POLAKOSKI-RENNIE:  Yes, she did.

UNIDENTIFIED SPEAKER:  She said it was left there.

MS. POLAKOSKI-RENNIE:  Technicality.  It was left at the nursing station.

MS. ULMET:  I think there's some question about who supervised the nurses and who was the employer of the nurses.  And so the fact that this document shows that they need permission from the director of nursing, which I think we have prior testimony about her being a Sprain Brook employee, shows relevance to the case.

MR. MASSEY:  It also says if lateness becomes a pattern, the director of nursing will consider disciplinary action.

JUDGE CHU:  I'll allow it in.  GC-61 marked and entered over the objection of relevance.

(General Counsel's GC-61 received.)

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, do you remember any other flyers being posted around that time about any changes at work?

MR. MEYER:  Objection to leading, Your Honor.

JUDGE CHU:  You should just ask were there any other

flyers posted around that time.

BY MS. POLAKOSKI-RENNIE:

Q    Directing your attention to 2013, do you remember any flyers being posted?

A    I can't recall.

JUDGE CHU:  You've got to speak up.

THE WITNESS:  I can't recall.

MS. POLAKOSKI-RENNIE:  I'd like to mark this document as GC-62 and I'd like to show the witness the document.

(General Counsel's GC-62 identified.)

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, have you ever seen this before?

A    Yes.

Q    Where have you seen this before?

A    By the elevator, in the lobby, at Sprain Brook.

Q    Do you remember when you saw this?

A    In July of 2013.

Q    I'd like you to look down at the bottom of the document. Who does it say that it's from?

A    Shlomo Mushell, the administrator.

Q    Do you know who Shlomo is?

A    He's the administrator.

MS. POLAKOSKI-RENNIE:  I'd like to move to have GC-62 entered into evidence.

JUDGE CHU:  Any objections?

MR. VANN:  Objection, Your Honor.  She's testified that the administrator, Shlomo Mushell (indiscernible) --

UNIDENTIFIED SPEAKER:  Has what?

MR. VANN:  And it's not relevant to this case.

JUDGE CHU:  Can you give me a proffer again?

MS. POLAKOSKI-RENNIE:  I think that, again, there is a question in this case about who the employer is and who is managing the employees, and whether there is any joint employer relationship.  And the labor relations of the employees and Mr. Mushell is an employee -- well, there's been testimony already on the record about Mr. Mushell's involvement in this organization, Sprain Brook.  And I would like to have this document as part of the evidence about that relationship that the employees --

MS. ULMET:  It shows the administrator of Sprain Brook setting employee policies.

JUDGE CHU:  I'll allow it in, but I'm not sure whether it absolutely shows that.  I mean an administrator has to have some kind of responsibility.  It doesn't necessarily mean that he works for one company or another company, or anything else other than setting up a lunch schedule for the employees.

UNIDENTIFIED SPEAKER:  We'll concede that GC-62 is not the smoking gun.

JUDGE CHU:  I'll allow it in and you can make the connection in your closing brief.

MS. POLAKOSKI-RENNIE:  Thank you.

(General Counsel's GC-62 received.)

MS. POLAKOSKI-RENNIE:  I have no further questions for this witness.

JUDGE CHU:  It's 5:10 now.  How long will cross-examination take?

MS. ULMET:  Your Honor, I really would request that we get through, that we finish with this witness today.  I know that we were delayed in starting and I appreciate everybody's patience with that, but this witness is not available to come back tomorrow.  She works a second job and a third job, something that is not Sprain Brook, during the day tomorrow and is not available to come back.  These guys usually only have maybe a half an hour at most.  So I think that taking us before six o'clock is reasonable.

MR. VANN:  Your Honor, General Counsel represented before this witness was put on the stand that they would be brief with her.  They were nowhere near brief.  They've consumed all of the time that they said it would take for her direct and cross.  And I really -- I have another engagement.  I can't really stay beyond this point, but I think we really have to bring this witness back.  If it can't be tomorrow, we'll take her another time.

MS. ULMET:  I think that a hearing going until six o'clock is totally a reasonable schedule for a hearing, even for a

government attorney, I can say that.

JUDGE CHU:  I'll just note for the record two things. First of all, we started much later than the General Counsel said we were going to start.  That's one thing.  The second thing Mr. Vann just mentioned, that this witness has extensive, cumulative testimony from a witness that gave testimony earlier.  In addition to that, there were other areas that she covered that the previous witness did not cover, making her direct examination much longer than was represented by the General Counsel.

Nevertheless, I am going to continue with the examination of this witness today given the fact represented by General Counsel that she would not be available tomorrow.  And I want some chronological testimony of witnesses.  I don't want this witness to be called back a month later.

MR. MEYER:  Your Honor, I would just note that we did the same thing with Mr. Speller (ph.).  I'm still waiting to finish my cross-examination of him for a date when he is available.

MS. ULMET:  And we vigorously objected.  And I understand the reason for granting that was because of the Jewish holiday, which was a very different reason than to accommodate the request from Respondents.

JUDGE CHU:  I've considered everybody's argument.  We're going to continue and hopefully we'll finish cross before six o'clock.  Do you have an affidavit for the Respondents?

MS. POLAKOSKI-RENNIE:  Yes, I do.

MS. ULMET:  Your Honor, perhaps it would be helpful for Mr. Vann to do the cross first, since he needs to leave, you know, to accommodate that, for sure.

JUDGE CHU:  Respondents parties can decide how they want to do cross-examination.

Let's go off the record.

(Whereupon, a brief recess was taken.)

JUDGE CHU:  Back on the record.

Cross-examination?  It doesn't matter who wants to proceed first.

MR. MEYER:  Thank you, Your Honor.  I'm going to make this quick.

CROSS-EXAMINATION

BY MR. MEYER:

Q    Ms. Robinson, you had testified previously that your job duties remained the same after the sale from the old entity to the new company around September of 2012, is that correct?

A    Yes.

Q    And that your supervisor, for the most part, I guess, stayed the same as well?

A    Yes.

Q    And your rate of pay stayed the same?

A    Yes.

Q    You talked about a Ms. Amy.  How long have you worked with

Ms. Amy?

A   I can't remember exactly.  I know for a while.

Q   She worked for the prior entity, right, that was Mr. Kline's company that was sold.  Do you recall the name of that entity?

A   Sprain Brook Manor Nursing Home.

Q   Sprain Brook Manor Nursing Home was the name of Mr. Kline's company, correct?

A   Yes.

Q   And then it changed to something else after the sale, correct?

A   Budget.

Q   Do you recall what the name of the -- was it still called Sprain Brook Manor?

A   Yes, that is what's on my ID.

Q   Does it say Sprain Brook Manor Rehab?

A   Yes.

Q   Okay.  So it was Sprain Brook Manor Nursing prior to the sale and Sprain Brook Manor Rehab post sale, correct?

A   Yes.

Q   And Ms. Amy was around prior to the sale?

A   Yes, sir.

Q   Do you know how long?

A   I can't recall how long, as I said before.

Q   If you could go back and look at the call-out policy,

GC-61.  If you could look at the second page, it has Ms. Amy's name by those extension numbers sort of in the middle of the page, do you see that?

A    The 914-574-1665?

Q    Right above that.  It says Ms. Amy, 117.

A    Oh, the extension.

Q    The extension, yes.

A    Yes.

Q    It says her name, right?

A    Yes.

Q    And then on the line which is blank here, it says I, blank, position, blank, have read the above Sprain Brook Manor Nursing policy.  Do you see that?

A    Yeah.

Q    Sprain Brook Nursing was the former company, right, prior to the sale?

A    Yes.

Q    Okay.  You never received a policy like this from Sprain Brook Manor Rehab, did you, the call-out policy?

A    I can't recall.

Q    Did you ever receive a policy like this from Budget?

A    No.

Q    Ms. Robinson, you testified before when you were shown Exhibits 26(a), (b), and (c), about a yellow card, blue card, and some other documents.  Do you recall that?

A     The yellow card and the blue card.

Q     Yes.  Do you recall that testimony?

A     Yes, I do.

Q     You said you never opened your envelope, correct?

A     Correct.

Q     So how do you know what was in that envelope?

A     Because Mercedes left two package for the two CNAs that worked at night.  The other CNA opened hers and that's what was in it.

Q     But you didn't open yours?

A     No.

Q     Did you ever open yours, to today, have you ever opened that envelope?

A     No, sir.

Q     Do you know where that envelope is?

A     No.

Q     Did you throw it away or did you take it home?

A     I did not pick it up.

Q     Did it leave the building with you, at any point?

A     No, sir.

Q     So you threw it away or you left it in your locker, you did something with it?

A     I do not know what Mercedes did with it.

Q     Did you ever have it in your possession?

A     No, sir.

898

Q    You never did, okay.  So you have no idea what was inside that envelope, do you?

A    As I said, no.

Q    Did you work on the same shift as Shelly Ann Williams?

A    Now.  She used to work seven to three.

Q    Did you ever talk about your pay rates with other CNAs?

A    Our pay rates for when?

Q    First, before the sale.

A    Not really.

Q    Did you ever talk about your pay rates after the sale?

A    Yes.

Q    Did you ever discuss that they were the same as they were prior to the sale?

MS. POLAKOSKI-RENNIE:  Objection.  It's outside the scope. We didn't talk about her pay rate.

MR. MEYER:  You talked about a number of terms and conditions of employment.  And she's already answered questions about her pay rate.

JUDGE CHU:  It's all lumped into terms and conditions, and benefits of employment.  Go ahead, you can answer.

THE WITNESS:  Could you repeat, please?

BY MR. MEYER:

Q    Did you speak with any other CNAs about your rate of pay continuing to be the same after the sale?

A    Yes.

Q    With whom did you speak?

A    Friends, co-workers.

Q    Other CNAs?

A    Yeah.

Q    What were their names?  By name, who are they?  Who did you speak with?

A    I spoke to Theresa Nemart (ph.), Janet Rung (ph.).  They are not there anymore.  They left for better jobs.

Q    But their rates of pay stayed the same after the sale, correct?

A    Yes.

Q    Did you speak with any other employees who were not CNAs?

A    I can't recall.

MR. MEYER:  I have nothing further, Your Honor.

JUDGE CHU:  Thank you.

CROSS-EXAMINATION

BY MR. VANN:

Q    You said with respect to your co-worker that she opened the envelope which you never opened for yourself, correct?

A    (no audible answer)

Q    And when she opened the envelope, you saw there was a blue card and a yellow card, isn't that correct?

A    (no audible answer)

Q    You didn't actually read what was on her card, did you?

A    No, I did not read what's on her card.  She told me --

Q    And when the Judge showed you -- I'm sorry, go ahead and finish.

A    I asked her and she told me.

Q    She told you what?

A    What's written on the card.

Q    What did she tell you was written on the card?

A    I think one of them is allowing deductions from the Union and the other one is medical coverage.

Q    But you never physically saw those cards.

A    No.  But I got the blue cards later, when I decided to take their medical.

Q    Did you fill out the blue card?

A    Yeah, that was this year, 2014.

Q    And how do you know that it was the same card that was shown in 2012?

A    Because she told me it's her medical -- it's a medical card.

Q    That's the only basis.  And when the Judge showed you, today, a blue card and a yellow card, and you said those were the same, you were merely doing that because you knew there was a blue card and a yellow card, and the Judge showed you a blue card and a yellow card, isn't that correct?

A    I did read it.  And one of it did say the deductions that allowing 713 to draw so much, the Union.

Q    When you say you read it, you read it today?

901

A    Yeah, I just gotten to it.

Q    But you have never read the first one, yourself?

A    No.

Q    Did you ever meet anyone employed -- withdraw that.  Did you ever meet anyone from Budget?

A    No, sir.

Q    The ID that you have as an employee, isn't it true that that does not have the name Budget anywhere on it?

MS. POLAKOSKI-RENNIE:  Objection.  We didn't ask anything on direct about her ID.  It's outside the scope and I don't see the relevance.

JUDGE CHU:  I'll allow it.  You can answer.  Rephrase the question.

THE WITNESS:  No, it does not say anything about Budget.

BY MR. VANN:

Q    Did you ever attend any meeting at which there was a representative of Local 713 or a representative of Budget present?

A    No, sir.

Q    Did you ever hear that there was such a meeting?

A    For the Budget, I read it that -- I read it on the letter from Mr. Kline that they would be there the 13th.  But that time I was on vacation, so I didn't meet anybody.  And I haven't met anybody from Local 713, either.

MR. VANN:  No further questions, Your Honor.

JUDGE CHU:  Thank you.  Ms. Winkelstein?

MS. WINKELSTEIN:  No questions, Your Honor.

JUDGE CHU:  Mr. McCarthy?

MR. McCARTHY:  No.

JUDGE CHU:  Redirect, please.

                    REDIRECT EXAMINATION

BY MS. POLAKOSKI-RENNIE:

Q    Ms. Robinson, I'd like you to look at GC-61.

A    Yes.

Q    This is the call-out policy.

A    Yes.

Q    Do you remember when you saw this call-out policy?

A    It was sometime I think in July, I'm not sure, 2013.

Q    And where did you see this call-out policy?

A    By the nurses' station.

Q    Did anyone say anything to you about it?

A    No.

Q    And when you saw this at the nurses' station, is this a place where management usually puts work-related notices out for employees to read?

A    No, a lot of times --

MR. MEYER:  Objection, leading.

THE WITNESS:  -- we get it on our checks.  But this one was there because there was some girls that went to do some orientation at another job, at the hospital.  So this was meant

for the girls that work seven to three, because I heard that some of them signed it.

MR. MEYER:  Objection to that answer, Your Honor, that's hearsay.

JUDGE CHU:  Sustained.

BY MS. POLAKOSKI-RENNIE:

Q    Has management ever placed other work-related notices at the nurses' station where you saw this sitting?

MR. MEYER:  Objection.  Asked and answered.

JUDGE CHU:  Sustained.

BY MS. POLAKOSKI-RENNIE:

Q    Was July of 2013 the first time that you ever saw this call-out policy?

A    Yes.

JUDGE CHU:  How are you so certain it's July 2013?

THE WITNESS:  Because I remember girls going to do this orientation at the hospital.

JUDGE CHU:  At where?

THE WITNESS:  At the hospital.

JUDGE CHU:  And you did not attend?

THE WITNESS:  The orientation?

JUDGE CHU:  Yes.

THE WITNESS:  No, sir.

JUDGE CHU:  Any other questions on redirect?

MS. POLAKOSKI-RENNIE:  No.  Thank you.

JUDGE CHU:  Mr. Massey?

MR. MASSEY:  No, thank you.

JUDGE CHU:  Recross?

MR. MEYER:  Nothing from me, Your Honor.

(Witness excused.)

MS. ULMET:  I just want to make sure that all the affidavits are returned.

JUDGE CHU:  All right, return the affidavits.  Let's convene at 10 o'clock tomorrow.

(Whereupon, at 5:57 p.m., the above-entitled matter adjourned, to reconvene on Tuesday, December 16, 2014, at 10 a.m.)

C E R T I F I C A T E

This is to certify that the attached proceedings done before the NATIONAL LABOR RELATIONS BOARD REGION TWO

In the Matter of:

SPRAIN BROOK MANOR, LLC; PINNACLE DIETARY, INC.; CONFIDENCE MANAGEMENT SYSTEMS; SC & BP SERVICE, INC.; AND COMMERCIAL MAINTENANCE CORP.,

          Respondents,
And

1199 SEIU, UNITED HEALTHCARE WORKERS EAST,

          Charging Party,
And

LOCAL 713, INTERNATIONAL BROTHERHOOD OF TRADE UNIONS,

          Party to the Contract,
And

BUDGET SERVICES, INC.,

          Party to the Contract.

Case No.:    02-CB-095670, et al

Date:        December 15, 2014

Place:       New York, New York

Were held as therein appears, and that this is the original transcript thereof for the files of the Board

          _____

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey  07470
(973) 692-0660

Official Reporter

906

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

SPRAIN BROOK MANOR, LLC;
PINNACLE DIETARY, INC.;
CONFIDENCE MANAGEMENT SYSTEMS;
SC & BP SERVICE, INC.; AND
COMMERCIAL MAINTENANCE CORP.,

      Respondent,               Case No.  02-CB-089408 et al
And

1199 SEIU, UNITED HEALTHCARE
WORKERS EAST,

      Charging Party,
And

LOCAL 713, INTERNATIONAL
BROTHERHOOD OF TRADE UNONS,

      Party to the Contract,
And

BUDGET SERVICES, INC.,

      Party to the Contract.

The above-entitled matter came on for hearing pursuant to

Notice, before THE HONORABLE KENNETH W. CHU, Administrative Law

Judge, at the National Labor Relations Board, Region 2, 120 W.

45th Street, New York, in Hearing Room 1, on Tuesday, December

16, 2014, at 10:00 a.m.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey 07470
(973) 692-0660

A P P E A R A N C E S

On Behalf of the General Counsel:
     JULIE ULMET, Esq.
     JULIE POLAKOSKI-RENNIE, ESQ.
     National Labor Relations Board, Region 2
     26 Federal Plaza, Suite 3614
     New York, New York 10278

On Behalf of the Respondent (Pinnacle):
     REBECCA WINKELSTEIN, ESQ.
     Jasinski, PC
     60 Park Place, 8th Floor
     Newark, New Jersey 07102-4412

On Behalf of Respondent (Sprain Brook):
     JEFFREY A. MEYER, ESQ.
     Kaufman, Dolowich & Voluck, LLP
     135 Crossways Park Drive, Suite 201
     Woodbury, New York 11797-2005

On Behalf of the Charging Party:
     WILLIAM S. MASSEY, ESQ.
     Gladstein, Reif, & Meginnis, LLP
     817 Broadway, 6th Floor
     New York, New York 10003-4709

908

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Israel Nachfolger | 911 | | 982 | 986 | -- | -- |

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey 07470
(973) 692-0660

E X H I B I T S

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-63 | 942 | 943 |

910

P R O C E E D I N G S

(Time Noted: 10:17 a.m.)

JUDGE CHU:  On the record.

It's December 16th.  Reconvening on the matter of Sprain Brook Manor, LLC et al, and Local 1199 SEIU.

I want the record to reflect that at the conclusion of the proceeding yesterday, Mr. Vann, who represents Budget Services, indicated that he would not need be present today.

And Mr. McCarthy, who represents Local 713, also indicated that he would not be present today.

Is General Counsel ready to proceed with the next witness?

MS. ULMET:  Yes, I am, Your Honor.  I would like to call the custodian of the records for Sprain Brook Manor Rehab.

JUDGE CHU:  All right, step up, please.  Have a seat.

MR. NACHFOLGER:  Thank you.

JUDGE CHU:  I'm going to swear you in as a witness at this time.  Raise your right hand.

(Whereupon,

ISRAEL NACHFOLGER,

was called as a witness by and on behalf of General Counsel and, after having been duly sworn, was examined and testified as follows:)

THE WITNESS:  I affirm.

JUDGE CHU:  Okay, thank you.

State for the record your full name and spell your last

911

name.

THE WITNESS:  Israel Nachfolger.  That's N-A-C-H-F-O-L-G-E-R.

JUDGE CHU:  All right.  And if you can sit a little bit closer to the microphone --

THE WITNESS:  Sure.

JUDGE CHU:  -- and speak into the mic so we can get all your testimony in.

As you may know, if there are any objections to any of the questions, do not answer those questions until I can rule on those objections, all right?

THE WITNESS:  Okay.

JUDGE CHU:  Thank you.

All right, GC's witness.

DIRECT EXAMINATION

BY MS. ULMET:

Q    Good morning, Mr. Nachfolger.

A    Morning.  Morning.

Q    Am I saying your name right?

A    Yeah, it's okay.

Q    Can I call you Israel?

A    Yes, you can.

Q    Okay.  I'm Julie Ulmet, I'm the attorney for the NLRB.

So I've -- I understand that you're here today because we issued a Subpoena Duces Tecum to Sprain Brook Manor Rehab for

the production of documents, and your attorney has identified you as the custodian of records.  Do you understand that?

A    Yes, I do.

Q    Okay.  And so I'm going to show you the subpoena.  It's General Counsel Exhibit 4.  So --

MS. ULMET:  Judge, is it okay if he takes your copy?

JUDGE CHU:  Yeah, we had agreed that I'll show the Witness the official copy so that the parties don't have to keep on coming up and -- to the Witness.

Take a look at General Counsel 4.

(Witness examined the document.)

BY MS. ULMET:

Q    Israel, have you seen that document before?

A    Yeah.  Yeah.  I just wanted to -- we got a lot of documentation from, you know, regarding this case so I just wanted to make sure that it recognized that.  Yes.

Q    Okay.  And when was the first time that you saw that document?

A    I don't recall a specific date.  Whenever it was sent to us, that's -- probably I received it a day or two later I reviewed it.

Q    Okay.  So it's dated -- it's not dated, is it?  Oh, dated September 16th.  So did you see it around the middle or end of September?

A    I don't recall the exact date that I saw it.

Q    Okay.  And can I -- how did you come to see it?

A    How did I come to see it?

Q    Yeah.  Who showed it to you?

A    It was probably e-mailed to me by either a secretary or sent to the facility.

I -- you know, just by way of understanding, I manage quite a few things, and it's very hard for me to remember when things are coming in to me.

Q    Um-hmm.

A    I get probably 150 e-mails a day.  So I can't tell you exactly when I got this particular subpoena.

Q    Um-hmm.  Okay, so let's get into actually your responsibilities, so we --

A    Sure.

Q    -- so we can understand.  So what are the responsibilities that you have Sprain Brook?

A    I'm the CFO/controller over there.

Q    Okay.  The CFO and controller?

A    Correct.

Q    Okay.

A    And I'm generally responsible for anything that has to do with fiscal items in the facility.  Whether its billing related, budgeting, making sure vendors are taken care; the general financial health of the facility is on my shoulders.

Q    And how long has that been your responsibility?

914

A    Okay, so I've actually been working in the facility for, I think since March 2009.

Q    Okay.

A    Okay.  But my responsibilities only -- I only became the CFO when the sale happened.  That's when Mr. Stein actually -- he took ownership of the facility and he promoted me to that position.

Prior to that, I was working for Mr. Klein, who was the owner, and I was functioning in a very limited capacity prior to the sale.  I was doing payroll items.  You know, it was -- it was a lot more limited than what I was doing after the sale.

Q    So what was the date that you were promoted to CFO?

A    My -- I actually took on the responsibility shortly after the sale, I believe it was the beginning 2013, so the sale happened in September 2012.  And I initially wanted, you know, I wanted the promotion prior to that but Mr. Stein was not in charge at that point.  And once I was able to get that promotion once he actually was in charge of the facility.

Q    Okay.  And so when you started working at the facility in March 2009, what was your position?

A    I was doing payroll related items.  I was in charge of, I guess, basically just payroll.  That's really -- you know, I had some, maybe staffing -- just I ran some reports for the director of nursing.  That's also really a payroll item.

So you -- I guess we can just call it payroll related.

915

Q    Did you have a title?

A    Payroll clerk, I guess, you can call it.

Q    Okay.  Payroll clerk, okay.  So are you still responsible for payroll?

A    So in my role as CFO, anything that has to do with fiscal items would be my responsibility.  So yeah, that -- it would fall under my general job description.

Q    So you've been responsible for payroll continuously from March 2009 to the present?

A    Correct.

Q    Okay.  So actually, I think why don't we talk about payroll --

A    Sure.

Q    -- right now.  So can you -- can you describe -- let me get the right date for you.

Okay, so I'm going to ask you about the time period that starts January 1, 2012.

A    Okay.

Q    So that would have been when you were handling payroll. You were a payroll clerk you said at that time, right?

A    Right, for Mr. Klein.

Q    For Mr. Klein.

A    Right.

Q    Can you please describe the process by which payroll was handled and produced and recorded --

A    Sure.

Q    -- whatever, at Sprain Brook.

A    Okay.  You know, it's a pretty typical process. Employees --

MR. MEYER:  Your Honor, I'm just going to object.  The subpoena was for Sprain Brook Manor Rehab and the custodian of records for Sprain Brook Manor Rehab.  Mr. Nachfolger's duties for Sprain Brook Manor Nursing Home are not responsive to the subpoena.  It's outside the scope of the subpoena and him as custodian of records.

MS. ULMET:  Do you need to hear my argument?

JUDGE CHU:  Yes.

MS. ULMET:  As I've stated repeatedly on the record, the sale agreement provides that Sprain Brook Manor Rehab will receive all business records, including payroll records, from Sprain Brook Manor Nursing Home, and retain them for six years. I also believe that there are laws that require a successor employer to retain the predecessor's payroll records.

As we all know, I haven't gotten payroll records from either entity, and I would like to understand how -- how payroll records were maintained so that I may more precisely question the Witness about what happened, what became of the records that were produced by Sprain Brook Manor Nursing Home after the sale.

If I know that they were done on a computer, that's one

thing.  If they were done by an outside contractor, that's another.  I think it's an entirely valid line of questioning.

JUDGE CHU:  I'll allow it for background information.

MR. MEYER:  I would just note, Your Honor, she -- counsel for General Counsel just stated she's asking questions about Sprain Brook Manor Nursing Home's payroll, not Rehab's, which again, this is Rehab's custodian, not Nursing Home's.

JUDGE CHU:  I understand that.  But good time to figure out -- well, I would like to know an "A/B" comparison.  I want to see what --

MS. ULMET:  Sorry, Judge?

JUDGE CHU:  And "A" and "B" comparison.

MS. ULMET:  Right.

JUDGE CHU:  I want to see what it was like.

MS. ULMET:  The other thing that's --

JUDGE CHU:  Before we move on.

Anything else?

MS. ULMET:  So I can proceed, Your Honor?

JUDGE CHU:  Yeah.

MS. ULMET:  Okay, thank you.

JUDGE CHU:  Co-counsel was whispering to you, so I thought there was something else.

MS. ULMET:  It's the same thing, but you've already ruled, so I'll move on.

BY MS. ULMET:

Q    Okay, so Mr. -- so Mr. Nachfolger, can you please describe the -- how payroll was produced and so forth at the nursing home in the -- during the time period starting in January?

A    Okay.  So payroll is processed with a time clock, okay. And the time clock goes into a computer system.  However, this computer system prior to the sale, all the contracts that we have with this would be done because we didn't assume any contracts.  This was a complete -- sale.  We had to contact all the vendors and redo our contracts, okay.

So therefore, although we're using the same system, okay, we're under a different contract, okay.  So when the sale happened, we are now using a similar system but it's a fresh brand new thing, okay.  So the records are not available to me in the new system because that's under the new contract.

The old system, even though it's the same software vendor, okay, I don't have those records currently because Mr. Klein has all those -- you know, access to all that data.  Okay, so it's a different login.  That login changed as of the sale date.  I have a brand new piece of software with, you know, a fresh way, okay.

Q    Okay.  So what are the names of the software programs?

A    I think it's a company called SBV Software.

Q    SB?

A    SBV, Sam, Barry, Victor.

Q    Sam, Very --

A    SBV, that's just --

Q    SBV Software.

A    So that you know how the abbreviation is.

Q    Okay.  And that's the software program that -- that was used to do payroll for all job classifications in the entire facility?

        MR. MEYER:  For what period of time?

BY MS. ULMET:

Q    September 1, 2012 -- well, from September 1, 2012 until the sale.

A    Yes.

Q    And you mentioned that Klein has access to the data?

A    Well, I can't tell you, you know, actually what he has access to at this particular moment.  But after the sale -- see, software vendors will not allow you to continue a contract if you're not an EIN.  You have, you know, you're a different company.  So they have to invoice the proper company and contracts typically are redone if there's a change of ownership.

        So all the software contracts in the facility were -- they had to be renegotiated.  Whether it was, you know, for payment sources, HMOs.  Medicare, we have new Medicare numbers. Everything's different.  So software contracts were no different than that.  So.

Q    Do you have copies of those software contracts?

A    I would have to look back.  I don't know offhand, but I can get you copies of contracts.

Q    You haven't produced them pursuant to the subpoena?

MR. MEYER:  The subpoena only recalls -- requests documents, payroll records for bargaining unit employees. That's why they were not produced.

MS. ULMET:  I think it says contracts, but we'll deal with that later.  I just want to establish whether they were produced or not.

BY MS. ULMET:

Q    So they haven't been produced?

A    It's a vendor contract, really.

Q    Okay.  Vendor contract.  Okay, do you know whether Mr. Klein still has any contracts with the software vendor?

A    I'm -- I would have no idea.  Once the sale happened, I haven't really had much contact.

Q    Are you aware of any state or federal laws that require employers to keep -- to maintain payroll records?

MR. MEYER:  Objection, relevance, Your Honor.

MS. ULMET:  I'm just asking if he's aware.  It's a yes or no question.

MR. MEYER:  This isn't a --

MS. ULMET:  And then we'll figure out whether --

JUDGE CHU:  Not relevant.  Sustained.

BY MS. ULMET:

Q    Okay, so the payroll that was processed under Sprain Brook through SBV Software, did Sprain Brook Nursing Home, that you know of, maintain any backup paper or electronic beside the software system?

A    It's interesting you ask that because prior to the sale the server in the facility was extremely old and one of the first projects that Mr. Stein did once ownership was taken over, was they installed a brand new server.  They invested a lot of money to upgrade that system, and I don't have any knowledge of where the old server went.

I would assume that the records are on the old server.  I can't tell you for certain.  But I can tell you that I believe it was in early to mid-2013 that the entire -- I think they put in a few hundred thousand dollars to upgrade the entire IT system.  Brand new software vendor.  Like I said before, new contracts with IT support.  Everything was redone when -- that was his objective, was to upgrade the facility.  Mr. Klein neglected to pay attention to a lot of that -- a lot of those things.

So I would venture to say that most of the records probably were on that old server and I do not have any knowledge as far as where that server is right now.

Q    Were any records -- were any electronic records copied or transferred from the old server to the new server?

A    See, that was another thing where I don't believe that Mr.

Klein had any backup system in place.  Typical now is to have, you know, a Cloud backup system so that there's redundant places with data.

We definitely did not copy any data over because there was no reason for us too because it's an old company.  And as far as we were concerned, you know, the day that the sale happened, that's when we -- that's when we began our operations.

Q   You said that the new server was installed in mid-2013?

A   I don't recall the exact date.  I believe it was probably the earlier part of 2013.

Q   Um-hmm.  So you didn't transfer Sprain Brook Manor Rehab's records from September 2012 to early 2013?

A   If it were Rehab's records, those definitely would have been transferred.  But I don't believe that we would have transferred any of the old items because we had no use for any of the old items that were not relevant to us.

JUDGE CHU:  You said the old records are maintained on an old server?

THE WITNESS:  I know that that old server was in use for at least probably 10 years or so, and that server's no longer in use.

JUDGE CHU:  Okay.  Do you know who has possession of --

THE WITNESS:  I would have to find out.  I don't know at this point.

JUDGE CHU:  Was any paper copies generated from the old

923

server for safekeeping?

THE WITNESS:  I -- I don't - I don't know.  I mean, it's possible that the server does exist and it still works, so the records are still in existence.  I would have to research that and find out, you know, exactly what happened.

JUDGE CHU:  Okay.  Thank you.

BY MS. ULMET:

Q    Have you ever seen the old server?

A    Yeah.  It was a box.  I mean, just a computer.  I don't remember the exact model.

Q    When's the last time you saw it?

A    I don't recall.  It was probably when the project was done and the new server was installed.  I probably was in the server room at one point and that's probably the last time I saw it.

Q    So the last time you saw it, it was in the server room at the facility?

A    Likely.

Q    Your time working at the facility under either Sprain Brook Nursing Home or Sprain Brook -- has the Nursing Home been audited by the Department of Labor?

A    The Nursing Home actually did have a Department of Labor audit back in -- it was definitely prior to sale.  I don't recall the exact date but there was -- there was an audit.  It was a wage and hour audit.  And we -- the audit was completed with very minor deficiencies, I believe, totaling under $100 or

so. And it was an extensive audit. I do recall that it took many months. That's -- yeah.

Q    Did you personally pertain *(sic)* responses to the --

A    Well, as the payroll --

Q    -- what they sought?

A    As the payroll clerk that was my responsibility. So, yes, I did.

Q    Um-hmm. And did you give them hard copies or electronic copies of documents? What did -- how did you --

A    I don't --

Q    -- what did you provide to them?

A    I don't recall. I believe that is what I did with the auditor via e-mail.

Q    Um-hmm.

A    But I think I did give him hard copies at that point. I think it was just correspondence via e-mail. But the actual payroll records, I believe, were printed.

Q    And did you maintain a copy for yourself of the hard copy documents you provided?

A    At that point I did. But all those records are in possession of Mr. Klein.

Q    Now, when you say they're in possession of Mr. Klein, what does that mean? They're in his house? Where are they?

A    I know that there was -- there were hundreds of boxes of records when the sale happened.

Q    Um-hmm.

A    And those records, once again, the new ownership had no interest in maintaining that, so I believe that he has some sort of storage -- either -- maybe it's in a storage facility. I don't know exactly where they're located.

Q    Um-hmm.

A    But they're not in the facility them self *(sic)*.

Q    And do you know who has access to that storage facility?

A    I don't.

Q    Okay.  But it -- any -- so it's not Sprain Brook Rehab?

A    No.  Definitely not.

Q    And when you say that the hundreds of boxes of documents were --

A    I know that there was an existing storage facility prior. And I believe that it does still exist.

Q    Um-hmm.

A    But I have no knowledge of what's in there.  I know that most of -- probably -- most of the documentation is probably, you know, from the old company going back to probably the '70s, '80s and you know, and more recent than that.

Q    And so it was always an offsite storage facility?

A    That's my understanding.  I was never there.  I don't know if that site even -- I know that it did exist at one point.

Q    Who would know how to access it?

        MR. MEYER:  Your Honor, I'm going to object at this point.

We're now dealing the guts, nuts and bolts of Sprain Brook Nursing Home, dating back to potentially the '70s.

JUDGE CHU:  Okay, we're going too far afield --

MS. ULMET:  I'm not interested in that.

JUDGE CHU:  This witness is only called as the custodian of the records for Sprain Brook Rehab.

MS. ULMET:  Your Honor, a couple of things.  First of all --

JUDGE CHU:  You know, I mean, I --

MS. ULMET:  -- there's a huge dispute in this case about when the sale actually happened.  Mr. Nachfolger was handling payroll and possibly other functions --

JUDGE CHU:  Yeah, and that --

MS. ULMET:  -- during the time that --

JUDGE CHU:  And that's fine.  But we're getting into his knowledge of old records going back to the '70s --

MS. ULMET:  I don't care --

JUDGE CHU:  -- storage, where the site is.  I mean --

MS. ULMET:  Right.  But he's telling me that documents from, you know, 20 -- from the early part of 2012 presumably are in this offsite storage facility because new Sprain Brook in September of 2012 didn't want anything, washed its hands of anything to do with old Sprain Brook, which I think violates the sale agreement and the law.  And so I want --

JUDGE CHU:  But those are legal arguments.

927

MS. ULMET:  -- to prove it.

JUDGE CHU:  Those are not questions --

MS. ULMET:  I know, but --

JUDGE CHU:  -- for this witness.  This witness is not going to say, "Oh, yeah" --

MS. ULMET:  I'm probing the facts.

MR. MEYER:  Of a different entity.

MS. ULMET:  So then I can make legal arguments later.  I'm entitled to probe the facts --

JUDGE CHU:  But how does --

MS. ULMET:  -- with this witness.

JUDGE CHU:  -- this witness know the thinking of Mr. Klein?  He just knows perhaps that Mr. Klein has a storage site, that perhaps those old records are there.

MS. ULMET:  Well --

JUDGE CHU:  But what else does he know about Sprain Brook Nursing Home?

MS. ULMET:  This appears to be the most knowledgeable witness that I've seen in my multiple attempts to get a custodian --

JUDGE CHU:  I think Mr. Klein is probably the best witness as to what happened to the records under his old company.

I mean, to the extent he knows.  He only knows because -- he was not a management official.  He wasn't part owner.

(Pause.)

928

JUDGE CHU:  Continue.

DIRECT EXAMINATION (continued)

BY MS. ULMET:

Q    Okay, so let's talk about the payroll at Sprain Brook Rehab.  So you said that as the CFO any payroll functions are still within your overall responsibility; is that right?

A    Yes, correct.

Q    Okay.  And can you describe what those responsibilities are with respect to payroll?

A    Well, basically it is anything that has to do with processing payroll, paying federal taxes, state taxes, processing actual tax returns, NYS-41's, 941's, metro tax. Anything -- like I said, anything related to fiscal items in the facility at this point are my responsibility ultimately.

Q    Okay.  And are you familiar with the general record -- aside from payroll, the general record keeping at the facility?

A    Be more specific.  Which -- there's --

Q    Well, let me put it this way; are there any file cabinets that contain documents?

A    For?

Q    Anything.

A    You know, actual payroll documents or any -- just any --

Q    Any documents.

A    In a broad -- well, we have an electronic medical records system, so that's, you know, we're trying to try to go digital

at this point.

Q   Okay.  So medical records are electronic?

A   Medical records are electronic.

Q   Okay.  And let's talk about the other kinds of things you mentioned responsibility for.  Vendors.

A   Um-hmm.

Q   Is that electronic or hard copy?

A   You're talking about contracts?

Q   Um-hmm.  Everything.

A   Yeah.  We're -- for the most part we're digital at this point.

Q   Okay.  So going back to the subpoena that you just looked at, GC Exhibit 4, I think.

A   Okay.

Q   Were you responsible for preparing Sprain Brook's response to that subpoena?

A   The response I believe was handled by our attorney.  Actual response to the subpoena?

Q   The "response" meaning preparing the response -- the documents that respond to the subpoena request.

A   Oh, documents.  Well, whatever the attorney asked me -- again, I reviewed the subpoena and whatever documentation I had access to, I forwarded to him.  So anything you have came from me, I would think.  Anything that we did not produce we don't have it or else I would have produced it.

930

Q    Um-hmm.  And did you ever -- why don't you put it in front of you again.  I'll get back to questioning about the subpoena itself.

A    Okay.

Q    Okay, so if you can turn to Page 4 of the subpoena.

A    Okay.

Q    Do you see where it says "Documents to be produced"?

A    Am I looking at the right page?  Oh, yeah.  Okay.

Q    Okay.  And then there's a number of items underneath that.

A    Um-hmm.

Q    Did you ever read that section --

A    Yeah.

Q    -- "Documents to be produced"?

A    Yes.

Q    And did you try -- did you make any effort on your own to identify what documents you could produce that were responsive to these requests?

A    Yes, absolutely.

Q    Okay.  And your attorney, he wasn't just saying "Get me this to" --

A    No.  No.

        MR. MEYER:  Objection, Your Honor.

        MS. ULMET:  All right, sorry.  I'll move on.

BY MS. ULMET:

Q    Okay, so how did you go about searching for the responsive

documents?

A    Yeah, I understand.

Q    Okay.

A    Just briefly reviewing Item 1 over here, it looks like most of these items would have been included in the closing binder.

Q    Okay.  So let's go one by one through the requests.  Okay, so Number 1, you're saying those would have been included in the closing binder?

A    I believe so.  I think item -- certificate of incorporation, I'm not sure if that was actually included in the closing binder, but that's readily available on the Department of State website.  That's public knowledge.  So if you don't have that particular item, that should be very easy to get if that was not included in the closing binder.  I don't recall.

The closing binder, itself, is I believe over 300 pages.  So it's hard for me to tell you exactly point to point what is included.  I know generally what's in there.  But if the certification of incorporation is not in there, that's -- that's in -- that should be easily gotten by any interested party.

Q    Okay.  So you're familiar with the closing binder?

A    Yes.

Q    And did you provide the closing binder to your attorney to

932

give to us?

A    I did, yes.

Q    Do you know when you gave it to him?

A    I don't.

MR. MEYER:  Objection, relevancy, Your Honor.

MS. ULMET:  The relevance is I got the closing binder today, more than two months after this subpoena was returnable and I just want to know --

MR. MEYER:  And I told her --

MS. ULMET:  -- why I didn't get it.

MR. MEYER:  And I told counsel I had it yesterday and I tried to e-mail it last night and the file was too large for me to send.

MS. ULMET:  I'm not talking about yesterday versus today. I'm talking about today versus two and a half months ago.

MR. MEYER:  And this isn't a timing issue, this is a question of what the documents say and what's in there.

MS. ULMET:  I think the timing is entirely relevant because I need to follow-up up on the closing binder and it's going to delay this proceeding.  And I want to know whether I'm delaying the proceeding -- why I'm delaying the proceeding because of getting a closing binder two and a half months after it was returnable.

JUDGE CHU:  You can ask if he knows.

BY MS. ULMET:

933

Q    Do you recall when you gave the closing binder to your attorney?

A    I don't recall.  It was a very large document.  Like I said, it was about 300 -- over 300 pages.  It was something that was not able to be e-mailed so I believe that I had once sent it with a file transferring service and then the link expired.  It's very possible that there was a holdup with me actually getting him the physical file because it was a large file.

Q    Um-hmm.  Okay.  I would like to show you what's been given to me as the closing binder, and I just want to ask you to take a look at it and review it.

A    Sure.

Q    Your understanding of what is the complete closing binder.

A    Okay.

MS. ULMET:  If I may approach, Your Honor?

JUDGE CHU:  Go ahead.

You can put aside the subpoena.

THE WITNESS:  Okay.

BY MS. ULMET:

Q    Actually, and view it to confirm that it appears to be complete and accurate.

A    Well, like I said, it's a very large --

Q    I know it's pretty big but --

A    It's a very large document and --

MR. MEYER:  Your Honor, I can say with -- I printed out the document from the link that I was able to finally open from my client, and this is an accurate printout, full and complete printout of what was sent to me; if that makes Mr. Nachfolger's life a little easier.

THE WITNESS:  If two pages were missing in the middle, I would not probably --

MS. ULMET:  Yeah.

THE WITNESS:  -- realize that.  But it looks to be complete.

JUDGE CHU:  He can spend all morning looking at 300 plus pages; is that what you want him to do?

MS. ULMET:  Just if there's anything -- no.  But if there's anything obvious about it.  It just -- I don't know.

THE WITNESS:  It looks like it has the table of contents here, it's got the loan documents, the bill of sale.  This is -- yeah, and it's got the old lease -- the original lease from 1973.

BY MS. ULMET:

Q    And you know, because he mentioned that it was so large, so I just want to see that this comports with your sense of how big it was.

A    Yeah, this looks to be about right.

Q    Okay.

A    You know, three hundred pages.  And this is -- these are

the contracts -- the new operator and the loan documents with M&T Bank.  The personal guarantees for the mortgage.  The assignments of rents.  Let's see what else is in here. Financing statements.  And these are all the organization documents.  W-9s.  Approval from the Public Health Council. And articles of organization.  The Department of State filing is in there; I'm not sure if that's what you were looking for. It looks pretty complete to me.

Q    Okay, thank you.

One specific question, can you -- well, were you at the closing?

A    No, I was not.

Q    Okay.  So you reviewed the closing binder after --

A    Allen Stein gave me a disc, which I then created -- I made it into a file to create that.

Q    Oh, okay.  So it was on some kind of CD disc?

A    Yes, it was.  But I believe that I exist it *(sic)* as a file.

Q    Um-hmm.  Okay, let's move on to -- if you go back to the subpoena, GC-4, Number 2.

A    Um-hmm.

Q    Can you describe what steps you took to search for and produce documents responsive to the subpoena?  So, these are pretty big, so let's go through them item by item.

So 2(a), "Documents showing or describing all sales loans,

transfers, assignments, leases, et cetera between SB Rehab, SB Nursing Home," those obviously stand for Sprain Brook, "Robert Klein, Sam Strulovitch, et cetera."

Can you please tell me what steps you took to search for documents responsive to 2(a)?

A    Well, anything that existed on our server, okay, I produced.  Most of the items I would believe that would be contained in the closing binder, because that will describe the relationship between the sellers and the buyers.

You -- one of the questions over here asks about any other financial relationships or transactions.

Q    Um-hmm.

A    Other than, you know, the sale of the facility, I don't know that there are any other financial relationships or transactions, because, like, you know, it's a simple, you know, arm's length transaction as far as I understood, as you know, Mr. Klein was in charge prior to the sale, and after the sale Mr. Stein was in charge.

Q    Um-hmm.

A    That's the extent of it.  So there were no other financial relationships or transactions, other than you have in the closing binder already.

Q    Okay.  By the way, are you familiar with the sale agreement?

A    The sale agreement that's in the closing binder?

Q    Yeah.

A    I've looked through it.  I don't know it by heart, but --

Q    Yeah, it's a long document to know by heart.

A    Yeah.  Yeah, so I've looked -- you know, I know that there were no assignments of any leases or any -- I don't believe anything was absorbed by the new company because the new company didn't want to have any connection to the old company, okay.  So they didn't want to have anything to do with Mr. Klein's mismanagement of the facility, which frankly it was.

Q    Um-hmm.

A    And yeah, that's -- that's pretty much what it was.

I don't think that there was anything that was contracts *(sic)*.  Like I said earlier, new EINs, new Medicare numbers, new Medicaid numbers.  The new owners wanted to have a clean slate.

Q    And what is your understanding of that based on?

A    My understanding is that -- Mr. Klein -- I don't know if you know the background of the facility itself.

Q    I don't.

A    Well, I think it might be a little helpful for, you know, for the Judge and the attorneys to understand.

Q    Thank you.

A    This facility was managed by two partners, Henry Book and Mr. Klein.  Mr. Book actually lived down the block from me.  I know -- knew him for about 30 years before he died.  And he

died, I believe, in maybe '05 or maybe a little earlier than that. And when that happened, Mr. Klein, who was the financial person of the facility took over the operations and he was unprepared to do so. And that's when the facility really started doing poorly. And that's when he started considering actually, you know, commencing with a sale.

I believe what happened was, was somehow he made contact with Mr. Stein. Mr. Stein knew nothing about nursing homes and he brought him into the facility just so that he can get educated as far as, you know, how a nursing home operates, just so that he can understand how the business works, okay. And that --

When I was there in 2009, when I started in March, that's when Mr. Klein hired me. I know Mr. Klein personally, as well. He lives pretty close to my house. I pray in the Synagogue with him for a very long time, and I know that he in -- '09, I hadn't seen Mr. Stein probably for, I don't know, a while later. I know that they were in talks to do a sale, but at point the facility was in pretty bad shape.

So eventually Mr. Stein started coming to the facility and getting educated about how a nursing home works. He understood that there was -- that there was tension with the Union, okay, and that the -- you know, to bargain with the Union, but the talks were going nowhere.

Mr. Stein, I know remarked to me on many occasions prior

to the sale, even though he wasn't there in a management capacity, you know, as he was in the facility getting familiar with the operation, he remarked to me that the only thing he wanted to do was to take care of patients, and not to -- he didn't want to run a kitchen, he didn't want to run a cleaning company, nor to do housekeeping, he didn't want to run a -- he's buying a nursing home so that he can take -- to do patient care.

And he told me that this intention was after the sale goes through, was that he intends to outsource everything so that his sole focus would be on patient care, and companies that manage employees and companies that manage housekeeping and companies that manage maintenance can do what they do, and then he can focus on his patient care.

Okay, so that's -- I can tell you that that was his intention, okay, from, you know, as he became familiar with how the nursing home operated.

Q    Um-hmm.

A    Okay, and he saw that through the fact that Mr. Klein, you know, would be busy with all these things and he would say, you know, "This is -- running a nursing home, there's so many different disparate elements to it.  I know nothing about running a kitchen and I don't want to run a kitchen."

Q    um-hmm.

A    Therefore he said, "I'm going to find a company who has

940

prior experience." And that's, in fact, what he did, okay. Pinnacle manages multiple facilities. And that's -- you know, that's pretty much how it went down. You know, date of the sale and he made good on this and he said he's not managing employees that had -- that don't have any relevance to patient care, per se.

Okay. So that's -- that's really what the background was.

So although there might be a misconception that Mr. Stein did have managerial capacity and decision-making capacity prior to the sale, okay, that is untrue. Mr. Klein was the sole member of the company -- had passed on prior to that. And then once the sale happened, at that point, that's actually when Mr. Stein promoted me to CFO, and implemented his measures to outsource as he wished.

Q    Thank you.

A    Sure.

Q    Okay. So when was that again that you were promoted to CFO?

A    Post-sale.

Q    And did you start taking on any additional CFO type responsibilities prior to that time?

A    No.

Q    So you seem like a pretty tech savvy guy, right?

A    Yeah. I enjoy tech.

Q    And I assume you use social media and so forth?

A    I try not to.

Q    Do you use --

A    I really try not to.

Q    How about LinkedIn?

A    I do have it, but I haven't been active on it for a very long time.

Q    Okay.  But at some point you created a LinkedIn profile?

A    I did.

Q    Okay.  And it stated what your job was and your job title was?

A    When I created it?

Q    Uh-huh.

A    I believe so.

Q    Okay.  And I assume you try to state your job title accurately, right?

A    I try to.

MS. ULMET:  I have a document I would like to mark GC-63.

MR. MEYER:  Your Honor, if we're dealing with getting page -- that has nothing to do with the subpoena or Sprain Brook Manor -- Sprain Brook Manor Rehab's response to the subpoena. This is -- now we're examining the Witness as a direct witness and not as a custodian of records.  This has nothing to do for the purpose of why he's here.

MS. ULMET:  It's got a limited --

MR. MEYER:  It has no --

MS. ULMET: -- relevance that will become apparent to everybody when I show the document.

MR. MEYER: There's no relevance. It has nothing to do with the subpoena.

MS. ULMET: You haven't even seen it. Can I distribute the --

MR. MEYER: I know where you're going.

MS. ULMET: -- document first?

JUDGE CHU: It's obvious where you're going, Counsel. I'm not sure how its relevant for why he was called as the custodian of record, unless you're going to attack his credibility as to what he testified to earlier as to his responsibility at the company. If that's where you're going to, it's very limited as you indicated, and I would agree it's very, very limited. But you can show him the document.

(General Counsel's GC-63 marked.)

JUDGE CHU: Go ahead, let's continue.

BY MS. ULMET:

Q    Mr. Nachfolger, is this your LinkedIn profile?

A    Yes, it is.

Q    And do you see at the bottom of the page it says "CFO Sprain Brook Manor Rehab, LLC, March 2009 to present"?

A    Yes.

Q    Did you write that?

A    I did. And I would like to comment on that.

Q    No, that question is not before you.

MS. ULMET:  I would like to move for the admission of GC-63.

MR. MEYER:  I would object to relevance, Your Honor.

THE WITNESS:  Your Honor, may I comment on this?

MS. WINKELSTEIN:  And it's a hearsay document, Your Honor.

JUDGE CHU:  No, there's no question before you.  You can wait until your --

THE WITNESS:  Okay.

JUDGE CHU:  -- attorney examines you and then you comment, if your attorney wishes you to comment on it.

I'll allow it in over the objection.  Marked and entered.

            (General Counsel's GC-63 received.)

MS. WINKELSTEIN:  And Your Honor, just so that the record is clear, my objection was based on hearsay, so it's not -- is it being admitted for the truth of the matter asserted, or just for the fact that this is his LinkedIn profile, because it is a hearsay document.

JUDGE CHU:  It's admitted for what it states, it's not admitted for the truth.

MS. WINKELSTEIN:  Okay, thank you.

JUDGE CHU:  All right.

MS. ULMET:  You can give it back to the court reporter.

THE WITNESS:  All right, I just -- there's something that I think --

MS. ULMET:  You'll get -- your attorney --

THE WITNESS:  -- deserves some clarification.

MS. ULMET:  -- will probably give you the chance later.
I'm going to get back to the subpoena.

BY MS. ULMET:

Q    So you can bring the subpoena --

A    It's more of a technical level, because when you update
your profile, okay --

Q    No, no, no --

JUDGE CHU:  That's fine.

MS. ULMET:  No, there's no question before you.  I know
it's tough, but it's okay.

THE WITNESS:  No.

BY MS. ULMET:

Q    So we were on 2(a).  Okay, so I had a question for you
about the sale agreement.  I don't remember why I didn't ask
it.

MS. ULMET:  I would like the Witness to -- well, yeah, GC
Exhibit 7, I don't know if that's in the same set that you have
in front of you already.  It's not the question -- it's the
little tab that says "7."

JUDGE CHU:  Tab on the right hand side.

MS. ULMET:  They're in reverse order.

THE WITNESS:  Backwards?

MS. ULMET:  Yeah, they're backwards.

THE WITNESS:  Yeah.

MS. ULMET:  Okay.

JUDGE CHU:  Could you just note for the record what the document is?

THE WITNESS:  This says "Agreement for the Purchase and Sale of Assets."

JUDGE CHU:  All right.

BY MS. ULMET:

Q    Okay, and do you recognize that to be the sale agreement between -- that resulted in the sale of the facility?

A    It looks to me like it's an agreement.

Q    Actually, if you turn back a page, I think that's the cover page.  Do you recognize that document?

A    I believe this was in the closing binder.

Q    Okay.  So can you turn to the last page of that document?

A    Okay.

Q    And do you see on the bottom that it's got page numbers that say -- actually, sorry.  Yeah, on the last page of the document -- are you looking at the page with a few signatures on it?

A    29 of 37?

Q    And it says "29 of 37."  Do you know what happened to pages 30 through 37?

A    I have no knowledge.  Whatever -- whatever's included in the closing binder, which this was a part of --

Q    Um-hmm.

A    -- okay, that's what we have.  Okay, and that's what was on the disc.

Q    Um-hmm.

A    So --

Q    And you don't have another copy --

A    No.

Q    -- that contains pages 30 through 37?

A    No.  Whatever you have over there in that pile, that's the complete closing binder.

Q    Okay.

JUDGE CHU:  Do you have any idea what document is between 30 and 37?

THE WITNESS:  No.  I was not -- like I said, I was not present at the closing.  And Dwayne Morris, which is the firm that did the closing, they provided the disc.  So I couldn't tell you what -- you know, if there are any missing pages or not.

MS. ULMET:  Okay.

THE WITNESS:  It looks to be like, you know, it's closing up over here, so I don't know.

MS. ULMET:  Okay.

BY MS. ULMET:

Q    And have you ever seen any attachments to the sale agreement?

A    No.  Other than what's in the closing binder.  That's -- anything you have -- anything I have was provided to you.

Q    That's what you see, okay.  If you want to go back to the subpoena, it was - it's Number 4.

A    4, okay.

Q    And we're on Page 4.

A    Okay.

Q    Okay.  So Item 2(b), do I understand correctly -- let me put it a different way, are there any documents relevant to 2(b) that would not be in the closing binder?

A    No.  Anything -- it looks to me like any asset purchase agreements, contracts, all these would be included in the closing binder.

Q    Okay.  And in terms of how you went about searching for documents responsive to 2(a) and 2(b), did you look anywhere besides the closing binder?

A    Yeah.  I mean, anything that was present on the server I would have given you.  But anything other than in the closing binder, I don't believe anything exists that would satisfy this request because it deals with, you know, sale transfer, assignment of assets, leases; all that would be included in the closing binder.

If there were any leases, you know, let's say for vendors or software vendors, we didn't do any assignments.  We -- you know, we wrote brand new contracts up, anyway, so there were no

assignments.

Q    I see.  Okay.  Would those be included in -- well, I'll move on.

All right, so moving on to 2(c), let's take this step-by-step.  So "Correspondence with the New York State Department of Health and Human Services."  Did you produce any documents responsive to that?

A    I believe that the Public Health Council approval is in the closing binder once again.

Q    Um-hmm.

A    So yeah, I think that's -- you should have that.

Q    And do you know whether there was any correspondence with them, besides the final approval?

A    Well, obviously in order to get the approval there's an extensive certificate of need process.

And I would assume that hundreds of documents were produced to the State in order to procure that.  I would think that that's public record, as well.  I can't tell you for certain, but I personally did not handle that.  I know that there were consultants who handle submission of documents.  There's other items that they had to -- character and competency review for the new owners.  A lot of different steps that had to be taken to transfer ownership of a nursing home.

Q    Um-hmm.

A    None of that stuff was under my jurisdiction, though.

Q    Okay.  So as the -- now, let me ask you actually to turn back to --

MR. MEYER:  Your Honor, I'll just note that the certificate of need, the CON application, was also produced to General Counsel.

JUDGE CHU:  Okay.

MS. ULMET:  And I'll stipulate to that.

BY MS. ULMET:

Q    Can you turn to Page 2 of the subpoena?

A    Page 2, okay.

Q    Okay.  And do you see Item 5, it says, "Documents subpoenaed shall include all documents in your physical possession, custody, or control and all documents in the physical possession, custody, or control of our present or former supervisors, agents, attorneys, accountants, advisors, investigators, and any other persons and companies directly or indirectly employed by or connected with you."

A    Okay.

Q    Had you seen that request -- direct -- Instruction 5 prior to this time?

A    Yeah.

Q    Okay.  And in responding to the subpoena did you have any communication with attorneys, agents, accountants, advisors, and so forth to try to obtain the -- any additional responsive documents that were not in your personal possession, custody,

or control?

A    Well, anything that I had ability to produce I did produce.

If you're looking for communications that were used in order to obtain them, is that what you're asking for?

Q    I'm not looking for the communications, I'm just asking you to tell me now whether you --

A    How I got them?

Q    -- communicated --

So you just told me that the -- that the certificate of need process was handled by a consultant.

A    Correct.

Q    And so my question for you is whether you asked your consultant, or I should say Sprain Brook's consultant, to provide you with any responsive documents that they had in their possession?

A    Well, other than the certificate of need itself, I believe that you have.  There wasn't other than that to produce.  I didn't personally communicate with them.  I believe it was my attorney.  So I think he took lead on that one.  So.

Q    Okay.

A    Yeah.

Q    Okay, how about -- and then there were some requests for "Correspondence, applications, notices, or other communications with Medicare, Medicaid, Centers for Medicare and Medicaid, et

cetera."

A    Which item is that?  Is that--

Q    The same one, 2(c).

A    Oh, 2(c), okay.

Q    So after it says New York State Department of Health, it lists Medicare, Medicaid, and CMS.

A    Um-hmm, okay.

Q    Do you know whether you provided me any documents responsive to that part of the request?

A    I believe anything that I had access to we did provide.  I really don't -- let me just review this.

(Witness examined the document.)

You know, again, this is very, very broad.  If you're asking for any correspondence with, you know, CMS, that could include remittances of, you know, protected health data for patients, which obviously we can't provide due to HIPAA laws.

So anything that was related to us, I don't believe there wasn't anything to provide in that regard.

Q    Do you know what kind of process Sprain Brook had to undertake in order to get its new Medicare provider ID?

A    I'm sure there was a standard application form that CMS requires to be filled out.  I personally did not do that.  It's very possible that the consultants who worked on the CON did it.  I don't know.

Q    Okay.  And so again in preparing the response you didn't

communicate with the consultants to try to obtain those documents?

A    Well, I would think that anything that was in the CON, that I believe you had, would have been included in that. Usually --

Q    Well, the CON goes to the Department of Health, right?

A    Correct.

Q    The New York State Department of Health.

A    Right.

Q    So I'm talking now about the Medicare/Medicaid application.

A    Right.  Again, all those items were not -- I don't maintain those particular records.  I didn't prepare those applications, so I don't have access to that myself.

Q    Okay.  And you didn't --

A    Okay.

Q    -- ask any other consultants or so forth to help you --

A    Prepare those?

Q    -- obtain those documents to provide a response to the subpoena?

A    No.

Q    Okay.  And do you know whether any documents exist that would -- so by the way, just to explain this a little bit, so the number 2 -- so all of this is a sub request to Number 2. And Number 2 is "Documents that concern, discuss, or reflect

the transfer and/or sale of the nursing home, et cetera." So we're not -- we're on the same page about the protected, you know, medical records. We're not looking for that.

But anyway, do you -- the request in 2(c) that references managed care providers, do you know whether Sprain Brook has any correspondence with private insurance companies regarding the fact that the facility was sold?

A    Well, what I can tell you is that over the past  I've been doing random contracts with all the providers because the contracts that they have existing are technically not valid because we didn't absorb anything from the old facility.

Okay, I've been -- we've been -- actually been using a consultant and we've been signing brand new contracts all this time.

Q    Okay.  And did you make any effort to obtain those documents in order to provide a response to the subpoena?

A    Well, the contracts that you might be referencing over here, which would be old contracts, those I don't have access to once again.  Okay, so anything that I worked on since I took over my CFO responsibility in the beginning of 2013, that I can produce.  But I believe that the request in (c) is talking about items that were related to the prior, which the new contracts that we have really have nothing to do with that.  So I don't think that those are relevant to the discussion.

Q    Um-hmm, okay.

A   And in fact, I would note that any contracts that existed prior, we've actually gotten denied payment on quite a few items because the contracts were for the old facility.  And that was actually a significant hold up because it was, you know, for the wrong EIN, wrong Medicare number.  So that, sort of, underscores the fact that it's a brand new entity and we were not able to assume any of those contracts.  We had to completely redo them.

Q   So you got a new -- so Sprain Brook Rehab has a new, what's it called, the Medicare number?

A   Well, it's a new Medicare number with a new NPI number, national provider.  There's a new EIN.  There's a new New York State UI number for unemployment insurance.  Everything is new.

Q   Oh, you just said, "We didn't absorb anything from the old facility."  What did you mean by that?

A   Meaning any contracts or other contract -- or you know, let's say ID numbers.  New applications.  There's an NYS-100 that you have to file.

Q   Okay.  Okay, so then moving on to 2(d), "Documents related to the closing of the sale."  So it looks like I've got most of that now from the closing binder.

Are there any documents that would be responsive to 2(d) that are not included in the closing binder?

A   I don't believe so.  I think in the closing binder there's a closing statement, which shows exactly how the proceeds of

the sale were disbursed.

Q    Um-hmm.

A    So any questions that you have probably would be addressed in the closing binder.

Q    Okay.  And now the last part of that 2(d) refers to a copy of a canceled check or proof of wire transfer showing the payment of the balance of the purchase price.

Do you know whether any of that -- anything related to that item was produced?

A    I don't have any knowledge of that.  No, other than the closing binder that was produced, I don't -- I don't have any access to any of that.

Q    Well, in order to -- the -- at the closing, tell me if I understand this correctly.  So at the closing, Sprain Brook Rehab had to pay the balance of the purchase price to the seller, right?

A    Right.

Q    And so they would have been the ones transferring money to other recipients?

A    Correct.

Q    Okay.  So there would be money that came out of Sprain Brook Rehab's bank account to pay to -- to be disbursed to other recipients?

A    Well, Sprain Brook Rehab at that point didn't -- I don't believe had an operating account because it didn't exist until

that date.

Q    I see.

A    So -- and even if there was a bank account, I don't believe that they would have disbursed the money directly from the facility operating -- because I don't believe that with a sale if equity is coming from the partners, they would have to do that on a personal level.  It's not coming from a business, which just started existence.

Q    Right, that's a good point.

A    So that's what I would think.

Q    Okay.  So in order to respond to the subpoena, did you talk to any of the partners about obtaining their records of this wire transfer or payment?

A    I believe that I did ask about it, and the answer was anything that's in the closing binder is all the documentation that exists on it.

Q    Who did you ask?

A    I believe I had a conversation with Allen Stein about it.

Q    Okay.  Did you have any conversations with Lazar Strulovitch?

A    No.

Q    Actually, let me back up, in responding to this subpoena, can you identify the -- any individuals that you spoke with to assist you in responding to the subpoena?

A    Well, I believe that I went through it and anything that I

felt that either Allen or Mr. Strulovitch would have possession of, I did ask them about it.  And they referred me this -- they told me to go back to the closing binder because it was the understanding of the partners that Dwayne Morris took, you know, all the data that was produced by the sale and enclosed it in that -- in that closing statement.  So -- in the binder.

Q    Okay.  So Mr. Stein and Mr. Strulovitch didn't provide you any additional documents beyond the closing binder in order to prepare Sprain Brook's response to the subpoena?

A    No.

Q    Okay.  Okay, so 2(e), "Notices" -- can you describe your submission to 2(e)?

A    Okay, so again anything that is for the prior entity, for Sprain Brook Manor Nursing Home, I don't have access to once again.  Okay, so if -- if there's any -- if you would like to see any new contracts that we have, I can provide that to you.  But I don't believe that that's relevant to the question.

Q    Um-hmm.  No, it's asking specifically about --

A    Yeah.

Q    -- correspondence with these agencies.  So -- all right.

Did you -- so what did you do to correspondence with these government agencies?

A    You're asking in terms of getting new numbers or?  Just can you explain the question a little better?

Q    Yeah.  The question is any --

A    What activities did I do to provide them?  Anything that existed on our server, which again --

Q    Okay.

A    -- we didn't have much of that information because we redid the entire system.

Q    Uh-huh.

A    And another thing that I would note is that prior to us implementing that new server, most of the documents were not in digital format, they were, you know, kept in boxes and things were not organized.

So it was -- we did look for documents, okay, but again most of the documents are not in the facility anymore.  And I'm not sure of the whereabouts of a lot of these contracts or other records that may or may not exist.

Q    Okay.  All right, so let's move on to 3(a).

A    Okay.

Q    Okay, so "Documents related to the operations of SB Rehab," Sprain Brook Rehab, "Documents that will show the identity of all customers or clients" --

MS. ULMET:  Is this the one where -- we're still fighting over this one?

MR. MEYER:  We've been through this one.

THE WITNESS:  I don't think that we -- we're allowed to provide patient data.

MS. ULMET:  Okay.  I won't bother you with that one.  I'm

taking it up with Mr. Meyer.

BY MS. ULMET:

Q    Okay, so did you provide any documents that show the full names -- so (b) -- 3(b), "Documents which show the full names, positions or titles and the titles of administrators, managers, and supervisors of Sprain Brook Rehab."

A    I believe we did provide that.

MR. MEYER:  I'll note that we stipulated to, I think, in Request Number 6, we stipulated to  -- on a previous day of the hearing, GC and I stipulated to a number of individuals names, titles, as set forth in the subpoena.

MS. ULMET:  Okay.  Right.  Thank you.

BY MS. ULMET:

Q    Okay, how about -- well, skip that one.

All right, so 4(a), this asks for payroll records.  So we talked generally about how payroll records are maintained and so forth.  But can you describe how you looked for documents responsive for 4(a) and what you produced?

A    Okay, so again, anything that was prior to the sale, so that was from January 2012, those were from the old software system, which we redid the contract.

Q    Um-hmm.

A    Okay, so as of the sale date, I wouldn't have access to that anymore.  That's all -- that's all Klein's.

Q    Um-hmm.

A    Okay.  So I would not be able to produce any of that.

Okay, he's -- at this point, he's the custodian of records of anything that was prior to the sale, because it's all in his, you know, between the boxes that are in that, you know, offsite storage that he may or may not maintain, you know, the programs which are contracts that apply to the old --

Q    Um-hmm.

A    Those are all -- he's the administrator of all those things.

Q    Okay.  And after the sale?

A    After the sale would be us.

Q    And did you provide any payroll records from after the sale?

A    For Sprain Brook Manor Rehab, yeah.

Q    You provided those?

A    I believe so.  Any -- but you're -- you have to be a little bit more specific about what kind of records you're looking for.

Q    Well, how do you understand a --

A    Meaning?

Q    -- payroll record?

A    Well, payroll records, are you looking for time sheets? I -- I believe that I provided the, you know, the roster of employees.

MS. ULMET:  I have never seen a roster of employees, Your

Honor.

THE WITNESS:. For the new company?

MR. MEYER: And we didn't produce it, Your Honor. The request provides for "Consider and reflect or discuss employees who perform bargaining unit duties at the facility for the period of time." Post-sale Sprain Brook Manor Rehab employed no employees who performed bargaining unit work. That was all with the agencies.

MS. ULMET: This doesn't --

MR. MEYER: We do not have those records.

MS. ULMET: This request does not specify whom they are employed by. That Mr. Nachfolger just referenced that he created would be responsive to this request.

MR. MEYER: No, it wouldn't because it only dealt with Sprain Brook Manor Rehab employees, which were --

MS. ULMET: It doesn't --

MR. MEYER: -- non-bargaining unit. It says bargaining unit duties.

MS. ULMET: Okay. So "employees" and "bargaining unit duties," terms in this subpoena, so let's all turn to Page 1.

JUDGE CHU: I'm not going to deal with this issue now, okay. I know the GC -- you can just put the -- put together a litany of items that you --

MS. ULMET: Okay.

JUDGE CHU: -- believe through the testimony of this

witness and what has been produced by Mr. Meyers that are still outstanding.  And --

MS. ULMET:  And I guess I just --

JUDGE CHU:  And you can file a motion for further compliance of the subpoena, and I'll deal with it then.

MS. ULMET:  Okay.

JUDGE CHU:  Because I'm not going to make a ruling as to whether, you know, Item 4(a) or 4(b) or 4(c) and 2(a) has been complied with -- at this point in time.

MS. ULMET:  Um-hmm. I would just --

JUDGE CHU:  It would delay the testimony of this witness who, I think, has other significant things to get involved and get going to do.  Why don't we just try to finish his testimony as we had indicated before noontime or around that time, and I'll deal with the alleged deficiency of the subpoena at some other point.

MS. ULMET:  Okay.

JUDGE CHU:  All right.

MS. ULMET:  But I think it would save us all a lot of trouble down the road if Mr. Meyer would please read the definitions of "employee" and "bargaining unit duties" that I took the time to carefully specify in the subpoena and maybe he'll realize that there are additional responsive documents that he should produce so that we don't have to have a, you know, legal fight over this and you don't have to waste your

time ruling on it.

JUDGE CHU:  If you can confer with opposing counsel after this witness's testimony as to whether you can agree or the parties can agree as to what outstanding documents still needs to be produced so, as you put it, so I don't have to rule on the fight.

MS. ULMET:  Okay, thank you.  I'll move on.

BY MS. ULMET:

Q    Okay, so Israel, if you look at 4(b), did you provide any work schedules in response to the subpoena?

A    Okay, so work schedules from the period of January 1 until the sale, once again I don't have access to.

Okay, anything post that, again, we don't handle the bargaining unit.

Q    Um-hmm.

A    Okay, Sprain Brook Manor Rehab, as a company, only employees the executive staff and top-level management. Anything else is, you know, if it's nursing staff, it's Budget Services.  If it's the kitchen then it's Pinnacle.  They manage their departments.  So I don't have any of that stuff.

Q    Um-hmm, okay.

A    Okay.

Q    And prior to the sale, work schedules were done on -- in electronic form or paper form?

A    I believe they were on paper.

Q     And what happened to those papers?

A     Once again --

MR. MEYER:  Objection, Your Honor, we're talking about Nursing Home again.  He was a payroll clerk.  He didn't do -- he didn't handle scheduling.  He's already testified to that.

MS. ULMET:  These documents are responsive to the subpoena request.  He knows what form they're in.  He can testify as to --

JUDGE CHU:  He may or may not know.

MS. ULMET:  -- what happened to them.

JUDGE CHU:  He can testify to that.  I mean, he was just a payroll clerk according to his testimony.  He may not have knowledge as to other items, other than payroll.  But you can ask.

BY MS. ULMET:

Q     If you know.

A     I do not.

Q     Okay.  Are there any employment applications that would be responsive to this request?

A     Once again, prior to the sale, the applications would be in the possession of Mr. Klein.

Anything post-sale, those applications were not being processed by the new company because, depending on which outsourced company was handling that department, they are processing those applications.

Q    Okay.

A    So we don't have any of that.

Q    And the next item, 4(d), refers to "Policies, rules at the facility that governed conduct by unit -- by employees who perform unit duties."

Now, so let me ask you, does Sprain Brook Rehab have any overall personnel policies that apply to all employees that perform work in their facility, whether they're employed -- regardless of whom they're employed by?

A    Well, we don't employ any bargaining unit employees so we can't dictate policies and procedures in that respect.

So we can dictate to the employee, but for the outsourced companies the policies and procedures would be those companies to implement.

Q    Okay, and so 4(e) asks for "Job postings or listings for positions, et cetera."

Does Sprain Brook -- does the new Sprain Brook Rehab advertise any job postings that relate to bargaining unit work?

A    I don't handle advertising.

Q    Okay.  So you don't know?

A    No.

Q    Okay.  Okay, and 4(f), would the prior request apply to 4(f), as well?

A    Correct.

Q    Okay.  All right, I'll skip 5 because I'm sure your answer

is --

6 I think we stipulated, right?

MR. MEYER:  Yes.

MS. ULMET:  All right, 7.

BY MS. ULMET:

Q    All right, so 7 gets into the subcontracting, "outsourcing," as you say.

Okay, 7(b), "Documents relied upon or referred to in deciding to subcontract such work, including the internal communications, notes, memoranda, financial analysis, spreadsheets, and/or budgets."

Do you see what I'm talking -- what I'm looking at?

A    I think I lost you.

Q    7(b).

A    7(b).  Okay.

(Witness examined the document.)

Q    Okay, do you know whether any such documents --

A    Well, I believe we -- I did send the contracts that we have with the outsourced companies.

Q    Yeah, this request -- 7(b) is not asking for the contracts.  It's asking for any financial analysis that was performed internal for outside.

A    Whether to outsource?

Q    Yeah.

A    We -- we didn't have any official, you know, analyses,

documents that we necessarily put together.  You know, that can be referred back to.

Q    Anything --

A    No.  There was nothing -- there was nothing that we filed. We probably did some paper, you know, back of the napkin calculations.

Q    Um-hmm.

A    We didn't -- I don't believe that there's anything that exists that, you know, that preceded any contracts with -- with the outsourced companies.

Q    Um-hmm.  And before you entered into those contracts, do you know whether -- whether Sprain Brook Rehab, sort of, shopped around to look at options for different subcontractors?

MR. MEYER:  Objection, relevance.

MS. ULMET:  It would be responsive to this if there were discussions with various subcontractors to decide who offered the best price.

MR. MEYER:  Discussions are different than documents.

MS. ULMET:  Right.  So if -- we'll see if there were discussions.  And then we'll find out whether they were, you know, recorded in any way.

JUDGE CHU:  I'll allow it.

THE WITNESS:  Not -- not that I recall.  Mr. Stein really is the one who was in charge of that as the owner.  So I don't have any knowledge of any other communications.

BY MS. ULMET:

Q    And you -- so you haven't seen any documents that would relate to that?

A    No.

Q    Okay.  And so that goes along with 7(c), at the very end, requests for proposals.

So to -- to your knowledge, Sprain Brook Rehab didn't issue some kind of request for proposals to various --

A    No.

Q    -- to multiple subcontractors?

A    Not as far as I know.

Q    Okay.  Okay, so 7(d) I understand is taken care of.

Although I do have this -- actually, 7(d), let me ask you something, Israel.  A lot of the subcontracts that were provided to me are not fully executed.  Do you know --

A    Okay.

Q    -- why that is?  I can show them to you what I'm --

A    I can take a look at it.  I'm not sure that I can tell you if any updated version exists, but it's possible that that's just the one that happens to be the one that we have on file. We never got sent the final executed version.

MR. MEYER:  Your Honor, I believe that there are fully executed copies provided by other -- or pursuant to other subpoenas with either Pinnacle, Budget, or whatever the case may be.  And I think those are entered into.

MS. WINKELSTEIN:  And Your Honor, I did provide General --

MS. ULMET:  They're entered into evidence over your objection.

MS. WINKELSTEIN:  And Your Honor, I did provide --

MR. MEYER:  For many reasons.

MS. WINKELSTEIN:  -- the most recent copy of the Pinnacle. Remember when there was a little bit of confusion and General Counsel refused to admit it into evidence.  So we do that document.

MS. ULMET:  I've got -- what we entered into evidence as -- I can tell you the numbers if anybody wants to know, GC-16(b) is a fully executed agreement entered over the objection of Mr. Meyer.

17 -- or actually, is that one --

MR. MEYER:  There's 16(a) and (b).

MS. ULMET:  Yeah.  Right.  16(a) is what you provided me.

MR. MEYER:  And 16(b) has a fully executed --

MS. ULMET:  17(a) is a fully executed document that I got from other sources that Mr. Meyer objected to.

GC-19(a) is a fully executed document that Mr. Meyer objected to.

I would like to show the Witness copies of what he -- what was produced to me by Sprain Brook.

JUDGE CHU:  Go ahead, show it.

BY MS. ULMET:

Q    Okay, so I've turned to the signature page of these, but feel free to turn back if you need to.  I'm showing you what Sprain Brook -- what Sprain Brook produced to me as the Confidence subcontract, the Budget contract, and the -- actually, this one I think we've got in evidence already; Pinnacle.  Pinnacle is executed.

Okay, so the ones that are at issue, so Confidence and Budget.  And do you see on both of them, they're executed by the subcontractor but not executed by Sprain Brook?

A    I see that.

Q    Okay.  And so do you know whether Sprain Brook has in its possession one executed by Sprain Brook?

A    I would have to look back at -- in the system to see if there's an updated version of this.  I would think that there is.  But I couldn't tell you for certain right now from this desk.

I mean, we're currently -- we were in contract with them, so I'm sure that at some point there was an updated version of this with a signature on there.

MR. MEYER:  Your Honor, just so we're clear, I'm looking through my notes now.  The reason I objected to those documents was because they were part and partial over in litigation.  That's why I objected them.  And if you go back in the record that's what it will show because we had a confidentiality order in place.

971

JUDGE CHU:  I believe that's what you had objected to.

MR. MEYER:  Right.  The fact --

JUDGE CHU:  Not for the production of the documentation itself --

MR. MEYER:  Correct.

JUDGE CHU:  -- but because of the --

MR. MEYER:  I just want to make clear --

JUDGE CHU:  -- pending --

MR. MEYER:  -- so I don't want General Counsel to mischaracterize my objections.

And two, the fully executed documents are in the record. They were provided by other parties.  We had a copy that had one signature on it, that's what was sent.  The fully executed versions are in.  So there's no issue --

MS. ULMET:  It doesn't make any sense --

MR. MEYER:  -- about the document.

MS. ULMET:  -- that he doesn't have versions without his own signature.

And it doesn't matter what the basis of the objection was, because the fact is that that document's admitted over objection.  He can argue his objections in the brief, and there might be fully executed versions in the record if --

MR. MEYER:  But they are in the record.

MS. ULMET:  You know, if he --

Right, but you could -- later, you can file exceptions

based on your -- on the Judge's decision to admit something over your objection, and then we have -- and you know --

MR. MEYER:  What was my objection, Julie?

MS. ULMET:  If you -- if your objection carries, the document is rejected and it's not in the record, and I don't have a fully executed version in the record.

MR. MEYER:  Even if the record I put into evidence was fully executed, I would have had the same objection and would still use it going forward.  It is not about the signatures --

MS. ULMET:  If you provided --

MR. MEYER:  -- about whether --

MS. ULMET:  -- a fully executed --

MR. MEYER:  Can I finish?

MS. ULMET:  -- version, I wouldn't have to --

MR. MEYER:  Let me finish.

MS. ULMET:  -- use those other documents.

JUDGE CHU:  One at a time.  Can't pick up objections if everybody's speaking.

MR. MEYER:  My only objection would be because it was pulled into this proceeding over a confidentiality order in a federal litigation.  That was my objection.

If I raise it for some other reason, you would have your reply papers to shoot that argument down.  A fully executed signed agreement signed by all parties is already in the record.  I'm not challenging that.  It's in the record.  It's

973

signed.

JUDGE CHU:  Yeah, I don't --

MR. MEYER:  There's no challenge to that.

JUDGE CHU:  I don't understand the GC's --

MR. MEYER:  We're wasting time.

JUDGE CHU:  -- line of question on this because we have those two documents that you just showed to the Witness in the record.  Fully executed.

So are you -- I mean, don't we have that?

MS. ULMET:  Can you give me a minute to confer, Your Honor?

(Pause.)

MS. ULMET:  Yeah, I mean, I -- I still think -- okay.

JUDGE CHU:  I mean, if your argument is that Sprain Brook Rehab, LLC was not in full compliance with the subpoena because they gave you two contracts that's before this witness that were not fully executed, that's one thing.

MS. ULMET:  Um-hmm.

JUDGE CHU:  But if your argument is that you need those documents, GC has those documents already.

MS. ULMET:  Well, Judge, the problem that I have is that it's everything that you just said, plus in order to make up for their deficiency, I used contracts that I obtained from another course.  Mr. Meyer objected to the documents because he didn't like the source that I had gotten them from.  So we

don't have in the record fully executed documents that all the parties have essentially consented or stipulated to the admissibility of. And that concerns me.

I would like to have a complete record where we have -- that the evidence in the -- you know, that these most essential pieces of evidence in the record, all parties agree that this document is the authentic and admissible document. I don't have that. And the reason I don't have that is because --

JUDGE CHU: You're never going to get full agreement with any party as to --

MS. ULMET: I know, but Judge --

JUDGE CHU: -- as to consent to every single item on the subpoena.

MS. ULMET: Of course.

JUDGE CHU: There are always going to be objections.

MS. ULMET: But wouldn't you agree that the subcontracts are among the, you know, top 10 most important documents in this record?

JUDGE CHU: Yeah. And if I could get the full-executed contract through Pinnacle instead from Sprain Brook Rehab, I'm satisfied with that.

MS. ULMET: You're satisfied with Sprain Brook's subpoena compliance?

JUDGE CHU: I didn't say that. I'm just saying that it's --

MS. ULMET: As far as the record, okay.

JUDGE CHU: -- to the two contracts that's before us.

MS. ULMET: Yeah.

JUDGE CHU: If you got -- if they're from different sources and they're fully executed, I'm satisfied with those two documents.

MS. ULMET: Okay.

MR. MEYER: And I would also note, Your Honor, the same thing applies to the payroll records. They were provided payroll records from Pinnacle, and I believe Budget, for --

JUDGE CHU: That --

MR. MEYER: I don't know why my client's sitting here being badgered about payroll records that we clearly stated we don't have and that we're not in possession of. They have them already. So what are we doing here? Are we going to be here for another three hours?

MS. ULMET: I have payroll records from September 12th onward, nothing --

JUDGE CHU: Again --

MS. ULMET: We'll deal with that in argument.

JUDGE CHU: Again, like I said, if you can confer and you can deal with that privately, that's fine. If not, then I've already stated General Counsel can put in a litany of items that you still feel are deficient to the subpoena. Not so much the ones that are -- you have already gotten through other

Respondent companies, but the ones that are still outstanding that allegedly are in the sole possession of Sprain Brook Rehab.

MS. ULMET:  Okay.  I'm done with these documents.

And for the record, these are not Pinnacle.  We -- we're okay with Pinnacle.  These are other entities, Confidence and Budget.

Okay, moving on.

DIRECT EXAMINATION (continued)

BY MS. ULMET:

Q    Israel, can you take a look at Item 7(j)?

A    Okay.

Q    This asks for any "Documents that would be communications with the subcontractors regarding the Union," which is 1199, "or Local 713, or any other labor organization."

Do documents exist?

A    No.  I know that Budget has a contract with 713.

Q    Um-hmm.

A    But that's between them.  We don't have anything to do with that.  That's between them and their --

Q    And what's the basis of your knowledge?

A    I just know that they have that contract.  I don't have any documentation on that.  That's --

Q    Okay.  So it's not based on anything?

A    No.

Q    Okay.  Okay, moving on.  8, "Documents concerning the Union," which is 1199.  Okay, this asks for a bunch of specific things about the Union.

A    When you say "the Union," you're referring to 1199?

Q    Yeah.  So Page 1 --

A    Okay.

Q    -- of this document has definitions and one of the definitions --

A    Because 713 is a union, as well.  I just want to clarify that.

Q    Right.  So if you turn to Page 1 it says "'The Union' refers to 1199 SEIU United Healthcare Workers East."

A    Okay.

Q    Okay.  So that's the union that this one -- Item 8 refers to.

Do you, as the custodian of records for Sprain Brook, have in your possession, custody, or control any documents relating to 1199?

A    I do not.

Q    Now, you were previously involved in bargaining with 1199; correct?

A    At one point I did sit in on a meeting where Greg Speller was present.  That was prior to the sale, but I didn't actually have any bargaining power, if you will.  I sat in on the meeting.  I looked at, you know, everyone screaming at each

978

other and I didn't actually have any role in that bargaining.

Q    Um-hmm.  Did you -- did you have any written communications with the Union or with Greg Speller?

A    No.  Not that I'm aware of.

Q    Um-hmm.  And what -- why did you go to that meeting?

MR. MEYER:  Objection, Your Honor, again we're talking pre-sale.

MS. ULMET:  It's still responsive.

MR. MEYER:  Nursing Home time.

JUDGE CHU:  Okay.  It's just a continuity of the question that's already asked.

THE WITNESS:  Well, prior to the sale, there was, you know, the relationship between the Union and Mr. Klein was very contentious.  I believe that they were under court order to come to a bargaining agreement, and the meetings just, you know, weren't going anywhere.  It had been a few years and I believe Mr. Klein, at that point -- Allen Stein was just getting trained in the facility, getting familiar with the operation, and you know, to sit in on the meeting and see what, you know, what was going on there.

BY MS. ULMET:

Q    Who's "both"?

A    Allen Stein and myself.

Q    Who asked you?

A    Mr. Klein.

Q   Oh, I see.

A   Yeah.  Being that --

Q   Okay.

A   -- being that he was the one in charge.

At that point, you know, he, I think, sort of, wanted to wash his hands of it, but since he was still the responsible party, you know, he just didn't want to have to deal with it, and he said just go educate yourselves and sit in on the meeting and, you know, see what comes out.  But ultimately, he was the responsible party to -- any decisions that could or would have been made would have been his.

Q   Um-hmm.  And do you recall whether any written documents were exchanged in that meeting?

A   No, I don't.

Q   Okay.  But you didn't maintain them if there were?

A   I -- even if they were maintained, any of those documents would be, again, Mr. Klein's and thy would have gone to his possession as of the sale.

Q   Okay.  We're at the last item, Number 9.  Do you see Number 9?

A   Yes.

Q   So now this relates to the other Union, Local 713.

A   Okay.

Q   Do any documents exist in Sprain Brook's possession, custody, or control that relate to Local 713's representation

980

or organization of employees at the facility?  Regardless of whether they're your employees or not.

A    Any of that documentation would be maintained by Budget.

Q    Budget, okay.

A    Since they're -- the employees, they're employed by Budget.

Q    Um-hmm.  Have you ever seen any of the documents that are --

A    Well, I know that when the sale happened, Budget was in the facility and I did see a few cards, you know, lying around.  But that I haven't -- I don't have any access to any of that.

Q    Um-hmm, okay.  What do you mean "When the sale happened Budget was in the facility"?

A    Well, that -- that's when we subcontracted and they had representatives in the facility making sure that people were doing their jobs, okay.  So they had their own managers in the building.

Q    Um-hmm.

A    So that's -- you know, they -- they were handling all the -- all the employment related issues, whether it was, you know, application, what have you.

Q    Um-hmm.  Do you have names of the representatives they had in the building?

A    I think there was a man by the name of Farouq.  I forget his last name.

JUDGE CHU:  And where was he from?

THE WITNESS:  Budget Services.

JUDGE CHU:  Okay.

THE WITNESS:  I believe they had a few others, but I didn't catch names.  Farouq was the only one that I remember his first name.

BY MS. ULMET:

Q    And you said that they had documents at that time, they had applications.  And did they also have documents concerning Local 713, if you know?

A    I wasn't privy to that because it was their -- you know, we wanted to keep out of that process; their employees, having anything to do with that.

Q    I see.

MS. ULMET:  Okay, Judge, could I just take a minute to review my notes and then I'll see if I'm done with this witness?

JUDGE CHU:  How much time do you want?  Let's take a short break.  Come back around 11:55.

MS. ULMET:  Oh, yeah, I only need a -- yeah.  That's perfect.

JUDGE CHU:  All right.

(Whereupon, a brief recess was taken.)

JUDGE CHU:  All right, back on the record.

MS. ULMET:  I have no further questions for Mr.

982

Nachfolger.

JUDGE CHU:  Okay, thank you.

Petitioner.

MR. MEYER:  Okay.

CROSS-EXAMINATION

BY MR. MEYER:

Q    Just a few things.  You had testified before that you handled payroll for Sprain Brook Manor Rehab; correct?

A    Correct.

Q    Does that involve payroll for anybody in the dietary department?

A    No.

Q    Anybody in (indiscernible) department?

A    It does not. No.

Q    Any of the nursing department?

A    No.

Q    Maintenance --

A    No.

Q    -- department?

Who -- the payroll that you do manage currently as controller of Sprain Brook Manor Rehab, who is in that group? In that window of employees.

A    So you have the administrative staff, the department heads.  You have basically top-level nursing staff, like the director of nursing.

983

Q    Okay.

A    And the supervisory staff.  Very limited to only top-level positions.

Q    If an employee came to you, say from the nursing staff about a payroll issue, would you -- you would -- would you just refer them to --

MS. ULMET:  Objection.

MR. MEYER:  -- Budget or Pinnacle, whatever their agency would be?

MS. ULMET:  Objection.

JUDGE CHU:  I'll allow it.

THE WITNESS:  Yes.

MR. MEYER:  Okay.

BY MR. MEYER:

Q    And you were previously shown what was marked as GC-63, your LinkedIn profile.  On the bottom it has your title as CFO. How long have you been CFO of Sprain Brook Manor?

A    So I was promoted post-sale.  And the -- the way LinkedIn works is that if you change the description it doesn't update the years.  So even though I've been working from March '09 through present, that does -- it's not to say that I was CFO that entire time.

Q    Okay.

A    Okay.  So when I updated my description, it doesn't say, you know, from this time period to this time period you were

984

this, and then -- because I guess LinkedIn, it would look a little fragmented.  So it just -- that's the total work history and this is currently what I'm doing.

Q    So you've just been at the facility then?  That's what that means?

A    Correct.  Correct.  And I updated, you know, the description.  I'm not sure when I created this page, but this is not to say that I was CFO that entire time.  I am currently the CFO.

Q    Understood.

MR. MEYER:  I have nothing further.

JUDGE CHU:  Just a follow-up question on -- that was raised on cross-examination.

You began talking about the payroll process after you became CFO and you just testified to that you're only responsible for payroll basically on the executive level; is that correct?

THE WITNESS:  Correct.

JUDGE CHU:  Right.  How does the subcontractor get the data to do the payroll?  How does Budget go around to - go about doing that?

THE WITNESS:  So they -- so the kitchen actually has their own clock, and they have their own systems.  And the software vendor actually set up a system where the existing clock would automatically send the data to the subcontractors, independent

of Sprain Brook, okay.

JUDGE CHU:  Is --

THE WITNESS:  So there's a few clocks in the facility and they're -- the IT staff set that up to get the data.  So I get the data that's relevant to me, and the other companies get the data that's relevant to them.

JUDGE CHU:  And as the CFO, you don't have access?  Or it doesn't go through your system --

THE WITNESS:  Correct.

JUDGE CHU:  -- with the payroll data?

THE WITNESS:  Correct.

JUDGE CHU:  Can you monitor that?

THE WITNESS:  I cannot.

JUDGE CHU:  Okay.  Can you access it?

THE WITNESS:  I personally can't.

JUDGE CHU:  Okay.  And as you testified to, if an employee had a problem -- not the executive staff, but the employee has a problem, you would give them a phone number of contractor?

THE WITNESS:  Correct.

JUDGE CHU:  Thank you.

Ms. Winkelstein, do you have any questions for this witness?

MS. WINKELSTEIN:  I don't, Your Honor.

JUDGE CHU:  No.  Any redirect?

MS. ULMET:  I think Mr. Massey, actually, has questions.

986

MR. MASSEY:  I have a follow-up question or two.

REDIRECT EXAMINATION

BY MR. MASSEY:

Q    You testified in response to -- just a minute ago, a question from your attorney, about the update that you did to the LinkedIn profile and how the title changed, I guess the start date didn't change, but the description changed, as well?

A    Well, the description was updated, but it doesn't update the dates reflective of, you know, what happened.  It doesn't maintain the old description and then updates it.  It's just -- you have the ability to, you know, provide a little missive there, and then the employment history stays static.

So if I were to update it now and say that I was owner of Sprain Brook Manor Rehab, which I'm not, then it would say owner from March '09 through present.

Q    Right.

A    I mean, it probably has the ability to do that, but I - the way that I put it in, it's just -- it's a description and total time worked at the facility.

Q    And when you updated the title, did you update the description, as well?

A    I believe I did, yeah.

Q    Okay.

A    Because I was not the CFO at that point, meaning early -- from '09 through '13.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey 07470
(973) 692-0660

Q    And what was the labor bargaining that you led?

MR. MEYER:  Objection, relevance, Your Honor.  We're getting into details again of the profile.

MS. ULMET:  I think Mr. Meyer opened the door to talking more about this document.

JUDGE CHU:  I'll allow it.

MR. MASSEY:  He testified that he had no involvement or knowledge of --

JUDGE CHU:  Well, he just testified --

MR. MEYER:  -- the bargaining between (indiscernible) and Budget.

BY MR. MASSEY:

Q    And then you also testified that you were asked to sit in by Mr. Klein at a bargaining session --

A    Correct.

Q    -- with Greg Speller where it went forth, but you were present as an --

A    Correct.  So --

Q    -- more as an observer, I think was the way you described it.

A    So the labor bargaining -- I think we can all agree that the labor bargaining with 1199 was not successful because it never went anywhere, okay.  So I --

Q    I would agree with that, which is why I'm curious what labor bargaining did you lead?

A    So what I'm eluding to, the labor agreement over here is the fact that we outsourced our payroll, okay, and all the employment to a company that manages that aspect, okay.  So that's when I -- when I said that sentence, "Led labor bargaining with the Union and ownership to a successful employment arrangement," that arrangement is the outsourced arrangement.

Q    Okay.  But what collective bargaining did you lead? Forget whether it was successful or not successful in and --

A    Well, we didn't -- we didn't bargain with anyone in terms of, you know, 713, because we didn't have any communication with them because they had an existing contract, okay.  So --

Q    So what labor bargaining did you lead?

A    I had limited labor bargaining involvement, although I alluded to it.  But that sentence was alluding to the fact that we successfully outsourced the payroll in order to create --

Q    Okay, you're referring to the second part of the sentence, "The successful employment arrangement"?

A    Um-hmm.

Q    I understand that was ridding yourself of employees, that's to subcontracting or the outsourcing.  But the first part of the sentence, the "Led labor bargaining with Union," what was that referring to?

    MR. MEYER:  Objection, Your Honor.  He's asked and answered the question.  He said it three different times.

MR. MASSEY:  No, he --

MR. MEYER:  Mr. Massey's badgering the Witness.

JUDGE CHU:  I agree.

MR. MASSEY:  Thank you.

JUDGE CHU:  Any recross?

MR. MEYER:  We have nothing, Your Honor.

JUDGE CHU:  Thank you, Mr. Nachfolger, you're excused as a witness.  Do not discuss your testimony, other than with your legal representative, all right?

THE WITNESS:  Fine.

JUDGE CHU:  Thank you.

There's a side room that you can sit if you want to confer with your attorney after we finish.

THE WITNESS:  So you want me to just stick around?

JUDGE CHU:  Yeah.  You're essentially finished.

(Witness excused.)

JUDGE CHU:  There's one -- we're still on the record.

There's one item that I want to bring up, which is kind of a loose end from yesterday.

We still that subpoena that's outstanding with Sprain Brook.  And I accepted Mr. Meyer's statements that he has made serious and sincere attempts to try to obtain those outstanding documents from either Mr. Klein or from Mr. Klein's family, have so far not been successful.  And I think I just, kind of, ended there yesterday by saying do the best you can.  However,

upon reflection, I think what we need to do is establish a deadline for your attempts to try to obtain those documents.

And looking at my calendar and looking at when we're going to reconvene, I will ask Mr. Meyers that he try to produce those documents no later than January 12th or on January 12th, which gives the General Counsel approximately eight days to look at those documents.

I say that in light of the fact that we -- I want to move so the 10(j) proceeding that's going on -- so I want to at least to have the General Counsel have those documents that she may or may not need for the (j) -- 10(j) proceeding that we indicated that I think you said it's on the 21st?

MS. ULMET:  28th.

JUDGE CHU:  28th.

MR. MEYER:  So we have the 20th and 21st here; are those are next two days back?

JUDGE CHU:  Right.

MS. ULMET:  Um-hmm.

MR. MEYER:  And then the 28th, 29th?

MS. ULMET:  26th, 27th, 28th.

JUDGE CHU:  26, 27, 28.

MR. MEYER:  Okay.

MS. ULMET:  And those -- and we've been talking about maybe moving those to 26 Federal Plaza.

JUDGE CHU:  Well, let me finish what I want to say first.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey 07470
(973) 692-0660

MS. ULMET:  Yeah.  Yeah.

JUDGE CHU:  Okay.  Because since the General Counsel indicated as you may want to file a motion for sanction for failure to obtain those documents, that's why I'm establishing a deadline of January 12th --

MS. ULMET:  Thank you, Judge.

JUDGE CHU:  -- to get those documents to you.  If it's not available, then -- I know you don't need my leave to do so, but you know, any time after the 12th you can file your motion for sanctions, as you deem necessary.

All right, moving on to calendar dates, we have 20th, 21st, 26, 27, and 28th of January.  And Mr. Meyers, are there any conflicts in those dates?

MR. MEYER:  I don't see any issue right now, no.

JUDGE CHU:  All right.

We would also like to add some additional dates, as we deem necessary, and it's hard to agree to dates with two representatives missing.  But if you go by my calendar, I'm free the -- any day or the full week of February 15th and February 22nd.

MS. ULMET:  Judge, do you want to compare our calendars off the record?

JUDGE CHU:  Sure.

MS. ULMET:  And then if we can agree on anything we'll put it on the record?

992

JUDGE CHU:  If you want to canvas the other representatives by e-mail, we can do that.

MS. WINKELSTEIN:  Judge?

JUDGE CHU:  We do need to talk to see the available.

MS. ULMET:  Yeah.  We can figure out among the four of us in the room what --

MS. WINKELSTEIN:  Judge, I have a jury trial -- that jury trial was postponed until February, I think, 2nd, whatever that Monday is, is when it starts.  It's anticipated to be four to six weeks.  It's actually it was a month, and there's extra witness, which is why I think it's going to be longer than the four weeks.

MS. ULMET:  Judge, I would ask that this case not be held up for a month and a half because of Ms. Winkelstein's availability.  I understand that she has a partner, Mr. Jasinski, who's been very actively involved in this case.  And I think that Mr. Jasinski should be present or somebody else from their firm should be present so that this entire proceeding is not delayed because of Ms. Winkelstein's case load, which I -- you know, I respect that she has -- personally has other professional obligations, and I don't begrudge her that.  But this case can't be delayed for six weeks because of one person who's from a large firm and can get somebody else here.

MS. WINKELSTEIN:  Your Honor, if I may attorneys in my

993

firm.  Mr. Jasinski and I are both handling the jury trial. And frankly, there were two dates last month or earlier this month, I believe, that General Counsel couldn't attend because both of their attorneys couldn't attend.  And frankly yesterday they delayed us for four hours.

MS. ULMET:  That's not true.  That's not true.

MS. WINKELSTEIN:  And they're ending this early on the 28th.

MS. ULMET:  That's not true.

JUDGE CHU:  Well, be it as it may --

MS. ULMET:  The court reporter is out of my personal hands.

MS. WINKELSTEIN:  I'm not saying your personal hands.

MS. ULMET:  I really --

JUDGE CHU:  Well, but --

UNIDENTIFIED SPEAKER:  The earlier dates this month --

MS. WINKELSTEIN:  I'm saying General Counsel --

UNIDENTIFIED SPEAKER:  -- that were canceled, we didn't cancel.

MS. ULMET:  Yeah.

UNIDENTIFIED SPEAKER:  They weren't canceled by us.  We were ready to go, okay.

JUDGE CHU:  Let me say this, okay, I just indicated two weeks I'm available in February.  I'm also available the week of March 2nd, the week of March 9th.  I'm going to go with my

calendar.

If the parties cannot get -- agree those -- those are potential weeks that I'm going to reschedule this matter.

MS. ULMET:  Judge, can you say again the February dates that you were available?

JUDGE CHU:  2/16, 2/23, March 3rd, March 9th.

MS. ULMET:  And that's the entire week?

JUDGE CHU:  That's the entire week.

MS. ULMET:  Okay.

JUDGE CHU:  I may have said March 3rd, which is actually a Tuesday -- I meant, you know, March 2nd.  So let me be a little bit more specific.  So February 16th is President's Day, so it's -- I'm available the 17th, that whole week.

MS. ULMET:  Okay.

JUDGE CHU:  February 23rd, I don't think there's any federal holidays, I'm available that whole week.  Week of March 2nd I'm available that whole week.  And week of March 9th I'm available that whole week.

MS. ULMET:  So, Your Honor, what's the -- what's your ruling with respect to how we should accommodate --

JUDGE CHU:  You can confer, talk it out, reach some kind of consensus, report back to me if you cannot --

MS. ULMET:  I don't see how --

JUDGE CHU:  -- and I'll make an executive decision.

MS. ULMET:  I mean, I don't think we're going to get a

consensus.  I think we're going to get a -- you know, Pinnacle's counsel has the position that we should wait for their other case to wrap up before we proceed.  And my position is going to be that I'm directed the Board to expedite this proceeding as much as possible.

MS. WINKELSTEIN:  Frankly, Your Honor --

MS. ULMET:  I'm making representations to a district court that this case needs to be expedited, I would be -- I really just cannot -- my -- General Counsel's position just needs to be on the record that this case needs to be as expedited as possible.

JUDGE CHU:  I said at the very beginning of yesterday that I know that General Counsel's pushing for a 10(j) hearing as a Petitioner.  And as the Judge I'm well aware that a federal court judge needs to have a full record as possible in order render an appropriate decision on a 10(j) motion.  So in light of that, I would like to expedite, as possible.

MS. WINKELSTEIN:  And I understand, Your Honor.  Can I just make my position clear for the record --

JUDGE CHU:  Go ahead.

MS. WINKELSTEIN:  -- in case there's an issue going forward?

And our position is that General Counsel had two and a half years to file the complaint and it's -- we believe it's extremely disingenuous for them to try to push hearing dates

right now, especially when they have postponed this.  I'm not saying to the fault of Ms. Ulmet personally, but I am saying General Counsel has postponed certain days for their schedule.

UNIDENTIFIED SPEAKER:  We have not.

MS. WINKELSTEIN:  So and this is what our --

JUDGE CHU:  No, the only --

MS. WINKELSTEIN:  -- request is for.

JUDGE CHU:  -- the only days that was postponed was based on my schedule, and those were the two days earlier this month.

MS. ULMET:  And two more at the request of Mr. Vann, counsel for Budget.

JUDGE CHU:  And at the request of Mr. Vann.

So confer with the two other representatives.

Ms. Ulmet, can task you with that responsibility?  Send out an e-mail?

MS. ULMET:  I'm sorry?

JUDGE CHU:  For the other two that are missing?

MS. ULMET:  Sure.  Absolutely.

JUDGE CHU:  And just include everybody in that e-mail.

MR. MEYER:  Your Honor, I will, for the sake of just being open here, one of those last two weeks in February, I presume my kids are going to be off of school and normally we go skiing one of those two weeks.  I have -- I'll have to check with my wife because she handles that.  But yeah, generally one of those two weeks I will -- it's the week of President's Day.  I

don't know if the week or the week leading up to it, so I have to check that.  But one of those two weeks I'm guessing I won't be around.

MR. MASSEY:  We shouldn't need two more weeks.

MS. ULMET:  Yeah.

MR. MEYER:  No, I understand.  I'm just -- I'm just saying if it doesn't work for somebody else, I want to let everybody know that one of those two weeks I'm not going to be available.

MS. ULMET:  Okay.

JUDGE CHU:  Right.  I want to discuss the dates a little bit -- I want to discuss the dates a little bit more off the record.  Anything else for today?

MS. ULMET:  Yeah, let me just say that so for the -- when we reconvene in January, I'm not ready to rest our case yet because we have some outstanding items with subpoenas and so forth, as we talked about today.  But I don't expect that we're going to call any more witnesses.  So when we reconvene I think that we will pretty quickly be ready for Respondents to begin putting on their respective cases.

JUDGE CHU:  And I don't know how you want to proceed. Maybe we can discuss this on the record, you know.  I was going to discuss it off the record, but if Pinnacle wants to present its case first when we reconvene, then that would resolve me having -- in February, if Pinnacle rests in those convened dates in January.  Then I'm not sure whether you need to be

present with the other Respondents presenting their cases.  But that's up to you.  Though you may want to consider something like that.

MS. ULMET:  That sounds like a great idea.  And maybe what we could do is -- is have a --

JUDGE CHU:  Well, we can discuss this off the record.

MS. ULMET:  Oh, are we still on the record?

JUDGE CHU:  We're still on the record.

MS. ULMET:  Okay.

JUDGE CHU:  That's why I'm saying if that's it for now, we can go off the record and talk some more about the dates and --

MS. ULMET:  Yeah.

JUDGE CHU:  -- and other procedural matters.

All right, let's go off the record, Barry.

We're going to reconvene at 10:00 on, I think, let me check --

MS. WINKELSTEIN:  And Your Honor, just so we're --

JUDGE CHU:  -- on the 20th --

MS. WINKELSTEIN:  I'm sorry.

JUDGE CHU:  -- of January.  All right, 10:00, 20th of January.  How about I issue an order for the reconvene date so that everybody's clear --

MS. WINKELSTEIN:  Okay.

JUDGE CHU:  -- as to the date, including the folks that are not here today.

All right, off the record.

(Whereupon, at 12:21 p.m., the hearing in the above-entitled matter was adjourned until 10:00 a.m. on January 20, 2015.)

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 206
Wayne, New Jersey 07470
(973) 692-0660

1000

C E R T I F I C A T E

This is to certify that the attached proceedings done before
the NATIONAL LABOR RELATIONS BOARD REGION TWO

In the Matter of:

SPRAIN BROOK MANOR, LLC; PINNACLE DIETARY, INC.; CONFIDENCE
MANAGEMENT SYSTEMS; SC & BP SERVICE, INC.; AND COMMERCIAL
MAINTENANCE CORP.,

        Respondent,
And

1199 SEIU, UNITED HEALTHCARE WORKERS EAST,

        Charging Party,
And

LOCAL 713, INTERNATIONAL BROTHERHOOD OF TRADE UNONS,

        Party to the Contract,
And

BUDGET SERVICES, INC.,

        Party to the Contract.

Case No.:  02-CB-089408 et al

Date:     December 16, 2014

Place:   New York, New York

Were held as therein appears, and that this is the original
transcript thereof for the files of the Board

                    _____
                         Official Reporter


                    BURKE COURT REPORTING, LLC
                   1044 Route 23 North, Suite 206
                     Wayne, New Jersey 07470
                         (973) 692-0660