UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————

No. 14-cv-9859 (RJS)
———————————————

KAREN P. FERNBACH, *REGIONAL DIRECTOR,
REGION 2, NATIONAL LABOR RELATIONS BOARD,
FOR AND ON BEHALF OF THE* NATIONAL
LABOR RELATIONS BOARD,

Petitioner,

VERSUS

SPRAIN BROOK MANOR REHAB, LLC; BUDGET SERVICES, INC.;
PINNACLE DIETARY, INC.; *and* LOCAL 713, INTERNATIONAL
BROTHERHOOD OF TRADE UNIONS,

Respondents.
———————————————

OPINION AND ORDER
MARCH 9, 2015
———————————————

RICHARD J. SULLIVAN, District Judge:

Karen P. Fernbach, Regional Director for Region 2 of the National Labor Relations Board ("Petitioner"), brings this action against Respondents Sprain Brook Manor Rehab, LLC ("SBM Rehab"), Pinnacle Dietary, Inc. ("Pinnacle"), Budget Services, Inc. ("Budget"), and Local 713, International Brotherhood of Trade Unions ("Local 713") (collectively, "Respondents") pursuant to Section 10(j) of the National Labor Relations Act ("NLRA"). (Doc. No. 2.) Now before the Court is Petitioner's motion for a temporary injunction pending resolution of the parallel administrative hearing currently proceeding before an administrative law judge. (Doc. No. 4.) Also before the Court is a motion from Budget seeking to stay the proceedings before this Court. (Doc. No. 23.) The Court heard argument on the motions on January 28, 2015. For the reasons set forth below, Petitioner's motion is granted and Budget's motions are denied.

I. BACKGROUND

A. Facts[1]

Prior to 2009, Sprain Brook Manor Nursing Home LLC ("SBM Nursing Home") operated a nursing home located at 77 Jackson Avenue, Scarsdale, New York (the "Facility"). The Facility was staffed by approximately 85-100 employees, who provided dietary, recreational therapy, and residential services to the approximately 120 residents of the Facility. On June 29, 2006, 1199 SEIU United Healthcare Workers East ("1199 SEIU") was certified as the exclusive

bargaining representative of a particular group of non-professional employees at the Facility. *Sprain Brook Manor Nursing Home, LLC*, 351 NLRB 1190, 1196 (2007).

In 2007, SBM Nursing Home began negotiating the sale of the Facility to SBM Rehab, and, on August 18, 2009, the parties entered into a Sale Agreement. (Pet. Ex. 9.) The Sale Agreement effectively transferred all of SBM Nursing Home's assets to SBM Rehab and stated that "[SBM Rehab] shall be entitled to any profit accrued with respect to the period from and after [January 1, 2007] and shall bear any loss with respect to the period from and after [January 1, 2007]." (Pet. Ex. 7 at 32.) The Sale Agreement identified Sam Strulovitch, Lazer Strulovitch, Moses Friedman, Allan Stein, and Leopold Schwimmer as the principals of SBM Rehab, and provided that these individuals would have management responsibility over the Facility pending the sale's closing. (Pet. Ex. 7.) Specifically, the Sale Agreement provided that the parties would "cooperate with one another to operate the business of the Facility in the ordinary course." (Pet. Ex. 7 at 44-45.)

On November 25, 2009, SBM Rehab submitted a Certificate of Need Application to the Department of Health Bureau of Project Management, seeking New York State Public Health Council approval to establish itself as the new operator of the Facility. (Pet. Ex. 9.) In its application, SBM Rehab asserted that it understood "the importance of maintaining staff continuity," and that it would enact a plan of action related to the "retention of existing staff" to foster "the best possible working conditions" and "maintain a competitive salary and benefit structure" for the next two years "based on existing staffing pattern." (*Id.*) To this end, principals of SBM Rehab participated in bargaining sessions with 1199 SEIU in November 2008, March 2009, July 2009, September 2009, October 2009, August 2010, and June 2011. (Pet. Ex. E.) Throughout, SBM Rehab's principals consistently presented themselves as representing the employer and manager of 1199 SEIU members. (*Id.*)

On April 6, 2012, the New York State Public Health and Health Planning Council issued final non-contingent approval to SBM Rehab, which under the Sale Agreement, triggered the ninety-day period by which the closing of the sale was required to take place. (Pet. Ex. 14.) On June 15, 2012, a few weeks before the ninety-day deadline, Allan Stein attested to Medicare that the change of ownership had taken place that day. (Pet. Ex. 15.) Although SBM Rehab continued to act as the employer and operator of the Facility, as it had been for several years, SBM Rehab did *not* inform 1199 SEIU or the employees of the Facility that the change in ownership was formally and legally finalized until September 12, 2012, when it unilaterally made several substantial changes to the working conditions of Facility employees. (Pet. Exs. C & E.)

On September 12, 2012, SBM Nursing Home sent letters to Facility employees stating that "[e]ffective 9/13/12 a change of ownership will occur" and that therefore "your position with [SBM Nursing Home] has been terminated." (Pet. Ex. 22 at 22-23; Pet. Ex. 23 at 32.) On the same day, SBM Rehab sent its own set of letters informing employees that they had the opportunity to be immediately rehired, with the same work schedule, by a subcontractor. SBM Rehab referred housing and maintenance employees to Confidence Management System (CMS) (Pet. Ex. 22 at 24), dietary employees to Pinnacle Dietary (Pet. Ex. 22 at 25), and nursing employees to Budget (Pet. Ex. 23 at 33). As a result of SBM Rehab's subcontracting to Budget, Pinnacle, and CMS, Facility employees' terms and

2

conditions – including wages, paid sick and vacation leave, and health insurance – materially changed. (Pet. Exs. C & D.) SBM Rehab hired these subcontractors three months after it took formal ownership of the Facility, three years after it began managing and operating the Facility, and without any input from 1199 SEIU. (Pet. Exs. 16, 17 & 19.) Moreover, with respect to the changes implemented by these subcontracting contracts, 1199 SEIU requested the opportunity to bargain with SBM Rehab and the subcontractors, but was rebuffed. (Pet. Exs. 45-50.)

Instead, SBM Rehab cultivated a relationship with another union, Local 713, for itself and for its contractors. Specifically, SBM Rehab allowed Local 713 to recruit employees at the Facility; Pinnacle distributed Local 713 membership and insurance cards to dietary employees, telling them that their jobs were contingent on completing the Local 713 paper work; and Budget signed an agreement that recognized Local 713 as representing Budget's dietary employees at the Facility. (Pet. Exs. 52, 54 & 55.) To further establish support for Local 713 and erode support for 1199 SEIU, SBM Rehab discharged three Facility employees – Clarisse Nogueira, Alvin Nicholson, and Vernon Warren – because they were 1199 SEIU supporters. Although Warren was ultimately reinstated, Nicholson and Noguiera remain unemployed. (Pet. Exs. C, D & E.)

### B. Procedural History

On September 19, 2012, 1199 SEIU filed charges with the National Labor Relations Board ("Board"), alleging that SBM Rehab violated Sections 8(a)(1), (2), (3), (4), and (5) of the NLRA. On November 27, 2012, July 15, 2013, and July 22, 2013, 1199 SEIU filed amended charges with the Board.

On December 28, 2012, 1199 SEIU filed a second action with the Board, alleging that Local 713 violated Sections 8(b)(1)(A) and (2) of the NLRA. On January 30, 2013 and July 22, 2013, 1199 SEIU filed amended charges in that action.

Petitioner then commenced an investigation of the charges, and on July 31, 2014, filed a Complaint with the Board alleging that Respondents SBM Rehab and Pinnacle engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(a)(1), (2), (3), and (5) of the NLRA, and that Local 713 engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b)(1)(A) of the NLRA. On October 6, 2014 and November 17, 2014, Petitioner filed amended pleadings with the Board, adding Budget as a Respondent. On October 6, 2014, administrative hearings began before Administrative Law Judge Kenneth W. Chu ("Judge Chu"). Hearings continued until October 10, 2014 and then recessed until December 15-16, 2014. Additional hearing dates are scheduled through March 2015.

On December 12, 2014, during the pendency of the administrative proceedings, Petitioner filed a petition for a temporary injunction pursuant to section 10(j) of the NLRA. (Doc. No. 2.) On January 12, 2015, Respondents SBM Rehab, Pinnacle, and Budget filed their opposition briefs (Doc. Nos. 14, 20 & 21), and on January 23, 2015, Petitioner filed its reply in support of its petition for temporary injunction (Doc. No. 30).

On January 19, 2015, Budget filed a proposed order to show cause, seeking the recusal of Judge Chu in the administrative proceedings and a stay of the proceedings before this Court. (Doc. No. 23.) On January 26, 2015, Petitioner filed its opposition to Budget's motions (Doc. No. 32), and on

3

January 28, 2015, Budget filed its reply (Doc. No. 34). The Court heard oral argument on Petitioner's and Budget's motions on January 28, 2015.

II. PETITIONER'S INJUNCTION MOTION

Pursuant to section 10(j) of the NLRA, the Board "shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, . . . for appropriate temporary relief or restraining order . . . and [such district court] shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). The Second Circuit employs a two-pronged inquiry when determining whether to grant section 10(j) injunctive relief. "First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013) (quoting *Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364-65 (2d Cir. 2001)).

In determining whether a petitioner has adequately demonstrated reasonable cause to believe that unfair labor practices have been committed, a district court "does not need to make a final determination [that] the conduct in question constitutes an unfair labor practice," and therefore need not conduct an evidentiary hearing. *Id.* (quoting *Inn Credible Caterers*, 247 F.3d at 365). Rather, courts give the NLRB's "reasonable cause" determinations significant deference. *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 469 (2d Cir. 2014) (citing *Inn Credible Caterers*, 247 F.3d at 365). Indeed, a "district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) (citing *Kaybard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir. 1980); *Kaybard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980)). Therefore, where "there are disputed issues of fact in the case, the [petitioner] should be given the benefit of the doubt," *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 36-37 (2d Cir. 1975), such that a district court "should sustain the NLRB's version of the facts as long as it is 'within the range of rationality,'" *Blyer ex rel. NLRB v. P&W Elec., Inc.*, 141 F. Supp. 2d 326, 329 (E.D.N.Y. 2001) (quoting *Mego Corp.*, 633 F.2d at 1031). District courts similarly defer to the NLRB's legal conclusions, sustaining its views "unless the court is convinced that it is wrong." *Palby Lingerie, Inc.*, 625 F.2d at 1051.

When evaluating whether relief is just and proper, district courts apply "traditional equitable principles governing equitable relief," but do so "in the context of federal labor laws." *HealthBridge*, 732 F.3d at 141 (quoting *Inn Credible Caterers*, 247 F.3d at 368-69). In the Second Circuit, injunctive relief is "just and proper" when "it is necessary to prevent irreparable harm or to preserve the status quo." *HealthBridge*, 732 F.3d at 142 (quoting *Inn Credible Caterers*, 247 F.3d at 368). The status quo that must be preserved or restored is that which "existed before the onset of unfair labor practices." *Trading Port, Inc.*, 517 F.2d at 38. As to irreparable harm, district courts consider "whether the employees' collective bargaining rights may be undermined by the . . . [alleged] unfair labor practices and whether any further delay may impair or undermine such bargaining in the future." *HealthBridge*, 732 F.3d at 142 (quoting *Inn Credible Caterers*, 247 F.3d at 369). The "main focus of a section 10(j) analysis should be on harm to organizational efforts."

4

*Remington Lodging & Hosp.*, 773 F.3d at 469.

### A. Reasonable Cause

The Court's analysis begins with the reasonable cause prong of the section 10(j) inquiry. To succeed, Petitioner must establish that there is reasonable cause to believe that Respondents have violated the NLRA in the ways that Petitioner alleges. Specifically, Petitioner must demonstrate that there is reasonable cause to believe that: (1) Respondents SBM Rehab, Pinnacle, and Budget violated section 8(a)(5) of the NLRA; (2) Respondents SBM Rehab, Pinnacle, and Budget violated section 8(a)(3) of the NLRA; (3) Respondents SBM Rehab, Pinnacle, and Budget violated section 8(a)(2) of the NLRA; and (4) Respondent Local 713 violated section 8(b)(1)(A) of the NLRA. The Court will address each in turn.

#### 1. Section 8(a)(5) of the NLRA

Section 8(a)(5) of the NLRA provides that "it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). An employer that violates Section 8(a)(5) of the NLRA also commits a "derivative" violation of Section 8(a)(1) of the NLRA, which provides that "it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the[ir] right" to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. §§ 157 & 158(a)(1). *See Allied Chem. & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 163 n.6 (1971).

The Supreme Court has held that "the bargaining obligation of section 8(a)(5) is activated" when a "new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987). The Supreme Court has interpreted section 8(a)(5) to prohibit an employer from unilaterally changing those conditions of employment that are the subject of mandatory bargaining without notice to the union and an opportunity to bargain. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). Mandatory bargaining conditions include "wages, hours, and other terms and conditions of employment," *NLRB v. Borg-Warner Corp.*, 356 U.S. 342, 349 (1958), such as whether the employer subcontracts employee work where the employer "merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment," *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 213 (1964).

Courts apply a three-factor test in determining when a new employer – referred to as a "successor" employer – must abide by section 8(a)(5). First, courts consider whether there is a "substantial continuity" between the predecessor and successor businesses. *Fall River Dyeing*, 482 U.S. at 43. In determining whether there is "substantial continuity," courts assess "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.*

Second, courts must determine whether a majority of the employees hired by the successor were employed by the predecessor. *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 279 (1972). Where there is a lag between when the successor begins

5

managing the business and when the successor formally takes ownership of the business, courts look to the date that the successor functionally "took control" of the management and operation of the business. *East Belden Corp.*, 239 NLRB 776, 792 (1978). However, "[w]hen an employer who has not yet commenced operations announces new terms prior to or simultaneously with his invitation to the previous workforce to accept employment," the successor employer need not first bargain with the employees' bargaining representative. *Spruce Up Corp.*, 209 NLRB 194, 195 (1974) (citing *Burns Int'l*, 406 U.S. at 294).

Third, courts must determine whether "the bargaining unit that a union seeks to represent remains appropriate under the successor's operations." *Banknote Corp. of America, Inc. v. NLRB*, 84 F.3d 637, 642 (2d Cir. 1996) (citing *Burns Int'l*, 406 U.S. at 280). Courts typically find a bargaining unit to be appropriate when a successor purchases the predecessor's entire operation and keeps the employees of the unit intact. *See, e.g.*, *id.* at 650.

If a court concludes that the successor-employer falls within the strictures of section 8(a)(5) under the three-pronged test, the court must also determine whether others responsible for operating and managing the business, such as subcontractors, also are bound by section 8(a)(5) and are liable for any of the successor-employer's violations of section 8(a)(5). In the Second Circuit, this inquiry focuses on whether the subcontractors exercise sufficient "immediate control" over the employees. *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985). Courts consider "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process." *AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995) (citing *Clinton's Ditch*, 778 F.2d at 188-89).

Petitioner asserts that SBM Rehab took formal ownership of the Facility from SBM Nursing Home on June 15, 2012, when a principal of SBM Rehab represented as much to Medicare. (Pet. Ex. 15.) SBM Rehab, by contrast, stresses that formal ownership did not transfer until September 13, 2012. (SBM Rehab Opp. at 27.) Granting Petitioner "the benefit of the doubt" as to this factual dispute, as the Court must, the Court is persuaded that there is reasonable cause to believe that SBM Rehab became a successor employer and took control of the Facility by June 15, 2012 at the latest – and likely much earlier. The facts alleged also give the Court reasonable basis to believe that SBM Rehab took control of the Facility at some point during the period of August 18, 2009 to June 15, 2012, since SBM Rehab managed the Facility, controlled labor relations, met with 1199 SEIU representatives, collected the Facility's profits, and assumed responsibility for its liabilities during this transition period.

Furthermore, Petitioner has established that SBM Rehab engaged in substantially the same business as SBM Nursing Home, with the same customers and the same employees doing the same work under the same working conditions with the same supervisors. (Pet. Ex. C.) SBM Rehab represented as much to the New York State Department of Health in its Certificate of Need Application (Pet. Ex. 6 at 17-20) and in the document it presented to 1199 SEIU at the October 19, 2009 bargaining session (Pet. Ex. 43). Petitioner has also secured testimony from employees who attest that in all material respects there were no changes to the way the Facility was operated and managed before and after June 2012. (Pet. Exs. C & D.)

6

Accordingly, because Petitioner has sufficiently shown that SBM Rehab was a successor employer and did not announce new terms prior to or simultaneously with its taking over, SBM Rehab had a legal obligation to recognize and bargain with 1199 SEIU at the latest by June 15, 2012. Petitioner has put forth more than sufficient allegations to establish reasonable cause that SBM Rehab refused to recognize and bargain with 1199 SEIU. Specifically, the record reflects that an 1199 SEIU representative contacted principals of SBM Rehab by letter on September 13, 2012 and October 8, 2012, opposing the changes to employees' contracts and requesting an opportunity to bargain over them, to no avail. (Pet. Exs. 45 & 46.) Put simply, SBM Rehab refused to recognize and bargain with 1199 SEIU as it was required to. (*Id.*) Accordingly, the Court finds there is reasonable cause to believe that SBM Rehab violated section 8(a)(5) of the NLRA.

The Court also finds that Petitioner has satisfactorily alleged that SBM Rehab violated Section 8(a)(5) of the NLRA by imposing unilateral changes to the terms of Facility employees' employment contracts that were mandatory subjects of bargaining, including wages, paid sick and vacation leave, and health insurance. SBM Rehab also chose to subcontract dietary, nursing, and housekeeping work to independent contractors. (Pet. Exs. 22 & 23.) In so doing, SBM Rehab did not change the scope or direction of its business or eliminate the type of work previously done by Facility employees – indeed, its letters to the Facility's employees on September 12, 2012 emphatically state as much. (*Id.*)

SBM Rehab did not notify 1199 SEIU of these subcontracting decisions in advance (Pet. Ex. 45), despite the fact that it was required to under the *Falls River Dyeing* "continuing demand" rule, which provides that bargaining demands from the exclusive collective bargaining representative prior to the official transfer of ownership remain outstanding until an employer becomes a successor. 482 U.S. at 52. A representative from 1199 SEIU made such a demand on December 10, 2010, when he sent a letter to SBM Rehab to request an opportunity to bargain on behalf of Facility employees. (Pet. Exs. 52 & 54.)

Similarly, the Court finds that there is a reasonable basis to find that Budget and Pinnacle are joint employers who are liable under section 8(a)(5). With respect to dietary employees, Petitioner has alleged that Pinnacle and SBM Rehab entered into a contract that set forth shared responsibility for labor relations, and that Budget entered into a collective bargaining agreement with Local 713. (Pet. Exs. 52, 54 & 55.) With respect to nursing employees, Budget and SBM Rehab shared responsibility for labor relations and management by, for example, providing that SBM Rehab would employ the department head who directed the daily work duties of employees, while Budget would enter into a collective bargaining agreement with Local 713. (*Id.*) Accordingly, the Court finds that there is reasonable cause to believe that Pinnacle and Budget also violated section 8(a)(5) of the NLRA because they are joint employers with SBM Rehab.

2. Section 8(a)(3) of the NLRA

Section 8(a)(3) of the NLRA provides that "it shall be an unfair labor practice for an employer . . . to encourage or discourage membership in any labor organization . . . in regard to hir[ing] . . . or any term or condition of employment." 29 U.S.C. § 158(a)(3). An employer that violates Section 8(a)(3) of the NLRA also commits a "derivative" violation of Section 8(a)(1) of the NLRA, which provides that "it shall be an unfair labor practice for an employer to interfere with,

7

restrain, or coerce employees in the exercise of the[ir] right" to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. §§ 157 & 158(a)(1); *see, e.g.*, *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

The Supreme Court has made clear that an employer violates section 8(a)(3) if it "fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that [it] proffers are pretextual." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 398 (1983). The Board has interpreted section 8(a)(3) to encompass not just employers discharging employees because of anti-union animus, but also employers disciplining employees or subcontracting their work because of anti-union animus. *See, e.g.*, *Healthcare Emp. Union, Local 399 v. NLRB*, 463 F.3d 909, 918-19 (9th Cir. 2006) (listing circuit cases).

The Court finds that Petitioner has presented sufficient facts to establish reasonable cause to believe that SBM Rehab violated section 8(a)(3). Petitioner alleges that SBM Rehab signed a contract with Pinnacle to perform dietary work at a time that dietary employees were represented by 1199 SEIU. (Pet. Ex. 16.) That contract "recognize[d] [the Facility] as a non-unionized facility" and provided that SBM Rehab had the responsibility to pursue "efforts to eliminate unionized activity" at the Facility. (*Id.* at 76.) Furthermore, once SBM Rehab subcontracted its work to Pinnacle, Budget, and CMS, it denied all access to 1199 SEIU representatives, assisted a challenger union in gaining acceptance among Facility employees, and discharged supporters of 1199 SEIU. (Pet. Exs. D & E.)

Petitioner also alleges that SBM Rehab violated section 8(a)(3) when it unlawfully discharged Nogueira, Nicholson, and Warren. Once again, the Court finds there is reasonable basis to believe that SBM Rehab principals directed a CMS manager to discharge Nogueira in retaliation for her union support, as she was fired the day after she told a nursing employee that she was represented by 1199 SEIU and that she did not need to sign Local 713 enrollment or health insurance cards. (Pet. Ex. C.) Petitioner likewise has established a reasonable basis to believe that SBM Rehab and Pinnacle unlawfully discharged Nicholson and Warren in retaliation for their support for 1199 SEIU and lack of support for Local 713. Specifically, Nicholson was terminated after he was seen handing out leaflets on behalf of 1199 SEIU and refused to complete the Local 713 enrollment card. (Pet. Ex. E.) Warren, an 1199 SEIU delegate, was discharged two days after he refused to sign the Local 713 enrollment card. (Pet. Ex. D.) Accordingly, the Court finds that Petitioner has established reasonable cause to believe that SBM Rehab and Pinnacle violated section 8(a)(3) of the NLRA.

### 3. Section 8(a)(2) of the NLRA

Section 8(a)(2) of the NLRA provides that "it shall be an unfair labor practice for an employer to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C. § 158(a)(2). An employer that violates Section 8(a)(2) of the NLRA also commits a "derivative" violation of Section 8(a)(1) of the NLRA, which provides that "it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the[ir] right" to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. §§ 157 & 158(a)(1); *see, e.g.*,

8

*Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 250 (D.C. Cir. 1991).

The Second Circuit has held that section 8(a)(2) "makes it an unfair labor practice for an employer to recognize and enter a collective bargaining agreement with a union that has not been selected by a majority of the employees in the bargaining, *regardless* of whether the employer believes in good faith that the union has majority support." *NLRB v. Katz's Delicatessen of Houston St.*, 80 F.3d 755, 767 (2d Cir. 1996). This includes assisting a rival, challenger union where there is already an incumbent union in place. *AT Sys. W., Inc.*, 341 NLRB 57, 62 (2004). An employer also violates section 8(a)(2) if it directs or asks employees to sign authorization cards for a particular union, or if it conditions employment, wages, or benefits on employees signing union authorization cards for a specific union. *See, e.g.*, *Baby Watson Cheesecake, Inc.*, 320 NLRB 779, 785 (1996).

Petitioner has set forth sufficient facts to give the Court a reasonable basis to conclude that SBM Rehab, Pinnacle, and Budget recognized and assisted Respondent Local 713 in violation of section 8(a)(2). As noted above, Petitioner alleges that supervisors from SBM Rehab, Pinnacle, and Budget distributed Local 713 membership and insurance cards and told employees that their employment or benefits were contingent on signing the Local 713 cards. (Pet. Exs. C & D.) Budget also signed an agreement recognizing Local 713 as covering dietary employees, informed nursing employees that the terms and conditions of their employment were determined by their membership in Local 713, and deducted Local 713 dues from Facility employees' paychecks. (Pet. Exs. 52, 54 & C.)

4. Section 8(b)(1)(A) of the NLRA

Section 8(b)(1)(A) of the NLRA provides that "it shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of the[ir] right" to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. §§ 157 & 158(a)(1).

Because the Court has found that Petitioner has established a reasonable basis to conclude that SBM Rehab, Pinnacle, and Budget violated section 8(a)(2), it naturally follows that Local 713 violated section 8(b)(1)(A), which "makes it an unfair labor practice for a union without majority support to accept an employer's recognition." *Katz's Delicatessen*, 80 F.3d at 767.

Representatives from Local 713 accepted SBM Rehab's assistance by posting a sign in the Facility announcing their presence and meeting with employees on company time at the Facility. (Pet. Ex. D.) Local 713 also entered into collective bargaining agreements to cover dietary and nursing employees and accepted dues from Budget despite the fact that Local 713 did not represent an uncoerced majority of employees. (Pet. Exs. 52 & 54.) Accordingly, Petitioner has demonstrated reasonable cause to believe that Local 713 violated section 8(b)(1)(A) of the NLRA by accepting unlawful assistance and recognition from SBM Rehab, Pinnacle, and Budget.

B. Just and Proper

Having found reasonable cause to believe that Respondents violated the NLRA, the Court now turns to whether the relief sought by Petitioner is just and proper. Here, Petitioner asks the Court to order SBM Rehab to (1) rescind its subcontracts relating to

Facility employees' work and offer interim employment to all Facility employees; (2) offer interim reinstatement to unlawfully discharged employees Nogueira and Nicholson; (3) rescind recognition of any collective bargaining agreements with Local 713; and (4) recognize and bargain with 1199 SEIU as the exclusive collective bargaining representative of Facility employees.

Respondents argue that Petitioner's requested injunctive relief is not just and proper because too much time has passed since the violations were committed and the Complaint was filed with the Board. The Second Circuit recently stated that it "certainly reject[s] the notion that the passage of time, alone, is sufficient to justify rejecting a section 10(j) petition." *Remington Lodging & Hosp.*, 773 F.3d at 471. Rather, "[d]elay . . . should not be taken into consideration unless between the alleged unfair labor practices and the filing of the petition circumstances have changed that affect the appropriateness of such relief," – in other words, unless "the relief requested by the Regional Director would not restore the *status quo*." *Blyer v. Pratt Towers, Inc.*, 124 F. Supp. 2d 136, 147 (E.D.N.Y. 2000). Furthermore, "it is inappropriate to punish employees for the Regional Director's delay." *Id.* Finally, when determining whether delay militates against granting section 10(j) relief, courts should consider how much of the delay is attributable to the time necessary for the NLRB to investigate the charges and to the litigation tactics of the respondents. *P&W Elec., Inc.*, 141 F. Supp. 2d at 332.

Here, Respondents have not made a showing that so much time has passed since the violations occurred that the relief requested by Petitioner could not effectively restore the status quo ante. Certainly, the individual employees and ousted union have demonstrated a desire to be reinstated. (Pet. Exs. C, D & E.) Furthermore, since the administrative hearing remains pending, any final Board order is likely several months away. And even assuming that much of the delay in this case is due to Petitioner's dilatory prosecution, rather than Respondents' obstructionist litigation tactics, the Court is not to punish employees for such delay. Additionally, other courts have granted section 10(j) relief for similarly lengthy delays. *See Frankl v. HTH Corp.*, 650 F.3d 1334, 1341 (9th Cir. 2011) (upholding an injunction where three years passed between union filing charges with the Board and petitioner filing a petition with the court); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544-45 (4th Cir. 2009) (upholding injunction where eighteen months elapsed between petitioner filing a complaint with the Board and petitioner filing a petition with the court); *Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 361 (E.D.N.Y. 2012) (granting injunction where fourteen months elapsed between the date when union filed charges with the Board and petitioner filed a petition with the court). Accordingly, the Court concludes that the passage of time in this case, while far longer than desirable, does not render the injunctive relief improper.

1. Interim Rescission of Subcontracts

Petitioner seeks an order requiring SBM Rehab to rescind its subcontracts relating to Facility employees' work, including SBM Rehab's subcontracts with Pinnacle and Budget, and to offer employment to all Facility employees with the terms and conditions of employment as they existed on September 12, 2012. Courts have recognized that interim rescission orders are the default remedy when employers violate section 8(a)(5) by enacting unilateral changes to critical terms and conditions, such as by decreasing wages, eliminating paid sick and vacation leave, and subcontracting their

operations. *See, e.g.*, *Power, Inc. v. NLRB*, 40 F.3d 409, 425 (D.C. Cir. 1994) (holding that "[o]nce unlawful contracting is found," an order "to resume unlawfully subcontracted operations" is "presumptively a valid remedy") (citing *Fibreboard*, 379 U.S. at 216-17). Only if the employer shows that "compliance with the order is unduly economically burdensome" because it "would require a substantial outlay of new capital or otherwise cause undue financial hardship" should a court deny this remedy when the employer unlawfully, unilaterally subcontracts its operations. *Teamsters Local No. 171 v. NLRB*, 863 F.2d 946, 957-58 (D.C. Cir. 1988).

Petitioner has alleged facts establishing that Respondents' subcontracting fractured employees into separate units and forced employees to work with inferior wages, terms, and conditions of employment. Petitioner has also shown that these conditions, if left unaddressed, could continue to undermine support for 1199 SEIU and further entrench Local 713, which threatens to erode the efficacy of a final Board order. (Pet. Exs. D & E.) Furthermore, Respondents fail to put forth any cost estimates associated with rescission to support their undue burden argument. Accordingly, the Court finds that interim rescission relief and reinstatement of Facility employees' ex ante employment terms and conditions is just and proper to prevent irreparable harm to 1199 SEIU's organizational efforts and to preserve the status quo ante.

2. Interim Reinstatement to Discharged Employees

Petitioner also seeks an order directing SBM Rehab to reinstate the discharged employees who were unlawfully retaliated against, Nogueira and Nicholson. Interim reinstatement for unlawfully discharged employees is routinely granted as part of section 10(j) injunctive relief to prevent the "chilling effect" that otherwise takes hold among remaining employees. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980) (listing cases). Given the presumptions applicable at this stage of the proceeding, the Court concludes that interim reinstatement of Nogueira and Nicholson – Warren has already been reinstated – is just and proper.

3. Rescission of Local 713

Petitioner seeks an order requiring SBM Rehab to rescind its recognition of Respondent Local 713 and any collective bargaining agreements with Local 713. Courts have recognized that permitting an employer to continue to recognize and bargain with an unlawful rival union undermines employees' right to choose their collective bargaining representative and harms the rightful union's organizational efforts. *See Mego Corp.*, 633 F.2d at 1035 (affirming rescission order under section 10(j) that district court granted after finding that there was reasonable cause to believe the union had violated section 8(b)(1)(A)). A rescission order is just and proper in this case because permitting SBM Rehab to continue to recognize Local 713 would likely confer unwarranted legitimacy on Local 713, further eroding employees' support for 1199 SEIU, and would force an unwanted union on the employees, further eroding employees' faith in the collective bargaining process.

4. Interim Bargaining Order

Petitioner also seeks an order directing SBM Rehab to recognize and bargain with 1199 SEIU as the exclusive collective bargaining representative for Facility employees. The Second Circuit has repeatedly upheld injunctions under section 10(j) that included interim bargaining orders,

11

finding that such relief is often necessary to restore the status quo ante. *See Inn Credible Caterers, Ltd.*, 247 F.3d at 369 n.7 (citing *Trading Port*, 517 F.2d at 40; *Palby Lingerie*, 625 F.2d at 1054-55). The Court concludes that an interim bargaining order is just and proper here because, without it, SBM Rehab arguably would continue to benefit from violating its obligation to bargain with 1199 SEIU to the detriment of Facility employees and 1199 SEIU.

III.  BUDGET'S MOTIONS

On January 19, 2015, Budget sought an order from this Court (1) disqualifying Judge Chu in the pending administrative proceedings, (2) directing the replacement administrative law judge to hold all hearings in the Board case *de novo*, and (3) staying the Court's consideration of Petitioner's petition for injunctive relief pending resolution of Budget's claim that its due process rights were deprived. (Doc. No. 23.) Budget asserts that such relief is warranted because counsel for Petitioner had one ex parte communication with Judge Chu about a scheduling issue, and Judge Chu violated Budget's due process rights by permitting it to be added as a party after the administrative proceedings began. By letter dated January 21, 2015, Budget withdrew its allegations about the impropriety of Judge Chu's single ex parte communication, and therefore is no longer seeking an order disqualifying Judge Chu. (Doc. No. 32, Ex. 1 at 45.) Nevertheless, Budget reaffirmed that it still seeks an order nullifying the hearings that have taken place before Judge Chu for alleged due process deprivations, and an order staying Petitioner's petition for injunctive relief pending this Court's resolution of Budget's claim that its due process rights were deprived.

The Supreme Court has held that district courts generally do not have jurisdiction to review whether Board administrative proceedings are fair because "all questions of the jurisdiction of the Board and the regularity of its proceedings, [and] all questions of constitutional right or statutory authority, are open to examination by the court [of appeals]" after there is a final Board order in a case. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48 (1938). The Supreme Court has recognized a narrow exception to this rule when the Board acts contrary to an explicit, mandatory provision of the NLRA and normal means of securing judicial review are unavailable. *Leedom v. Kyne*, 358 U.S. 184, 188-90 (1958).

Budget has not argued that Judge Chu acted contrary to an explicit, mandatory provision of the NLRA – nor is there any evidence that he did – and Budget has not argued that it cannot obtain full judicial review of the administrative proceedings by either the Second Circuit or the D.C. Circuit following Judge Chu's ruling. Accordingly, under well-established Supreme Court precedent, the Court finds that it lacks jurisdiction to consider Budget's motions.

Budget does not address *Myers* or *Leedom* in arguing to the contrary. Rather, Budget asserts that the Court has jurisdiction based on a single district court case from 1968. Budget, however, failed to disclose that this case – the sole legal support for its claim that the Court has jurisdiction to enjoin the Board – was reversed and remanded by the District of Columbia Circuit on the ground that the district court *lacked jurisdiction* to enjoin the Board. *McCulloch v. Libbey-Owens-Ford Glass Co.*, 403 F.2d 916, 917 (D.C. Cir. 1968). Accordingly, the Court also puts Budget's counsel on notice that future submissions that contain false statements of the law, particularly when that law forms the cornerstone of its legal argument, will result in sanctions. *See* N.Y. Rules of Prof'l Conduct R. 3.1 ("A lawyer

12

shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . ."); *see also Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) (holding that district courts may sanction counsel under Rule 11 for making frivolous legal arguments that objectively have no chance of success).

## IV. CONCLUSION

For the reasons stated above, the Court grants Petitioner's motion for a temporary injunction and denies Budget's motions. The Court finds that there is reasonable cause to believe that Respondents SBM Rehab, Pinnacle, Budget, and Local 713 have engaged in serious and pervasive unfair labor practices in violations of Sections 8(a)(1), (2), (3), (5), and 8(b)(1)(A) of the NLRA, and that injunctive relief is just and proper.

Accordingly, IT IS HEREBY ORDERED THAT, pending the final disposition of the related matters pending before the Board, SBM Rehab, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it or them, are enjoined and restrained from:

(a) Failing and refusing to recognize and bargain in good faith with 1199 SEIU as the exclusive collective bargaining representative of employees in the Unit[2];

(b) Subcontracting or otherwise performing Unit work with non-Unit employees in retaliation for its employees assisting 1199 SEIU and/or to discourage employees from engaging in those activities and/or without first providing 1199 SEIU with notice and the opportunity to bargain either to an agreement concerning the decision to subcontract or overall impasse on a collective bargaining agreement;

(c) Denying representatives of 1199 SEIU access to the Facility for purposes of meeting with SBM Rehab's management and/or Unit employees without first providing 1199 SEIU with notice and the opportunity to bargain either to an agreement concerning that decision or overall impasse on a collective bargaining agreement;

(d) Implementing changes to the terms and conditions of employment of employees in the Unit that are mandatory subjects for the purposes of collective bargaining without first providing 1199 SEIU with notice and the opportunity to bargain either to an agreement concerning the change or overall impasse on a collective bargaining agreement;

(e) Terminating, or causing the termination of, employees because of their support for and activities on behalf of 1199 SEIU and/or to discourage employees from engaging in these activities;

(f) Unlawfully assisting Local 713 by ordering Unit employees to sign authorization cards for Local 713 and threatening employees with discharge, a loss of benefits, and other reprisals for refusing to sign authorization cards for Local 713;

(g) Unlawfully assisting Local 713 by deducting dues from Unit employees' pay and remitting those dues to Local 713;

(h) Unlawfully assisting Local 713 by entering into and/or maintaining a collective bargaining agreement with Local 713 covering Unit employees; and

(i) In any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed in Section 7 of the NLRA.

IT IS FURTHER ORDERED THAT SBM Rehab take the following affirmative actions:

(a) Within fourteen (14) days of the issuance of this Order, rescind the current subcontracts for the performance of Unit dietary, nursing, housekeeping and laundry work, restore such work to the bargaining Unit; and offer immediate interim reinstatement to all employees currently performing Unit work, with the terms and conditions of employment that existed for those positions on September 12, 2012;

(b) Within fourteen (14) days of this Order, offer immediate reinstatement to Unit employees Clarisse Nogueira and Alvin Nicholson to their former job positions and working conditions, as they existed on or about September 12, 2012, with the terms and conditions of employment that existed on September 12, 2012, or if those job positions no longer exists, to substantially equivalent positions, displacing, if necessary, any workers contracted for, hired, or reassigned to replace them, without prejudice to their seniority or any other rights or privileges previously enjoyed;

(c) Withdraw recognition from Local 713 as the purported collective bargaining representative of any Unit employees;

(d) Rescind any and all collective bargaining agreements with Local 713 covering Unit employees;

(e) Cease deducting Unit employee dues for, and remitting dues to, Local 713;

(f) Recognize and bargain collectively and in good faith with 1199 SEIU as the exclusive collective bargaining representative of the Unit employees concerning their wages, hours, and other terms or conditions of employment and, if agreement is reached, embody such agreement in a signed document;

(g) Provide 1199 SEIU with advanced notice of any change(s) to the wages, hours, and other terms or conditions of employment of Unit employees and, upon request, bargain either to an agreement over the intended changes or overall impasse on a collective bargaining agreement prior to implementing the change(s);

(h) Upon request of 1199 SEIU, restore any and all of the Unit employees' terms and conditions of employment as they existed for those positions on September 12, 2012 or prior to the date SBM Rehab first subcontracted Unit work;

(i) Within five (5) days of issuance of this Order, post copies of this Order at the Facility at all locations where notices to its employees are customarily posted; maintain said postings during the term of this Order, with all employees to have free and unrestricted access to said postings; and grant agents of the Board reasonable access to said facility to monitor compliance with this posting requirement;

(j) Within ten (10) days of issuance of the Court's Order, hold a mandatory meeting or meetings at SBM Rehab's facility on working time, scheduled to ensure the widest possible audience of employees, at which a responsible management official, in the presence of a Board agent (or, at SBM Rehab's option, a Board agent, in the presence of a responsible management official), shall read the Court's Order; and

(k) Within fourteen (14) days of the issuance of the Court's order, file with the Court, with a copy submitted to the Regional Director of the Board for Region 2, a sworn affidavit from a responsible official of SBM Rehab, setting forth with specificity the

manner in which SBM Rehab complied and will continue to comply with the terms of the decree, including the location of the documents to be posted under the terms of this decree.

IT IS FURTHER ORDERED THAT, pending the final disposition of the related matters pending before the Board, Pinnacle, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it or them, are enjoined and restrained from:

(a) Failing and refusing to recognize and bargain in good faith with 1199 SEIU as the exclusive collective bargaining representative of employees in the Dietary Unit[3];

(b) Implementing changes to the terms and conditions of employment of employees in the Dietary Unit that are mandatory subjects for the purposes of collective bargaining without first providing 1199 SEIU with notice and the opportunity to bargain either to an agreement concerning the change or overall impasse on a collective bargaining agreement;

(c) Terminating, or causing the termination of, employees because of their support for and activities on behalf of 1199 SEIU and to discourage employees from engaging in these activities;

(d) Unlawfully assisting Local 713 by ordering the Dietary Unit employees to sign authorization cards for Local 713 and threatening employees with discharge, a loss of benefits, and other reprisals for refusing to sign authorization cards for Local 713;

(e) Unlawfully assisting Local 713 by deducting dues from the Dietary Unit employees' pay and remitting those dues to Local 713;

(f) Unlawfully assisting Local 713 by entering into and/or maintaining a collective bargaining agreement with Local 713 covering the Dietary Unit employees; and

(g) In any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed in Section 7 of the NLRA.

IT IS FURTHER ORDERED THAT Pinnacle take the following affirmative actions:

(a) Rescind any and all collective bargaining agreements with Local 713 as they relate to the Dietary Unit employees;

(b) Within five (5) days of the issuance of the Court's order, mail a copy of this Order to the homes of all current Pinnacle's employees, supervisors, and managers employed at the Facility, and maintain proofs of mailing as required by this Order; and

(c) Within fourteen (14) days of the issuance of the Court's order, file with the Court, with a copy submitted to the Regional Director of the Board for Region 2, a sworn affidavit from a responsible official of Pinnacle, setting forth with specificity the manner in which Pinnacle complied and will continue to comply with the terms of the decree, including the location of the documents to be posted under the terms of this decree.

IT IS FURTHER ORDERED THAT, pending the final disposition of the related matters pending before the Board, Budget, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or

participation with it or them, are enjoined and restrained from:

(a) Failing and refusing to recognize and bargain in good faith with 1199 SEIU as the exclusive collective bargaining representative of employees in the Nursing Unit[4];

(b) Failing and refusing to recognize and bargain in good faith with 1199 SEIU as the exclusive collective bargaining representative of employees in the Dietary Unit;

(c) Implementing and/or making changes to the terms and conditions of employment of employees in the Nursing and Dietary Units that are mandatory subjects for the purposes of collective bargaining without first providing 1199 SEIU with notice and the opportunity to bargain either to an agreement concerning the change or overall impasse on a collective bargaining agreement;

(d) Terminating, or causing the termination of, employees because of their support for and activities on behalf of 1199 SEIU and to discourage employees from engaging in these activities;

(e) Unlawfully assisting Local 713 by ordering the Nursing and Dietary Unit employees to sign authorization cards for Local 713 and threatening employees with discharge, a loss of benefits, and other reprisals for refusing to sign authorization cards for Local 713;

(f) Unlawfully assisting Local 713 by deducting dues from the Nursing and Dietary Unit employees' pay and remitting those dues to Local 713;

(g) Assisting Local 713 by entering into and/or maintaining a collective bargaining agreement with Local 713 covering the Nursing and Dietary Unit employees; and

(h) In any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed in Section 7 of the NLRA.

IT IS FURTHER ORDERED THAT Budget take the following affirmative actions:

(a) Rescind any and all collective bargaining agreements with Local 713 as they relate to the Nursing and Dietary Unit employees;

(b) Within five (5) days of the issuance of the Court's order, mail a copy of this Order to the homes of all current Budget employees, supervisors, and managers employed at the Facility, and maintain proofs of mailing as required by this Order; and

(c) Within fourteen (14) days of the issuance of the Court's order, file with the Court, with a copy submitted to the Regional Director of the Board for Region 2, a sworn affidavit from a responsible official of Budget, setting forth with specificity the manner in which Budget complied and will continue to comply with the terms of the decree, including the location of the documents to be posted under the terms of this decree.

IT IS FURTHER ORDERED THAT, pending the final disposition of the related matters pending before the Board, Local 713, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it or them, are enjoined and restrained from:

(a) Entering into and/or maintaining a collective bargaining agreement with SBM

Rehab, Pinnacle, Budget and/or any other entity purporting to cover employees employed at the Facility;

(b) Accepting recognition from SBM Rehab, Budget and/or Pinnacle for employees employed at the Facility;

(c) Accepting unlawful dues remittances from SBM Rehab, Budget and/or Pinnacle for employees employed at the Facility; and

(d) In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the NLRA.

IT IS FURTHER ORDERED THAT Local 713 take the following affirmative actions:

(a) Rescind any and all collective bargaining agreements with SBM Rehab, Pinnacle, Budget, or any other entity purporting to cover any and all Unit employees employed at the Facility;

(b) Within five (5) days of the issuance of the Court's order, mail a copy of this Order to the homes of all employees employed at the Facility and covered by a collective bargaining agreement between Local 713 and SBM Rehab, Pinnacle, Budget and/or any other entity; and

(c) Within fourteen (14) days of the issuance of the Court's order, file with the Court, with a copy submitted to the Regional Director of the Board for Region 2, a sworn affidavit from a responsible official of Local 713, setting forth with specificity the manner in which Local 713 complied and will continue to comply with the terms of the decree, including the location of the documents to be posted under the terms of this decree.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 9, 2015
New York, New York

\* \* \*

Petitioner is represented by Julie Polakoski and Julie Ulmet of the National Labor Relations Board, Region 2, 26 Federal Plaza, New York, New York 10278.

Respondent SBM Rehab is represented by Jeffrey Meyer of Kaufman, Dolowich & Voluck LLP, 60 Broad Street, New York, New York 10004. Respondent Budget is represented by Avrom Vann of Avrom R. Vann, P.C., 420 Lexington Avenue, New York, New York 10170. Counsel for Respondents Pinnacle and Local 713 have not filed a notice of appearance.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03.09.15

ENDNOTES

[1] The following facts are taken from the Petition (Doc. No. 2. ("Pet.")), Petitioner's memorandum of points and authorities in support of its petition (Doc. No. 3 ("Mem.")), Budget's memorandum of law in opposition (Doc. No. 15 ("Budget Opp.")), Pinnacle's memorandum of law in opposition (Doc. No. 20 ("Pinnacle Opp.")), SBM Rehab's memorandum of law in opposition (Doc. No. 21 ("SBM Rehab Opp.")), Petitioner's reply memorandum of law in support of its petition (Doc. No. 30 ("Rep.")), Budget's memorandum of law in support of its motions (Doc. No. 24 ("Budget Mem.")), Petitioner's memorandum of law in opposition to Budget's motions (Doc. No. 32 ("Fernbach Opp.")), Budget's reply memorandum of law in support of its motion (Doc. No. 34 ("Budget Rep.")), and the declarations and exhibits filed in conjunction therewith.  In deciding these motions, the Court also considered the parties' statements and representations at the hearing on January 28, 2015.

[2] The Court adopts the definition of Unit contained in the Petition.  (Pet. at 11.)

[3] The Court adopts the definition of Dietary Unit contained in the Petition.  (Pet. at 12.)

[4] The Court adopts the definition of Nursing Unit contained in the Petition.  (Pet. at 13.)