UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

KAREN P. FERNBACH, Regional Director,
Region 2, National Labor Relations Board,
For and on Behalf of the NATIONAL
LABOR RELATIONS BOARD,

|  |  |
|---|---|
| Petitioner, | Index No: |
| -against- | No. 14-cv-9859 (RJS) |

SPRAIN BROOK MANOR REHAB, LLC;
BUDGET SERVICES, INC.; PINNACLE
DIETARY INC.; AND LOCAL 713, INTER-
NATIONAL BROTHERHOOD OF TRADE
UNIONS (IBOTU),

DECLARATION OF
WILLIAM S. MASSEY IN
OPPOSITION TO MOTION
FOR RECONSIDERATION

Respondents.

----------------------------------------------------------------x

William S. Massey, under penalty of perjury, hereby declares that the following statements are true and correct:

1.     I am a member of the firm Gladstein, Reif & Meginniss, LLP and am counsel to *amicus curiae* 1199 SEIU Healthcare Workers East ("1199 SEIU" or "the Union"), the charging party in the underlying unfair labor practice proceeding before the National Labor Relations Board ("the Board" or "Petitioner"). I have represented the Union and its bargaining unit at Sprain Brook Manor since 2005, and have extensive knowledge of the issues currently before the Court. I make this declaration in support of the Board's opposition to Respondent Sprain Brook Manor Rehab, LLC's ("Sprain Brook" or "Respondent") motion for reconsideration.

2.     In its March 9, 2015 Order, this Court found reasonable cause to believe that Respondents "have engaged in serious and pervasive unfair labor practices" in violation of the National Labor Relations Act. The Court granted the Board's request for 10(j) injunctive relief, and ordered, *inter alia*, that Sprain Brook, "[u]pon request of 1199 SEIU, restore any and all of

1

the Unit employees' terms and conditions of employment as they existed for those positions on September 12, 2012". See 10(j) Order at 14. The Union made such a request by letter dated March 13, 2015 (attached hereto as Exh. A), identifying various categories for which it sought restoration of the terms and conditions of employment, including, but not limited to, wage rates, paid time off, and uniform and meal allowances. In particular, the Union also specifically requested that Sprain Brook reinstate the health insurance plan that was effective on September 12, 2012, or to the extent that this plan was no longer available, "immediately make available to bargaining unit employees a health insurance plan of comparable or more favorable terms and conditions, to be negotiated with the Union." The Union noted that its request to restore terms and conditions "is limited to the extent that such terms and conditions are more favorable to said employees than those employees' present terms and conditions." The Union also requested that Sprain Brook meet to bargain both over the proposed restorations, and for a collective bargaining agreement, and proposed two specific dates for bargaining, on March 25th and March 30th. (*See* Exh. A.)

3.      In addition, after Sprain Brook's counsel informed me that he was unavailable to bargain during the week of March 25th, I reminded him that the Union had also offered to bargain on March 30th. I also made it clear that the Union was available in the interim to bargain over the specific and urgent issue of health insurance, and that he could contact Gregory Speller, the Union's Vice President and lead negotiator, or myself by phone for that purpose at any time. (See March 24, 2015 email from William S. Massey to Jeffery A. Meyer, annexed as Exh. B.)

4.      Sprain Brook now contends, in the March 20, 2015 Declaration of Jeffery Meyer ("Meyer Decl."), that if it complied with the Union's request with respect to health insurance, it

would put Unit employees at risk of losing coverage, and that therefore, it is necessary for Sprain Brook to continue providing coverage under the Local 713, International Brotherhood of Trade Unions ("Local 713") plan. Meyer Decl. at ¶¶ 8-13. Sprain Brook also claims that if the Union requests that Sprain Brook restore terms and conditions of employment as they existed on September 12, 2012, employees in the nursing department should not be permitted to maintain two modest pay raises of twenty-five cents each that they received over approximately the last two years. As is explained in more detail below, Sprain Brook's factual allegations in support of its contentions with respect to health insurance coverage are unsupported and inaccurate. Moreover, as is explained in Petitioner's Brief, the Union may elect to maintain the modest pay raises received by nursing employees, even as it requests that other terms and conditions of employment be restored. The overwhelming majority of Respondents' unilateral changes to the terms and conditions of employment substantially worsened conditions for Unit employees and damaged the Union's standing. The nursing department employees should not lose their modest raises, thereby rewarding Sprain Brook as a consequence of its own wrongdoing.

**A. Sprain Brook Must Reinstate the Previous Health Insurance Plan, or a Comparable or More Favorable Plan, To Be Negotiated With the Union**

5.     Prior to Sprain Brook's unlawful subcontracting on September 12, 2012, Unit employees received health insurance though their employer under a plan from United Healthcare Oxford ("the Oxford Plan"). Shortly after the unlawful subcontracting, some Unit employees received, through their employer, health insurance under the Summit Care Plan, a plan offered pursuant to Respondents' collective bargaining agreements with Local 713 ("the Local 713 Plan"). Based on the Union's communications with its members, I am aware that the Local 713 Plan offers far inferior coverage to that previously offered under the Oxford Plan. For example, the Local 713 Plan is a single coverage, member-only plan, whereas the Oxford Plan covered

dependents. The Local 713 Plan has waiting periods that the Oxford Plan did not, such as six and twelve month waiting periods, respectively, for prescription drug coverage and coverage for pre-existing conditions. The Local 713 Plan has a maximum annual benefit of $7,500, with no maximum out-of-pocket expenses, whereas the Oxford Plan did not have a maximum annual benefit, and capped out-of-pocket expenses. The Local 713 Plan also costs more for members to visit the emergency room or obtain prescription drugs. Based on these differences, the Union exercised its right under the Court's Order to request that the prior plan be restored, or if it was unavailable, that comparable or more favorable health insurance be made available, subject to negotiation with the Union. As noted, the Union has made itself available to bargain over this insurance. (*See* Exhs. A and B.)

6.      In claiming that it cannot comply with this request, and must continue to provide the inferior insurance offered through the Local 713 Plan, Sprain Brook asserts that reinstating the prior insurance coverage, or implementing new coverage, would jeopardize continuing coverage for Unit employees. In fact, Meyer states that counsel for Local 713's Fund has informed him that "the members [of 1199 SEIU] formerly covered by the collective bargaining unit [with Local 713] no longer have medical coverage." Meyer Decl. at ¶¶ 8-9. He adds that "given the reality of waiting periods and other similar issues . . . Sprain Brook would be unable to enroll its bargaining unit employees into any comparable health insurance plan for a minimum of 90 days," and that members would be deprived of health insurance during this interim period. *Id.*

7.      These allegations are simply untrue. To date, according to the Union's best knowledge, and recent conversations with Unit employees, no Unit employee has received any notice of discontinuance with respect to health insurance coverage. This makes sense, because

4

on information and belief, Unit employees' premiums have been paid on a monthly basis, and members' health insurance premiums currently have been paid through the month of March. Sprain Brook's claim that it would take a minimum of 90 days to commence coverage under a new plan is also unsupported and inaccurate. The Union has proposed, for example, that the Greater New York Benefit Fund (1199 SEIU's Taft-Hartley Fund for nursing home employees) provide insurance coverage to Unit employees. If Sprain Brook agrees to provide coverage under this plan, and makes the necessary premium payments, the Union confirms that coverage can commence by April 1, 2015. By agreeing to this plan, Sprain Brook would comply with the 10(j) Order, and Unit members would receive insurance coverage comparable to or better than that in effect on September 12, 2012. The Union and its counsel remain available to bargain in person or by phone over the terms of health insurance. Thus far, Sprain Brook has declined to bargain with the Union over restoration of adequate health insurance. To be clear, 1199 does not want to see its members suffer any lapse in health coverage, and remains willing and available to negotiate with Sprain Brook over the immediate provision of alternate health benefits.

8.      Sprain Brook's effort to characterize its refusal to comply with this Court's remedial order as concern for Unit members is belied by the inadequacy of the insurance it offers under the Local 713 plan. As noted *supra* at ¶ 5, the Local 713 Plan is demonstrably inferior to that which Unit members enjoyed on September 12, 2012. Sprain Brook's further assertion that it "may not obtain . . . substitute coverage unless and until it has reached agreement regarding same with 1199" would effectively strip the 10(j) Order of its remedial function. As explained in Petitioner's Brief, the Order requires Sprain Brook to bargain with 1199 SEIU, including regarding the immediate provision of replacement insurance coverage. Sprain Brook could

simply delay bargaining or refuse to agree to any alternative health plan, thus ensuring that Unit employees are indefinitely limited to receiving substandard coverage from the Local 713 Plan. Any such delay would also have a profoundly damaging impact on 1199 SEIU's standing as the Unit members' duly elected bargaining agent. In my experience as counsel to a number of labor unions, employees rightly view the provision of health insurance as one of the most important functions of their union, and will continue to associate Local 713 with this function for so long as its Taft-Hartley Fund provides the coverage. As the Board pointed out in its opening brief, one of the most important purposes of the 10(j) Order is to remove Local 713 during the pendency of the administrative action, and permit 1199 SEIU to resume its role, and regain its standing, as the bargaining units' representative.

### B. Sprain Brook's Unlawful Unilateral Changes Overwhelmingly Harmed the Unit Members and 1199 SEIU

9. Following the September 12, 2012 change in ownership, by virtue of the subcontracting, Sprain Brook imposed a series of unilateral changes to the terms and conditions of employment in its role as joint employer. All of these changes collectively harmed Unit employees and the Union, and most of which, individually, substantially worsened the terms and conditions of employment. Each of these unilateral changes, some of which took effect immediately, and others of which occurred shortly after the subcontracting, was a discrete violation of labor law. The Board identified a number of these unilateral changes in its opening brief. *See* Petitioner's Br. at 16-17. For example, as a result of illegally subcontracting unit work, housekeeping workers experienced a decrease in salary from as high as $16 per hour to $10 per hour, and saw paid vacation, sick days and other benefits substantially reduced; dietary workers experienced a decrease in salary from as high as $14.75 per hour to $10 per hour and saw their health insurance, paid sick days, vacation days, holidays and other benefits

6

substantially reduced. Nursing department workers experienced similar reductions to paid time off, but did not have their salary reduced. Workers in this one department, upon information and belief, have received two modest pay raise of 25 cents each over approximately the last two years. In addition, all Unit employees have lost uniform and meal allowances, and their health insurance opt-out payments were substantially reduced. And of course, all employees who receive insurance coverage have experienced a reduction in health insurance benefits as a consequence of having their prior insurance replaced by the Local 713 Plan. *See* ¶ 5

10.    Sprain Brook now contends that in order for the Union to request Sprain Brook's compliance with this Court's remedial order, it must request, also, that Sprain Brook eliminate the one minor favorable benefit that Respondents afforded to employees in the nursing department, in the form of the two 25-cent pay raises. But as is explained in Petitioner's Brief, this is not the law. "[T]he normal remedy for [] unlawful [unilateral] changes . . . would be to restore the status quo ante, but to give the union the choice to retain any changes deemed beneficial." *Fresno Bee*, 339 N.L.R.B. 1214, 1217 n.6 (2003). Thus, where "some of Respondent's unilateral changes may be perceived as beneficial to employees, [the Board] will order the rescission of these changes only at the request of the Union." *Id.* Based on my experience, this rule is understandable. If the Employer could rescind a beneficial change or reduce a benefit at precisely the moment that a Union obtains remedial 10(j) relief, the employees might perceive the Union's victory to be hollow, and the wrongdoing employer would derive a benefit as a consequence of the 10(j) remedy. Moreover, if an employer could rescind beneficial changes in response to a 10(j) order, the entire purpose of the remedial relief would be undermined, as employers could effectively immunize themselves from being

subjected to remedial 10(j) relief by simply offering a modest benefit to a segment of its workforce.

11.     It is also important to emphasize that even though nursing department employees experienced two modest pay raises since September 12, 2012, this does not mean that terms and conditions are not worse than they were on that date, or that these workers have not suffered as a result of Sprain Brook's refusal to bargain with their duly elected Union.  While the Union chooses to retain this beneficial change, had the Union been able to bargain for workers in this department, the Union would have taken the position that those employees should have received higher wage increases and no reduction in other benefits, and thus the employees might well have received an even more favorable pay increase, and avoided the reduction of their other benefits.

12.     Finally, Sprain Brook suggests that because neither it, nor its predecessor, reached agreement with 1199 SEIU regarding the few more favorable terms and conditions afforded some employees, it should not be bound by them.  But the Court found that Sprain Brook is a joint employer with Budget and Pinnacle, and therefore, Sprain Brook is jointly responsible for imposing these changes.  *See* March 9, 2015 Order at 7.

Executed on this 26th day of March, 2015.

_____
William S. Massey

8